UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates to All Actions*

14-MD-2543 (JMF)

Hon. Jesse M. Furman

-----------------------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF GENERAL MOTORS LLC'S
OMNIBUS MOTION TO EXCLUDE EXPERT OPINIONS
UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702**

Richard C. Godfrey, P.C.
Andrew B. Bloomer, P.C.
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
Phone: 312-862-2000
Fax: 312-862-2200
richard.godfrey@kirkland.com
andrew.bloomer@kirkland.com

***Attorneys for Defendant
General Motors LLC***

Date: December 4, 2015

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................5

    A.       Plaintiff's Pre-Existing Medical Conditions. .......................................................5

    B.       Plaintiff's Allegations. .........................................................................................5

    C.       Plaintiff's Experts' Opinions. ..............................................................................6

            1.       Christopher Caruso .................................................................................6

            2.       Robert Cox ..............................................................................................7

            3.       Steven Loudon ........................................................................................7

            4.       David Macpherson ..................................................................................8

            5.       Michael Markushewski .........................................................................8

            6.       Michael McCort .....................................................................................9

            7.       Glen Stevick ...........................................................................................9

LEGAL STANDARDS ..................................................................................................10

    A.       Federal Rule Of Evidence 702 And *Daubert*. ..................................................10

    B.       The Interplay Between Rule 702 And Summary Judgment. ...............................12

ARGUMENT AND AUTHORITIES ............................................................................13

I.       Ignition-Switch-Rotation Opinions Should Be Excluded. ...................................13

    A.       There Is No Reliable Data Showing That Inadvertent Switch Rotation Can Occur Where All Items Were Removed From The Key Ring. .............................13

    B.       Opinions That The Ignition Switch Rotated In This Accident Are Based On Unreliable Speculation. ................................................................................15

            1.       The Rotation Opinions Are Predicated On The Unsupported Assumption That The Airbags Should Have Deployed. .........................15

            2.       Plaintiff's Expert Admits That He Can Only Speculate That The Ignition Switch Rotated In This Accident. ...............................18

C.      Stevick's Knee-Off Theory Has No Relevance To Plaintiff's Accident And Is Predicated On Speculative Possibilities, Not Probabilities....................20

II.      Medical-Causation Opinions Should Be Excluded.............................................23

A.      Opinions Regarding Any Injuries That Are Not Claimed To Be Caused By Airbag Non-Deployment Are Irrelevant................................................23

B.      Plaintiff's Experts' Medical Causation Opinions Are Inadmissible Because The Experts Are Not Qualified To Render Them And Their Conclusions Are Not Based On A Reliable Methodology. ...............................24

1.      Markushewski's Medical Causation Opinions Are Inadmissible............. 24

2.      Caruso's Medical Causation Opinions Are Inadmissible. ........................ 29

C.      The Failure To Meaningfully Address Alternative Causes Of Plaintiff's Alleged Injuries Requires Exclusion. ....................................................31

III.      Airbag Prolongation Opinions Should Be excluded.........................................31

IV.      State-Of-Mind Opinions Should be excluded.....................................................34

A.      Loudon's Opinions Regarding New GM's Knowledge And State-of-Mind.........34

B.      Markushewski's Opinions Regarding The "Ordinary Consumer." ......................36

V.      Rehabilitation And Vocational Opinions Should Be Excluded.........................................36

A.      The Court Should Exclude Cox's Vocational Opinions. ......................................36

1.      Cox Fails to Use A Reliable, Generally Accepted Methodology. ............ 36

2.      Cox's Opinions Are Based on Medical Assumptions He is Not Qualified to Make. ................................................................ 38

3.      Cox Admittedly Speculates that Plaintiff Might Have to Retire Early.................................................................... 39

B.      The Court Should Exclude Macpherson's Opinions On Future Wage Losses Because They Rely On Cox's Unsupported And Inadmissible Opinions......................................................................40

CONCLUSION..........................................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*523 IP LLC v. CureMD.Com,*
    48 F. Supp. 3d 600 (S.D.N.Y. 2014) ............................................................................11, 28

*In re Air Disaster at Lockerbie Scotland,*
    37 F.3d 804 (2d Cir. 1994) ...............................................................................................28

*Alves v. Mazda Motor of Am., Inc.,*
    448 F. Supp. 2d 285 (D. Mass. 2006) ..............................................................................12

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002) ...............................................................................10, 12, 17

*Beastie Boys v. Monster Energy Co.,*
    983 F. Supp. 2d 369 (S.D.N.Y. 2014) ..............................................................................13

*Bee v. Novartis Pharms. Corp.,*
    18 F. Supp. 3d 268  (E.D.N.Y. 2014) ........................................................................ *passim*

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) .............................................................................................19, 39

*Bourelle v. Crown Equip. Corp.,*
    220 F.3d 532 (7th Cir. 2000) ............................................................................................33

*Bridgeway Corp. v. Citibank,*
    201 F.3d 134 (2d Cir. 2000) .............................................................................................19

*Britt v. Chrysler Corp.,*
    699 So.2d 179 (Ala. 1997) ...............................................................................................12

*Brooks v. Outboard Marine Corp.,*
    234 F.3d 89 (2d Cir. 2000) ...........................................................................................22, 33

*Brown v. Burlington N. Santa Fe Ry. Co.,*
    765 F.3d 765 (7th Cir. 2014) ............................................................................................37

*Caboni v. Gen. Motors Corp.,*
    398 F.3d 357 (5th Cir. 2005) ............................................................................................12

*Cacciola v. Selco Balers, Inc.,*
    127 F. Supp. 2d 175 (E.D.N.Y. 2001) ..............................................................................11

*Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P.*,
    823 F. Supp. 2d 334 (D. Md. 2011) ...................................................................18, 23

*Caudill v. Toyota Motor Corp.*,
    2005 WL 3149311 (E.D. Ky. Nov. 23, 2005) ...........................................................12

*Clarke v. Travco Ins. Co.*,
    2015 WL 4739978 (S.D.N.Y. Aug. 7, 2015) .............................................................15

*Colon v. Abbott Labs.*,
    397 F.Supp.2d 405 (E.D.N.Y. 2005) ........................................................................19

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ........................................................................18, 23, 31

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .............................................................................................. *passim*

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013) .................................................................11, 28

*Dibella v. Hopkins*,
    403 F.3d 102 (2d Cir. 2005) .....................................................................................17

*In re Dow Corning Corp.*,
    2015 WL 5737997 (E.D. Mich. Sept. 30, 2015) ................................................25, 27

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
    367 F. Supp. 2d 413 (W.D.N.Y. 2005) ....................................................................12

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) .........................................................................................11, 21, 30

*Higginbotham v. KCS Int'l, Inc.*,
    85 Fed. App'x 911 (4th Cir. 2004) ..............................................................17, 23, 31

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .............................................................................................10, 37

*Luitpold Pharma., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
    2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ..........................................................40

*Lynch v. Trek Bicycle Corp.*,
    374 Fed. App'x 204 (2d Cir. 2010)...........................................................................28

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)......................................................................................19

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)...................................................................................28

*Miller v. City of New London*,
   2015 WL 2179773 (D. Conn. May 8, 2015)........................................................................13

*Munn v. Hotchkiss Sch.*,
   24 F. Supp. 3d 155 (D. Conn. 2014)....................................................................................28

*Niemeyer v. Ford Motor Co.*,
   2012 WL 3277273 (D. Nev. Aug. 9, 2012) ...........................................................................6

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)................................................................................................35

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
   164 F.3d 736 (2d Cir. 1998)................................................................................................17

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)..................................................................................................10

*R.F.M.A.S., Inc. v. So*,
   748 F. Supp. 2d 244. (S.D.N.Y. 2010)....................................................................... *passim*

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004)................................................................................19

*Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ..........................................................................................11

*Riegel v. Medtronic, Inc.*,
   451 F.3d 104 (2d Cir. 2006)................................................................................................13

*Sanders v. Fireline, Inc.*,
   295 F. App'x 373 (2d Cir. 2008) ........................................................................................33

*Scheuer v. Gen. Motors LLC*,
   1:14-cv-08176 (S.D.N.Y. Nov. 17, 2015) (Docket No. 192) ("3d Am.
   Compl.")....................................................................................................................5, 23, 36

*Tamraz v. Lincoln Elec. Co.*,
   620 F. 3d (6th Cir. 2010) ....................................................................................................11

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and
   Prods. Liab. Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) .......................................................................4, 7, 35

*Valente v. Textron, Inc.*,
   559 Fed. App'x 11 (2d Cir. 2014) ..........................................................13

*Watkins v. Telsmith, Inc.*,
   121 F.3d 984 (5th Cir. 1997) ................................................................33

*White v. Nissan Motor Corp.*,
   1999 WL 819566 (Mass. Super. Ct. Aug. 23, 1999) ..............................12

*Wood v. Toyota Motor Corp.*,
   760 A.2d 315 (Md. App. 2000)...............................................................12

*Zaremba v. Gen. Motors Corp.*,
   360 F.3d 355 (2d Cir. 2004)....................................................17, 33, 34

*Zenith Electronics Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) ...........................................................37, 39

**Rules**

Federal Rule of Evidence 702 ................................................................ *passim*

**Other Authorities**

Deutsch, Paul M. and Sawyer, Horace Witt, *A Guide to Rehabilitation*, 1998 ............................36

Rubin, Stanford E. and Roessler, Richard T., *Foundations of the Vocational
   Rehabilitation Process*, 6th Ed. ...........................................................36

Van de Bittner *et al.*, "Comparison of a Consensus Methodology for Evaluating
   Employability and Earning Capacity by the CA-IARP DFEC Work Group
   with Published, Peer-Reviewed Methodologies" Vol 20, No. 2, 2012.....................37

# INTRODUCTION[1]

Plaintiff Robert Scheuer seeks to hold New GM liable for injuries allegedly arising from a May 28, 2014 accident.  Plaintiff specifically contends that a defect caused the ignition switch in his Saturn Ion to rotate out of the "run" position, and caused his driver front airbag not to deploy.  As detailed in New GM's accompanying summary judgment briefing, however, plaintiff's claims fail as a matter of law because the undisputed facts confirm that there is no genuine issue of fact as to at least two indispensable causation elements of his claims—namely that (i) a defective ignition switch caused plaintiff's accident or airbag non-deployment; and (ii) airbag deployment would have prevented or reduced plaintiff's alleged injuries.  In addition, this *Daubert* motion demonstrates that judgment should be entered in New GM's favor for an additional, independent reason: plaintiff's proffered expert opinions on causation (among other issues) are inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.

As discussed below, plaintiff's experts' opinions on dispositive causation issues, as well as several additional topics, are inadmissible because they are not based on "sufficient facts or data," that are "the product of reliable principles and methods" and have been "reliably applied . . . to the facts of the case."  *See* Fed. R. Evid. 702.  The opinions are instead premised solely on "subjective belief or unsupported speculation," and must be excluded.  *Daubert*, 509 U.S. at 590. In many instances, the opinion testimony is also separately inadmissible because the experts are

---

[1]    New GM fully stands by the Deferred Prosecution Agreement it entered into with the United States Attorney for the Southern District of New York, dated September 16, 2015, and the Statement of Facts associated with that Agreement.  Nothing in this filing is intended to contradict the Statement of Facts or New GM's representations in the DPA.

not "qualified . . . by knowledge, skill, experience, training, or education" to offer them. Fed. R. Evid. 702.

The inadmissible opinions of plaintiff's experts are as follows:

● Ignition Switch Rotation Opinions.  Opinions that plaintiff's ignition switch rotated or could have rotated in this case should be excluded on multiple grounds.  *First*, plaintiff's experts have offered no admissible opinions that an ignition switch is prone to inadvertent rotation where plaintiff—who had received at least two ignition-switch recall notices—had removed everything from his key ring ***before*** that accident.  As explained by the Secretary of the United States Department of Transportation, after reviewing extensive post-recall testing, NHTSA concluded these "vehicles are safe to operate" where (as in plaintiff's case) all items were removed from the key ring.  None of plaintiff's experts has identified any reliable testing or data to the contrary. They instead rely on their own *ipse dixit* to conclude that the airbag non-deployment must have been caused by an ignition switch defect.  Such unsupported opinions do not pass muster under *Daubert* and Rule 702.

*Second*, to the extent plaintiff proffers any opinion testimony at all regarding key rotation in this case, his experts have candidly admitted that either they have not studied this specific incident or they can only "speculate" that the switch "could" have rotated, and concede they are "not going to be able to tell the jury one way or another on that."  The experts' speculation as to the possibility that the switch could have rotated is unreliable, unhelpful, and thus inadmissible.

*Third*, plaintiff cannot bridge the "analytical gap" between airbag non-deployment and an ignition switch rotation claim by invoking a "knee off" theory.  This theory is incompatible with plaintiff's own testimony that he does not recall "any part of [his] body striking anything inside

the car."[2]  Moreover, admittedly speculative remarks that plaintiff's knee **could** have contacted the switch and therefore **could** have caused a rotation here are not based on the requisite "good grounds," *Daubert*, 509 U.S. at 590, but rather are pure conjecture predicated on unreliable and untested theories and possibilities.

- <u>Medical Causation Opinions</u>.  Plaintiff fares no better with respect to requisite expert opinions on medical causation.  *First*, plaintiff and his experts admit that a defective ignition did not cause or contribute to the accident itself; "there was nothing about the vehicle that caused [plaintiff] to leave the roadway."  Accordingly, expert opinions regarding injuries purportedly caused by the accident itself are inadmissible because they would not "assist the trier of fact . . . to determine a fact in issue," and thus do not meet Rule 702 and *Daubert*'s relevancy requirement.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

*Second*, expert testimony concerning whether plaintiff's injuries were caused or exacerbated by airbag non-deployment should be excluded because the only "experts" who opine on this issue are neither medical doctors nor otherwise qualified to render medical causation or biomechanics opinions.  In addition, these causation opinions are inadmissible because they are not based on reliable data or grounded in any discernable methodology.

*Third*, plaintiff's medical causation testimony should be excluded because none of his experts has attempted to rule out the "obvious alternative cause" for his neck and back pain that he now attributes to this accident—namely plaintiff's longstanding history of neck and back pain dating back to an industrial accident 25 years earlier.

- <u>Airbag Prolongation Opinions</u>.  Plaintiff proffers two experts to opine that New GM should have instituted software that would have prolonged extensively the time that airbags

---

[2]    Ex. 1, R. Scheuer Dep. at 128.

could deploy even after a power loss, and that the failure to use such software is a vehicle defect. Plaintiff's attempt to introduce this new "defect" theory through his experts should be rejected.

*First*, such opinions are based on no reliable testing, methodology, or independent investigation, but are instead premised entirely on speculation about the meaning of company documents that included suggestions or considerations of a prolonged deployment time-span as a means to enhance future designs.

*Second*, there is no evidence that there was any ignition switch rotation or other loss of power that caused airbag non-deployment in plaintiff's accident—or even that an airbag should have deployed in this accident. Accordingly, opinions regarding an extension of deployment capabilities in the event of a power loss are wholly irrelevant, would not assist the trier of fact, and should be excluded.

● State-of-Mind Opinions. Plaintiff's experts have also offered a number of opinions concerning New GM's state of mind and knowledge regarding the ignition switch defect. These opinions should be excluded at the outset because they are not helpful to the trier of fact because "[a]ny juror could have employed common sense to perform the same analysis." *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269. (S.D.N.Y. 2010). Tellingly, the *Toyota* MDL court excluded similar opinions proffered by one of plaintiff's experts here, Stephen Loudon, on these grounds, holding that a party's "knowledge" and "understanding" was "not a proper subject for expert testimony." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1087 (C.D. Cal. 2013). Plaintiff's experts' state-of-mind opinions are also inadmissible for other reasons, including lack of qualifications and failure to employ a reliable methodology.

- <u>Vocational And Rehabilitation Opinions.</u>  Finally, plaintiff's expert opinions regarding plaintiff's lost earnings and other vocational issues are likewise inadmissible.  The opinions are not grounded in any reliable methodology and are speculative.

## BACKGROUND

### A.      Plaintiff's Pre-Existing Medical Conditions.

Plaintiff Robert Scheuer claims his back and neck injuries were caused by an ignition switch defect that caused his airbag not to deploy during a May 28, 2014 accident.[3]  Plaintiff, however, had a lengthy history of pre-existing medical conditions well before the accident at issue here, including a number of back and neck ailments dating back to a 1988 industrial accident more than *25 years earlier*.  Plaintiff underwent multiple surgeries following that accident, and was diagnosed with "cervical degenerative disc disease" and had "cervical disc displacement" in or before 2007.[4]

### B.      Plaintiff's Allegations.

Plaintiff's claims are based on the May 28, 2014 car crash involving the subject vehicle.[7]  Critically, by the time of this accident, plaintiff had received at least two notices from New GM

---

[3]    Third Amended Complaint at ¶¶ 24–30, *Scheuer v. Gen. Motors LLC*, 1:14-cv-08176 (S.D.N.Y. Nov. 17, 2015) (Docket No. 192) ("3d Am. Compl.").

[4]    Ex. 29, Cox 9/14/15 Dep. at 202–203.

[5]    Ex. 30, 3/27/07 Med. Rec.

[6]    *Id.*; Ex. 1, R. Scheuer Dep. at 77–78.

[7]    3d Am. Compl. at ¶¶ 1, 22.

regarding the ignition switch recall,[8] and had removed all items from his key ring, aside from the ignition key.[9]

Plaintiff alleges he was driving the subject vehicle on Highway 48 in Bristow, Oklahoma, when another vehicle swerved toward his vehicle, causing it to leave the road and hit a tree.[10] Plaintiff claims the ignition switch inadvertently rotated from the "run" position to the "accessory" or "off" position, which "interfered with the engine power, power steering and/or power braking functions."[11]  Plaintiff further alleges that the power loss resulted in the crash and the front airbag non-deployment, thereby causing his alleged injuries.[12]

    **C.**    **Plaintiff's Experts' Opinions.**

        **1.**    **Christopher Caruso**

Plaintiff has proffered Caruso, a retained airbag sensor expert, to offer opinions that an ignition switch defect caused non-deployment of plaintiff's airbag and seatbelt pretensioner.[13] Caruso also offered opinions on injury causation and biomechanics issues—despite the fact that he is not qualified to to opine on whether airbag deployment could have prevented or reduced plaintiff's alleged injuries.[14]  For example, Caruso opines that plaintiff's injuries would have been prevented had the airbag deployed.  He does so primarily based on his "experience," and reliance on other experts, rather than an objective basis.  Importantly, he has tried this before, as another federal court recently granted a motion *in limine* to limit Caruso's opinion testimony under similar circumstances, finding that his estimates lacked an "objective basis," and instead

---

[8]    Ex. 1, R. Scheuer Dep. at 116–117.

[9]    *Id.* at 115.

[10]    3rd Am. Compl. at ¶¶ 12, 24.

[11]    *Id.* at ¶ 27.

[12]    *Id.* at ¶¶ 23–28.

[13]    *See generally*, Ex. 21, Caruso Expert Rpt.

[14]    Ex. 16, Caruso Dep. at 117–18.

relied "solely on his experience."  *See Niemeyer v. Ford Motor Co.,* 2012 WL 3277273, at *4 (D. Nev. Aug. 9, 2012).   Caruso's expert report also includes several opinions accident-reconstruction issues.  Because he testified that he will not be offering such opinions at trial, however, New GM does not address those opinions (which would also be inadmissible) here.[15]

### 2.   Robert Cox

Cox is a vocational expert who opines that plaintiff has lost earning capacity since the accident for two reasons: (i) he has a diminished capacity for overtime, and (ii) he may need to retire five years early.  Cox opines that plaintiff "is not able to work overtime hours at this time," that it is unlikely he will be able to work overtime in the future, and that his inability to work overtime will result in lost earnings between $20,000 and $25,000 per year.[16]   Cox also speculates that Mr. Scheuer's medical conditions "***may*** lead him to take an early medical retirement" and that "*[i]f* Mr. Scheuer has to take early medical retirement five years before regular retirement his expected wage loss would be $296,633.00."[17]

### 3.   Steven Loudon

Loudon is offered as an expert on the effect of the ignition switch defect on vehicle control systems generally in GM Vehicles.[18]   Loudon offers several opinions that are the subject of this motion, including: (i) that a vehicle is defective if it does not use prolongation software that would allow the Sensing Diagnostic Module ("SDM") (which controls airbag deployment) to remain powered for at least 9.11 seconds in the event of primary power loss; and (ii) that New

---

[15]   *Id*. at 122–123.

[16]   Ex. 31, Cox 7/29/15 Expert Rpt. at 5.  Cox revised his calculation of lost overtime in his supplemental and rebuttal reports.

[17]   *Id.*

[18]   *See* Ex. 32, 7/29/15 Loudon Expert Rpt.

GM understood the problem with the ignition switch but "chose to do nothing to correct it."[19] Other federal courts have excluded Loudon's similar opinions in other cases.  *See In re Toyota*, 978 F. Supp. 2d at 1087.

### 4.    David Macpherson

Macpherson is an economics and damages expert who relies on the overtime earnings estimate provided by plaintiff's vocational expert (Cox) to calculate the present value of lifelong damages ostensibly attributable to the accident.[20]   Macpherson's latest opinion is that plaintiff will suffer "a present value of a compensation loss of $248,979 to $638,409," which he bases on expected decreases in expected overtime earnings, and anticipated early retirement.[21]

### 5.    Michael Markushewski

Markushewski offers opinions on the plaintiff's car's crashworthiness, purporting "to evaluate the design and performance of the occupant crash protection system."[22]   He concludes that the car "sustained a catastrophic loss of power prior to the loss of control and subsequent tree impact," and, as a result, the airbag and seatbelt pretensioner failed to deploy.[23]   He opines that an ignition switch rotation caused the airbag and seatbelt pretensioner non-deployment, and concludes that "[t]he fact that both the airbag did not deploy and therefore the pretensioner also failed to deploy in this crash contributed to the impact-related injuries Mr. Scheuer sustained."[24] Markushewski also offers opinions regarding "ordinary consumer" expectations, but admits he has not performed *any* analysis of the knowledge available to the ordinary consumer.

---

[19]   *Id*. at 44.

[20]   *See* Exs. 33, 34, 35, Macpherson 7/29/15, 9/8/15, and 11/13/15 Expert Rpts.

[21]   Ex. 34, Macpherson 9/8/15 Expert Rpt. at 8.

[22]   Ex. 36, Markushewski 7/29/15 Expert Rpt. at 2.

[23]   *Id.* at 5.

[24]   *Id.* at 7.

### 6.     Michael McCort

McCort is plaintiff's retained accident reconstruction expert.   He agrees that "it is unlikely that a key off movement occurred to cause the initial road departure of the Saturn,"[25] but opines that "it is likely that a key off movement occurred between the Saturn's road departure and prior to the major ground strike event, causing the safety systems to be disabled and preventing a[n] [airbag] deployment."[26]   McCort admits that he cannot explain how, why, and when the alleged key off movement occurred and merely "speculates" that plaintiff may have "bounced around and his knee hit [the key] or the car just bounced around or whatever."[27] McCort bases his "key off" opinion solely on his conclusion that the airbag should have deployed—a conclusion that McCort admits he lacks the expertise to make—and that a non-deployment here "seems consistent with this known defect, which is that the key turns off and it doesn't deploy."[28]

### 7.     Glen Stevick

Plaintiff has proffered Stevick to offer a variety of generic opinions that are not specific to this accident.   New GM seeks to exclude the following opinions because they do not meet Rule 702 and *Daubert* standards and are inadmissible: (i) that the location of the ignition cylinder in the Chevy Cobalt and Saturn Ion is defective and dangerous; and (ii) that the lack of a ten-second SDM prolongation is a design defect.

---

[25]     Ex. 37, McCort 7/29/15 Expert Rpt. at 7.

[26]     *Id.*

[27]     Ex. 14, McCort 9/14/15 Dep. at 57–58.

[28]     *Id.* at 90.

## LEGAL STANDARDS

### A.   Federal Rule Of Evidence 702 And *Daubert*.

● <u>Expert opinions must be relevant and reliable.</u>  Under Rule 702 and *Daubert*, federal trial courts must serve as "gatekeepers" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert.* 509 U.S. at 589.  *Daubert* "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).[29]  The burden is on the proponent of expert testimony to show by a "preponderance of proof" that the expert satisfies each of the *Daubert* admissibility requirements.  *See Daubert*, 509 U.S. at 592 n.10.

To satisfy the relevancy prong, the expert testimony must "help the trier of fact . . . to determine a fact in issue."  Fed. R. Evid. 702(a).  This consideration of "fit" requires that the expert's opinion be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (citations omitted); *see also id.* at 591–92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

To meet the reliability prong, the proponent of expert testimony must show that it is "based on sufficient facts or data," that it is "the product of reliable principles and methods," and that those methods have been "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  In other words, the expert's opinions must be "derived by the scientific method" and "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590.  The

---

[29]  *See also* Fed. R. Evid. 702, Advisory Committee's Note (2000 Amendment) ("While the terms 'principles' and 'methods' may convey a certain impression when applied to scientific knowledge, they remain relevant when applied to testimony based on technical or other specialized knowledge.").

opinions must also be scientifically reliable—based on "more than subjective belief or unsupported speculation." *Id.*; *see also R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248–49 (S.D.N.Y. 2010). Moreover, under Rule 702 and *Daubert*, "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). Accordingly, courts must scrutinize every step in an expert's opinion. *See Amorgianos*, 303 F.3d at 267.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

- Possibilities or speculation are not admissible. Opinions premised on possibilities, speculation, or hypotheses are insufficient to satisfy the *Daubert* test. *See Daubert*, 509 U.S. at 589–90 ("The subject of an expert's testimony must be scientific knowledge. . . . The word 'knowledge' connotes more than subjective belief or unsupported speculation.") (internal citation omitted); *Cacciola v. Selco Balers, Inc.,* 127 F. Supp. 2d 175, 183 (E.D.N.Y. 2001) (excluding opinion evidence based on "unsubstantiated generalizations, speculative hypotheses and subjective evaluation"); *Tamraz v. Lincoln Elec. Co.*, 620 F. 3d, 665, 670 (6th Cir. 2010) (a "working hypothesis" is not "admissible scientific 'knowledge.'"); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) ("Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles. The courtroom is not the place for scientific guesswork, even of the inspired sort.").

- Credentials are required, but are not enough. Finally, the proponent of expert testimony must demonstrate that the expert offering the opinion is "qualified by . . . knowledge,

skill, experience, training, or education," (Fed. R. Evid. 702) and that his testimony specifically relates to "issues or subject matter within his or her area of expertise." *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."); *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) ("[T]he admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."). Moreover, "[a]n otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques or cannot explain the technical basis for his opinion." *Dreyer v. Ryder Auto. Carrier Grp., Inc.,* 367 F. Supp. 2d 413, 416–17 (W.D.N.Y. 2005).

### B.     The Interplay Between Rule 702 And Summary Judgment.

Plaintiff must provide expert testimony on the complex technical issues—such as airbag deployment, biomechanics and medical causation—that are the heart of this case. *See Caboni v. Gen. Motors Corp.*, 398 F.3d 357, 361 (5th Cir. 2005) (agreeing that "whether or not the failure of the driver's side air bag to deploy 'enhanced' plaintiff's injuries, is not a part of the everyday experience of the consuming public. Thus, jurors would need expert testimony to evaluate this issue.") (citation and quotation omitted); *Alves v. Mazda Motor of Am., Inc.,* 448 F. Supp. 2d 285, 297 (D. Mass. 2006) ("Air bag systems are so complex that a plaintiff must introduce expert testimony to prove a defective design or breach of warranty"); *White v. Nissan Motor Corp.,* 1999 WL 819566, at *3 (Mass. Super. Ct. Aug. 23, 1999) (expert testimony necessary when knowledge of alternate designs not within lay knowledge of jury); *Britt v. Chrysler Corp.,* 699 So.2d 179, 181 (Ala. 1997) (because an "airbag system is comprised of clock spring sensors, diagnostic units, and an airbag/inflator unit," it is "precisely the type of complex and technical commodity that [requires] expert testimony to prove an alleged defect"); *Wood v. Toyota Motor Corp.,* 760 A.2d 315, 318 (Md. App. 2000) (expert required in

air bag deployment and defect cases); *Caudill v. Toyota Motor Corp.,* 2005 WL 3149311, *2 (E.D. Ky. Nov. 23, 2005) ("the deployment or non-deployment of air bags is not a matter within the common knowledge of lay persons").

Accordingly, the exclusion of plaintiff's experts' opinions on these complex issues provides an independent basis to grant summary judgment in New GM's favor. *See Amorgianos*, 303 F.3d at 271 (affirming district court's grant of summary judgment because, without expert evidence, plaintiffs did not have "any admissible evidence in support of their theory of causation."); *Valente v. Textron, Inc.*, 559 Fed. App'x 11, 14 (2d Cir. 2014) (granting summary judgment where expert's testimony was properly excluded under *Daubert* and the record was devoid of any evidence supporting design defect and causation theories).

## ARGUMENT AND AUTHORITIES

### I.     IGNITION-SWITCH-ROTATION OPINIONS SHOULD BE EXCLUDED.

#### A.     There Is No Reliable Data Showing That Inadvertent Switch Rotation Can Occur Where All Items Were Removed From The Key Ring.

The linchpin of plaintiff's case is that he sustained injuries as a result of an inadvertent ignition switch rotation that caused the driver's front airbag's not to deploy.  Plaintiff's experts' rotation opinions should be excluded because they are pure speculation, and there is no reliable data or methodology showing that plaintiff's ignition switch was prone to inadvertent rotation where (as here) all items were removed from the key chain.  *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion."); *see also Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 369, 372 (S.D.N.Y. 2014); *Miller v. City of New London*, 2015 WL 2179773, at *3 (D. Conn. May 8, 2015).  The absence of data on this score requires exclusion of any opinions regarding inadvertent key rotation in this case.

Significantly, in contrast to the absence of data supporting plaintiff's theory, the unrebutted results of extensive testing performed by New GM, which was peer evaluated by an independent automotive research organization (Virginia Tech Transportation Institute) and reviewed by NHTSA shows that there is no inadvertent rotation of ignition switches if there is no additional weight on a key, regardless of the conditions.   Specifically, in 2014, New GM conducted hundreds of tests designed to determine whether and under what condition the ignition switch in recalled vehicles may inadvertently move out of the "run" position to the "accessory" position.[30]   These tests include 80-plus tests conducted with only the production key in the lock cylinder.[31]   The ignition switch never turned from the "run" to the "accessory" position in any of these tests.[32]   This testing confirms undisputed principles of physics:   when only the production key is inserted in the lock cylinder, sufficient torque (twisting force) will not be generated to turn the ignition key from the "run" to "accessory" position due to accelerations experienced even in extreme conditions—this is due to the symmetry of the production key, as there is no unbalanced mass that can react to acceleration from even extreme conditions and create the necessary twisting force on the ignition key.[33]

As the Secretary of the Transportation Department stated on May 6, 2014:  "The NHTSA reviewed GM's testing material and believes the information supports GM's position that the subject vehicles are safe to operate provided that the key that is placed in the ignition cylinder is

---

[30]   Ex. 23, Antonucci Affidavit, ¶ 7.

[31]   *Id.*

[32]   This testing includes severe testing conditions, such as (1) a simulated four inch median at high speed; (2) a high speed railroad crossing; (3) river rocks, potholes, and cobblestones; and (4) a 4 mile road loop with various severe road conditions.  *Id.*

[33]   *Id.*

not attached to a key ring containing other items."[34]   None of plaintiff's experts has offered

opinions to the contrary[35]—let alone explained how such opinions could be squared with these

uncontroverted test results and data, much less with NHTSA's own conclusion.

      **B.**    **Opinions That The Ignition Switch Rotated In This Accident Are Based On Unreliable Speculation.**

    Plaintiff proffers McCort to offer the requisite expert opinions on fundamental issue of

whether there was ignition switch rotation before or during plaintiff's accident.[36]   But McCort

does not provide "good grounds" supporting the rotation here.   Instead he candidly admits that

his opinions regarding whether, when, and why the rotation occurred are based on mere

possibilities and speculation.

        **1.**    **The Rotation Opinions Are Predicated On The Unsupported Assumption That The Airbags Should Have Deployed.**

    McCort bases his rotation theory on his assumption that the airbag should have deployed,

and if it didn't deploy, then that means the ignition switch had rotated.   This circular logic fails at

the outset because it is predicated on McCort's supposition that the airbag should have deployed

---

[34]   Ex. 20, Ltr. from Secretary of the Department of Transportation Anthony R. Foxx; *see also* Ex. 23, Antonucci Affidavit; Ex. 39, Stevenson 10/19/15 Expert Rpt. at 53 (summarizing new GM testing at Milford Proving Ground and concluding that "in no case was there any rotation of a keychain with a weight of less than 0.24 lb.").

[35]   Stevick, who has not evaluated any specific accident, including the Scheuer incident, alludes to purported "complaints of vehicle stalls with a single key used in the ignition."  Ex. 40, Stevick Rebuttal Expert Rpt. at 27. Stevick concedes that these stall complaints lack sufficient data to evaluate whether they relate to inadvertent key rotation, but has neither independently tested nor otherwise verified them.  Ex. 56, Stevick 9/29/15 Dep. at 522–523, 644–645, 667.  He also acknowledges that without data such as "the vehicle make, model, the characteristics of the individual involved and the characteristics of the seating position, it's impossible to draw any conclusions as to whether that incident or test is instructive as it relates to knee-key interaction."  *Id*. at 623.

[36]   While Markushewski opines that an ignition switch rotation caused the airbag and seatbelt pretensioner non-deployment in this case, he admitted that he did not "independently assess[] whether or not the air bag or the pretensioner failed to fire because of ignition switch rotation," nor has he "done any analysis to determine whether or not the ignition switch, in fact, rotated," but instead relies on McCort to provide that assessment.  Ex. 18 Markushewski 9/28/15 Dep. at 309; Ex. 19, Markushewski 9/29/15 Dep. at 474.  Because McCort's assessment is inadmissible, Markushewski's opinions on this issue should also be barred.  *See Clarke v. Travco Ins. Co.*, 2015 WL 4739978, at *6 (S.D.N.Y. Aug. 7, 2015) (expert report is "plainly inadequate in that it does not set forth any foundation upon which [the] expert opinion could rest and it is not sufficiently grounded in reliable facts, but rather rests upon unsupported speculation")**.**

in this accident.[37]  McCort testified that, although he is not an airbag expert,[38] he "would have

thought we'd deploy an airbag" in the impact, "and so that would *suggest* the ignition was off":

> Q.  All right.  That's what I thought you said.  So based on what you've
> just told us, prior to the vehicle becoming airborne, if the ignition switch
> turned off, it was prior to the ground strike when the vehicle became
> airborne?
>
> A.  Yeah. So when you say when – or when I said when it becomes
> airborne, that – it may be within the period in which it is becoming
> airborne.  In other words, as it ramps up over that dirt driveway, that may
> be the jostling that's required or it may be the off-road area prior to that.
>
> What I'm going to tell the jury is my understanding is when these
> cars shut off, with this defect, the airbag doesn't deploy and the impact at
> the ground was about a 24-mile-an-hour Delta-v.  *I would have thought*
> we'd deploy an airbag in that, and so that would *suggest* the ignition was
> off.
>
> Q.  All right.  So to put that in a kind of concise way, you believe the
> airbag should have deployed when the vehicle hit the ground after going
> airborne?
>
> A.  I would say that at 24, 25 miles an hour, I think a minimum of 22 is
> what I said in my report, yeah, I would have expected an airbag
> deployment. *I want to be careful not to enter into airbag expert* and, you
> know where the must-deploy limits are as you talked about earlier.
>
> *But, sure, I mean, it seems like that's an awfully high number to
> have the bag not deploy*.[39]

Although McCort represented that "the specific parameters for a 'must deploy' event are

*beyond the scope* of this [expert] report," he nevertheless "determine[s] that the minimum impact

severity of at least one of the two impacts" in plaintiff's accident "was likely above the threshold

---

[37]    Plaintiff's expert Caruso's report also included opinions regarding deployment thresholds and other accident reconstruction issues.  But at deposition, he conceded that he does not intend to offer any accident reconstruction opinions at trial.  *See* Ex. 16, Caruso 10/1/15 Dep. at 122–123.  He should be precluded from doing so.

[38]    McCort explained that he was not an airbag expert, could not explain what the "must-deploy thresholds are," and did not know the threshold values for airbag deployment in Saturn Ion vehicles.  Ex. 14, McCort 9/14/15 Dep. at 51, 84.

[39]    *Id.* at 56–57 (emphasis added).

observed in most reconstructed crashes to cause a front airbag deployment."[40]   Remarkably, McCort: (i) fails to provide any "thresholds;" (ii) admits he has no idea what the airbag deployment thresholds in plaintiff's vehicle are; and (iii) admits he is not an airbag expert and thus cannot provide expert testimony on that issue.[41]   Instead, McCort can only speculate that, "*I think the ground impact was a pretty big hit and it seems like the airbag should have deployed*. But beyond that, I don't know how the algorithm is going to make that determination."[42] McCort's layman's conclusion is itself inadmissible because it is both rank unscientific speculation and has no basis in any special skills McCort has acquired through education or experience.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) (upholding exclusion of proffered expert who admittedly lacked relevant experience).

McCort should not be permitted to opine that the airbags should have deployed at the time of the initial impact with the ground because he "thinks" that a delta-v[43] of 22 "seems like an awfully high number to have the bag not deploy"[44]—let alone offer a key-rotation opinion based on his utterly unsupported deployment opinions.  His testimony on this issue has no indicia of reliability and is thus inadmissible as a matter of law.  *See Amorgianos*, 303 F.3d at 265; *Dibella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005) (affirming exclusion of expert testimony because report from which the expert proposed to testify made "conclusions, observations, and speculations [that] are not proper testimony from an expert witness"); *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357, 360 (2d Cir. 2004) (affirming exclusion of expert testimony based on unfounded speculation).

---

[40]   Ex. 37, McCort 7/29/15 Expert Rpt. at 7 (emphasis added).

[41]   Ex. 14, McCort 9/14/15 Dep. at 51; 56–57; 84.

[42]   *Id.* at 75 (emphasis added).

[43]   Delta-v means "change in velocity."

[44]   *Id.* at 56–57.

Moreover, McCort did not even consider (let alone meaningfully address) a number of plausible reasons why the airbags did not deploy that have nothing to with the ignition switch or any other defect.  His failure to rule out these alternative causes offers an additional reason for exclusion.  *See Bee v. Novartis Pharms. Corp.*, 18 F. Supp. 3d 268, 306 (E.D.N.Y. 2014) (recognizing that, "while an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant" (quotation omitted)); *see also Higginbotham v. KCS Int'l, Inc.*, 85 Fed. App'x 911, 916 (4th Cir. 2004) (recognizing the critical importance that an expert rule out alternative plausible hypotheses); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) (recognizing that "if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony"); *Casey v. Geek Squad® Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 343–46 (D. Md. 2011) (excluding expert's opinions as unreliable because they were not based on sufficient facts or data, and expert failed to rule out alternative hypotheses).

### 2.  Plaintiff's Expert Admits That He Can Only Speculate That The Ignition Switch Rotated In This Accident.

McCort also admitted that he could not identify precisely how, why, and when the subject vehicle's ignition switch moved out of the run position:

> Q.  Okay.  But as far as how, why, and when it came out of run, if it did, in that window, you can't tell us?
>
> A.  ***That's right***.  I mean, ***we could speculate*** that he bounced around and his knee hit it or the car just bounced around or whatever.  ***I'm not going to be able to tell the jury one way or the other on that***.[45]

---

[45]   *Id.* at 57–58 (emphasis added).

McCort further speculated that "just general accelerations on the car . . . as it's going across the rumble strips maybe a little bit of bumping to the steering column and ignition in that area" may have caused the key off movement, but that he did not know precisely how it occurred.[46]

According to McCort, the fact that the airbag did not deploy "***seems consistent*** with this known defect, which is that the key turns off and it doesn't deploy."[47]   When asked if he determined when and if the ignition switch moved out of run, McCort could only respond that "***if the ignition switch turned the car off***," it must have occurred prior to the first impact with the ground:

> Q.  Have you determined when and if it actually occurred?
>
> A.  I've determined that the airbag didn't deploy and we had a high Delta-v, and so either something else was going on or the ignition switch failed. And it seems to me that if the car is not on, my understanding is the airbag's not going to deploy.
>
> So what I'll tell the jury is that prior to becoming airborne, ***if the ignition switch turned the car off***, that's when it occurred because at the ground strike the air bag didn't deploy.[48]

This testimony confirms that McCort does not know and cannot say whether the ignition switch even was in the "accessory" or "off" position ***at any point*** during the accident.

McCort's admitted uncertainty on this issue requires exclusion.   An expert's testimony may not be based on speculation or conjecture. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (noting that expert testimony should be excluded if it is "speculative or conjectural") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21–22

---

[46]   *Id.* at 92–93. There are a number of inconsistencies between McCort's report and his deposition testimony. For instance, although he indicated in his report that the subject vehicle was airborne for only 25–30 feet, McCort explained in his deposition that he believed it was actually airborne for ***twice*** that distance. *Id.* at 159–163.  McCort further explained that he could not say "with any scientific knowledge" how fast plaintiff was traveling when the other vehicle allegedly attempted to pass him.  *Id.* at 80.

[47]   *Id.* at 90.

[48]   *Id.* at 55 (emphasis added).

(2d Cir. 1996) (concluding district court abused its discretion in admitting testimony that was not "accompanied by a sufficient factual foundation")). "An expert's conclusory opinions are similarly inappropriate." *Major League Baseball Props.*, 542 F.3d at 311 (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000)).   In fact, Rule 702's requirement of "knowledge" precludes the admission of subjective or speculative opinion.   *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004); *see also Colon v. Abbott Labs.*, 397 F.Supp.2d 405 (E.D.N.Y. 2005) (noting that scientific evidence requires "more than subjective belief or unsupported speculation").

### C.   Stevick's Knee-Off Theory Has No Relevance To Plaintiff's Accident And Is Predicated On Speculative Possibilities, Not Probabilities.

Faced with no data or other reliable evidence showing that plaintiff's ignition switch was prone to inadvertent rotation if everything was removed from his key ring—let alone that the switch in fact rotated in this accident—plaintiff offers a generic expert opinion through Stevick that a driver could inadvertently rotate the key of a Cobalt or Ion through knee contact. In particular (and without evaluating plaintiff's accident), Stevick opines that because the ignition cylinder in the Chevy Cobalt and Saturn Ion is located near the driver's knee, a driver could inadvertently hit the key and turn the vehicle off as a general proposition.[49]   But this opinion testimony should be excluded.

*First*, the generic knee-to-key opinions do not "fit" the issues in this case.  Regardless of whether a knee strike even could cause inadvertent rotation, there is absolutely no evidence that plaintiff's knee struck the ignition switch or key here.  To the contrary, plaintiff testified that he he does not recall "any part of [his] body striking anything inside the car."[50]  And, Stevick has

---

[49]   Ex. 15, Stevick 7/29/15 Expert Rpt. at 70–72.

[50]   Ex. 1, R. Scheuer Dep. at 128.

conducted no analysis or evaluation of plaintiff's accident, and concedes that he is offering no specific opinions about plaintiff's case, including whether plaintiff inadvertently rotated the key.[51]

*Second,* Stevick performed no analysis to understand what interior design features or driver body positions may be relevant to inadvertent key rotation due to knee interaction. Instead, he asserts with no meaningful support that the distance between the driver's knee and the key is the only relevant data point for evaluation.[52]  But even assuming distance is a proxy for knee-to-key interaction, Stevick conducted no measurements of the distance between the driver's knee and the key for the Chevy Cobalt and Saturn Ion, rendering his "analysis" incomplete.  Moreover, Stevick has not determined whether knee contact to an otherwise non-defective switch could cause inadvertent rotation:

> Q. Now, with respect to the 15 to 25 Newton centimeters torque specification, have you done any analysis or evaluation to determine whether or not that is sufficient to avoid a knee strike causing an inadvertent key rotation?
>
> A. No.[53]

Stevick conducted *no* testing whatsoever to determine whether a knee strike could actually cause inadvertent rotation to the ignition switch and pose a safety concern. Because there is "too great an analytical gap between the data and the opinion proffered," his testimony regarding knee-to-key distance is inadmissible and should be excluded.  *See Joiner*, 522 U.S. at 146.

*Third*, Stevick also relies on insufficient data to show that the location of the subject ignition cylinder is susceptible to inadvertent rotation due to knee-key interaction.  To support his opinion, Stevick relies on only three pieces of data: (1) a picture of the interior of a Chevy

---

[51]    Ex. 41, Stevick 9/28/15 Dep. at 103–104.

[52]    *Id.* at 140–141.

[53]    *Id.* at 224.

Cobalt and Saturn Ion; (2) untested statements from Ray DeGiorgio that suggest no current ignition switch would be able to resist rotation from a knee strike; and (3) his personal "experience" from once sitting in a Saturn Ion and in a Chevrolet Cobalt.[54]  Yet "facts" such as these lead to the type of "subjective belief [and] unsupported speculation" that is inadmissible under *Daubert* and its progeny.  509 U.S. at 590.

Stevick further testified that he never attempted to measure the dimensions of the interior layout of the Chevy Cobalt or Saturn Ion or compare their layout to other vehicles in the industry.[55]  As the Second Circuit has noted in a similar case, when an expert is opining about the defective nature of a vehicle's layout, testimony is inadmissible when an expert is unaware of the dimensions and relative location of the subject components. *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 92 (2d Cir. 2000) (holding that an expert's testimony was inadmissible when he "was unaware of the dimensions of [a] boat and the placement of the seats in relation to the motor").[56]

* * *

In sum, given their fundamental lack of reliability and relevance, the following opinions of plaintiff's experts should be excluded under *Daubert*:  (i) that ignition switches with items removed from the key ring are prone to inadvertent rotation; (ii) that the ignition switch

---

[54]  *Id.* at 362–363; 514.

[55]  *Id.* at 140–141.

[56]  In contrast, Stevick's recent rebuttal report contends that New GM's knee-to-key interaction expert, James Sprague, did not perform enough testing to reach a conclusion that could be considered "statistically complete."  Ex. 40, Stevick 11/13/15 Rebuttal Rpt. at 18.  But (unlike Stevick) Sprague conducted surrogate testing in a Cobalt and Ion with twelve different people, collecting six data points per person related to knee-key interaction.  *See* Ex. 42, Sprague 10/19/15 Rpt. at 16.  Stevick contends, however, that the seventy-two data points Sprague collected are inadequate to make a conclusion regarding knee-key interactions. *Id.* ("In order to better evaluate the knee-to-key interactions, additional information needs to be considered.").  Incredibly, given Stevick's own rationale, his own reliance on a picture, untested statements from Ray DeGiorgio, and his experience from once sitting in a Saturn Ion and a Chevrolet Cobalt cannot possibly support his broad knee-to-key distance opinion.  *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 268 (S.D.N.Y. 2010) (excluding expert testimony when the "testimony relies on insufficient data").

inadvertently rotated before or during plaintiff's accident; and (iii) that ignition switches in Ions or Cobalts can inadvertently rotate through knee contact.

## II.     MEDICAL-CAUSATION OPINIONS SHOULD BE EXCLUDED.

### A.     Opinions Regarding Any Injuries That Are Not Claimed To Be Caused By Airbag Non-Deployment Are Irrelevant.

As a threshold issue, the scope of potentially admissible opinions regarding injuries or medical conditions is cabined by Rule 702's relevancy requirement.  Plaintiff and his experts concede that an ignition switch defect played no role in causing the accident itself.  To the contrary, plaintiff alleges that "a vehicle tried to pass him, but instead swerved into plaintiff's vehicle, ran him off the road and caused him to hit a tree."[57]  Plaintiff's sworn fact sheet affirmatively states (and thus admits) that his accident was not caused by a "moving stall" or other loss of "engine power."[58]  And plaintiff's accident reconstruction expert, McCort, testified that "there was nothing about the vehicle that caused him to leave the roadway.  It was this phantom Mustang."[59]  Accordingly, any medical issues or injuries allegedly caused only by the accident itself (as opposed to airbag non-deployment) are irrelevant and should be excluded.

Indeed, the failure by plaintiff's experts to distinguish between the issues or injuries caused by the accident versus those caused by airbag non-deployment is sufficient reason in and of itself to exclude their testimony.  The accident itself is an alternative cause of plaintiff's injuries, and failing to account for this alternative cause renders plaintiff's experts' conclusions

---

[57]   3d Am. Compl. ¶ 22.

[58]   Pl. Fact Sheet at 44.

[59]   Plaintiff admitted at deposition that his steering was functioning when he swerved to avoid the other vehicle, indicating that the ignition switch had not inadvertently rotated and that the Vehicle still had power.  *See also* Ex. 1, R. Scheuer Dep. at 121–22 ("Q. Okay. And when you -- when you steered to the right, you -- you did so by turning the steering wheel, obviously? A. Uh-huh. Q. And the vehicle responded as you expected it to? A. To my recollection, yes."); Ex. 1, R. Scheuer Dep. at 180.  Plaintiff's experts have been quick to cite loss of power steering as circumstantial evidence of ignition switch rotation. *See, e.g.*, Ex. 21, Caruso Expert Rpt. at 13; Ex. 36, Markushewski Expert Rpt. at 11; Ex. 37, McCort Rpt. at 6–8.  But plaintiff's own testimony undercuts such circumstantial evidence of ignition switch rotation in this accident.

inadmissible.  *See Bee*, 18 F. Supp. 3d at 306; *Higginbotham.*, 85 Fed. App'x at 916; *Cooper*, 259 F.3d at 202; *Casey*, 823 F. Supp. 2d at 343–46.

B.     **Plaintiff's Experts' Medical Causation Opinions Are Inadmissible Because The Experts Are Not Qualified To Render Them And Their Conclusions Are Not Based On A Reliable Methodology.**

1.     **Markushewski's Medical Causation Opinions Are Inadmissible.**

Plaintiff's crashworthiness expert, Markushewski, improperly attempts to offer an opinion on medical causation.  He concludes that "[t]he fact that both the airbag did not deploy and therefore the pretensioner also failed to deploy in this crash contributed to the impact-related injuries Mr. Scheuer sustained."[60]  He specifically opines that the "[f]ailure of the airbag and pretensioner to deploy permitted excessive excursion of Mr. Scheuer because of the payout from the torsion bar.  This led to impact of his body with the interior structure."[61]  Markushewski's medical causation and related biomechanical opinions should be excluded.

*First*, Markushewski's occupant kinematics opinions are not based on an adequate factual foundation or reliable methodologies.  Markushewski states that plaintiff's body impacted the interior structure of the subject vehicle during the crash sequence, and that plaintiff "sustained back and neck injuries as a result of the crash."[62]  However, Markushewski did not perform any calculations or conduct any analysis of any forces involved in the subject collision and the effect those forces may have had on plaintiff's body.  He did not take any measurements to determine the crush of the vehicle, calculate the delta-v[63] that the subject vehicle experienced during the crash sequence, or perform any other calculations to determine the forces involved in the subject

---

[60]     Ex. 36, Markushewski 7/29/15 Expert Rpt. at 7.

[61]     *Id.* at 11.

[62]     *Id.*

[63]     "Delta-v" means "change in velocity," and is used by accident reconstructionists to indicate the severity of a crash.  Rather than classifying a crash as "mild, moderate, or severe," accident reconstructionists use the numerical delta-v (typically expressed in miles per hour) to indicate the severity of a crash.

crash.[64]  Nor did he perform any calculations to determine what forces would have been at play if the seatbelt pretensioner had deployed, and he conceded that "[t]here's not enough information to determine that."[65]

Markushewski also admitted that neither he nor anyone else could determine whether the firing of the pretensioner would have prevented plaintiff from contacting the interior components of the vehicle:

> Q.   Okay.  As you sit here today, you cannot tell me whether or not in any of these given accidents, the firing of the pretensioner would have prevented the contact with the frontal components that you believe any of the occupants contacted?
>
> ***
>
> A.   I don't think anybody can tell you that.
>
> Q.   I didn't ask you about anybody.  I asked about you.
>
> A.   Including myself.[66]

Because Markushewski did not take any measurements, perform any calculations, or conduct any type of analysis whatsoever of the forces involved in the subject accident and the effect of those forces on plaintiff's body, his opinions regarding the mechanism of plaintiff's particular injuries allegedly sustained in the subject crash are not based on a reliable methodology and should be excluded.  *See In re Dow Corning Corp.*, 2015 WL 5737997, at *5 (E.D. Mich. Sept. 30, 2015) (finding an expert's conclusions unreliable where "his report d[id] not set forth any methodology or any analysis or reasoning").

Additionally, Markushewski cannot identify any evidence to support his opinion that plaintiff's body impacted the interior structure of the vehicle.  Because the subject vehicle is not

---

[64]   Ex. 18, Markushewski 9/28/15 Dep. at 209.

[65]   *Id.* at 186.

[66]   *Id.* at 165.

25

available for inspection, Markushewski cannot say with any reasonable certainty where, if anywhere, Scheuer struck the interior of the vehicle. When asked where plaintiff allegedly made contact with the vehicle, Markushewski responded: "I don't know. With specifics, I don't know."[67] Markushewski admits that the available photographs of the car's interior do not show any evidence of plaintiff making contact with any structure within the vehicle.[68] In fact, Markushewski stated with certainty that plaintiff *did not* strike the steering wheel during the collision: "Well, we know that he didn't strike the steering wheel given that it's not -- not deformed in any way in a crash like this one."[69] And he also admitted that there is nothing in plaintiff's medical records related to bruises, fractures, or other injuries that would indicate his body contacted any interior components of the vehicle.[70]

*Second*, Markushewski is not qualified to render opinions on biomechanics and injury causation, including opinions regarding what injuries, if any, resulted from airbag and seatbelt pretensioner non-deployment, and what injuries airbag and seatbelt pretensioner deployment could have prevented in this accident. In motor-vehicle accidents, "biomechanics" is often used as shorthand for "injury biomechanics," which is the study of forces acting on a biological structure and the injurious effects produced by those forces. "Occupant kinematics," in contrast, involves only an analysis of how a vehicle occupant's body moves relative to the vehicle and the forces involved in a collision; it does not involve an analysis of the injurious effects those forces may have on the occupant. While Markushewski purports to be an expert in the field of occupant kinematics (*i.e.*, how occupants move relative to the vehicle during a collision), in his

---

[67] *Id.* at 310.

[68] *Id.* at 312.

[69] *Id.* at 310.

[70] *Id.* at 313.

report he improperly attempts to offer opinions extending beyond his field of expertise into the field of biomechanics (*i.e.*, the injurious effects that the forces involved in a collision may have on the occupant).  Markushewski admitted, however, that he is not a biomechanic, does not assess injury causation, and does not assess the mechanisms of particular injuries:

> Q.   . . . I think before you have told me you agree you are not a biomechanic from the standpoint you're not a medical doctor; correct?
>
> A.   Correct.  Correct.
>
> Q.   You don't do injury causation --
>
> A.   Correct.
>
> Q.   -- right?
>
>              * * *
>
> Q.   You don't do mechanisms of injury?
>
>              * * *
>
> Q.   Sorry.
>
> A.   I -- correct.
>
> Q.   Correct?
>
> A.   Yeah.[71]

He likewise testified: "I don't talk about how injuries occur in crashes, so to speak.  That's the role of a biomechanic. . . . and I don't believe I'm testifying on it here either."[72]  He went on to specifically state:  "I'm not offering an injury causation opinion here and I don't want to -- want you to think that I am," and confirmed again during his second deposition that he is ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[71]   Ex. 18, Markushewski 9/28/15 Dep. at 92–93.

[72]   *Id.* at 99.

[73]   *Id.* at 112; Ex. 18, Markushewski 9/28/15 Dep. at 206, 238–239, 242, 244 (rough draft).

Given Markushewski's specific admission that he is not an expert in the field of biomechanics, and does not and will not be offering any opinions regarding what force is required to cause a specific type of injury or the mechanisms of the particular injuries plaintiff allegedly sustained in the subject crash, the Court should exclude any and all opinion testimony on these topics.  *See In re Dow Corning Corp.*, 2015 WL 5737997, at *6 (E.D. Mich. Sept. 30, 2015) (finding that a witness could not testify regarding injury causation "[b]ased on his own admission that he is not a medical doctor"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) (finding that a witness was not qualified to provide expert testimony on "the statistical significance of a common choice of colors" where the witness "admitted that he was 'maybe not' an expert in probability theory"); *Lynch v. Trek Bicycle Corp.*, 374 Fed. App'x 204, 206 (2d Cir. 2010) (finding that the district court did not abuse its discretion in excluding a purported expert's testimony when the expert testified that his area of expertise was different from the issues about which he planned to testify); *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014) ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."); *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) ("[T]he admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case.").

In short, any opinions Markushewski may have regarding the mechanism of plaintiff's particular injuries allegedly sustained during the subject crash are unreliable because they are completely devoid of any factual foundation.  The Court should exclude his opinions on these issues.  *See Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 203 (D. Conn. 2014) (noting that the trial court excluded purported expert testimony because it "lacked a sufficient basis in facts or

data"); *In re Air Disaster at Lockerbie Scotland*, 37 F.3d 804, 824 (2d Cir. 1994) (noting that expert testimony that is "speculative and conjectural" should be excluded).

**2.    Caruso's Medical Causation Opinions Are Inadmissible.**

Plaintiff also offers the following biomechanical and medical causation opinions through his airbag sensor expert, Caruso:[74]

- "A properly deployed frontal impact airbag and seatbelt pretensioner would have provided a barrier between Mr. Scheuer and the vehicle interior structures, reducing or mitigating the harmful interior impact and G-forces he was subjected to."

- "The injuries suffered by Mr. Scheuer would not have been expected to be life threatening, had [the airbags and seatbelt pretensioners] activated appropriately."

- "The failure to deploy the driver frontal impact airbag and seatbelt pretensioner allowed Mr. Scheuer to be subjected to unacceptable vehicle deceleration forces that caused his serious and permanent injuries."

These opinions should be excluded.

*First*, Caruso is not qualified to testify as an injury causation/biomechanics expert. Contrary to the statements in his report, Caruso acknowledged in his deposition that he could not—and more importantly, is not *qualified* to—opine that airbag deployment would have prevented plaintiff's alleged injuries in this accident:

Q.    [Y]ou do not know and do not have the qualifications to express an opinion about whether a given airbag in a given crash could have prevented a given injury to an occupant, correct?

A.    Other than, again, generically what airbags are designed to do and what injury types they're designed to prevent, ***I could not tell you specifically in this – in any of these three crashes if the given airbag would have prevented the specific injuries that resulted***, but I believe I can opine in general terms about what the airbag is

---

[74]    *See* Ex. 21, Caruso 7/29/15 Expert Rpt. at 5, 16, 18.

supposed to do and the general types of injuries it's supposed to prevent.[75]

He does not "hold [himself] out as an expert in occupant kinematics" and is left "to defer" to the biomechanics expert for his opinions and expertise regarding injury causation and whether airbag deployment would have prevented plaintiff's injuries:

> Q.   You rely upon the biomechanics to determine whether or not injuries are something that an airbag could have been – could have prevented or minimized?
>
> A.   Yes, I defer to the biomechanical for the final answers as to whether or not an airbag would have performed and prevented certain injuries.[76]

Accordingly, Caruso lacks the requisite qualifications to offer opinions regarding the mechanism of plaintiff's alleged injuries and whether deployment of the subject vehicle's driver's front airbag and seatbelt pretensioner would have prevented any such injuries.

*Second*, Caruso's medical and biomechanical opinions should be excluded because they are not based upon any objective examination or methodology.  As a threshold matter, Caruso acknowledges he did not perform any analysis of the causes of plaintiff's injuries:

> Q.   You haven't done an injury causation analysis either, correct?
>
> A.   No, I have not.[77]

Nor did Caruso perform a biomechanical analysis of plaintiff in the subject accident.[78]  Because he has no foundation for any injury causation opinions related to plaintiff, Caruso admits he "won't talk about whether these specific injuries would have been prevented by an airbag deployment in this case," and he "could not tell you specifically in this -- in any of these three

---

[75]   Ex. 16, Caruso 10/1/15 Dep.  at 115–116.

[76]   *Id.* at 108, 117–118.

[77]   *Id.* at 108 (objection omitted).

[78]   *Id.* at 118.

crashes [including plaintiff's crash] if the given airbag would have prevented the specific injuries that resulted."[79]

Caruso's report contains injury causation and biomechanics opinions, without identifying any underlying principles or methodology he used or relied upon.  Accordingly, his injury causation and biomechanics opinions fall short of the reliability benchmark set forth in Federal Rule of Evidence 702, as they are not "based upon sufficient facts or data;" nor are they "the product of reliable principles and methods."  *See Joiner,* 522 U.S. at 146.

C.     **The Failure To Meaningfully Address Alternative Causes Of Plaintiff's Alleged Injuries Requires Exclusion.**

Plaintiff's experts' medical causation opinions should also be excluded because none of them meaningfully address (let alone rule out) plaintiff's longstanding history of serious back and neck pain as the alternative pre-existing cause of his alleged injuries.  *See Bee*, 18 F. Supp. 3d at 306; *Higginbotham,* 85 Fed. App'x at 916; *Cooper*, 259 F.3d at 202.

\*\*\*

In sum, the Court should exclude the following plaintiff's experts' opinions: (i) any opinions regarding injuries that are not caused by airbag non-deployment; (ii) Markushewski's opinions regarding occupant kinematics, biomechanics, and injury causation, including whether any alleged injuries were caused by or contributed to by airbag or seatbelt pretensioner non-deployment; and (iii) Caruso's medical causation opinions, including opinions that airbag or seatbelt pretensioner non-deployment caused or contributed to plaintiff's alleged injuries.

III.    **AIRBAG PROLONGATION OPINIONS SHOULD BE EXCLUDED.**

Plaintiff's experts Loudon and Stevick opine that plaintiff's car (and nearly every small car on the road)[80] was also defective because it did not employ software that could have allowed

---

[79]    *Id*. at 108; 116.

airbag deployment up to 10 seconds after a primary power loss.[81]  These opinions should be excluded.

*First*, neither Loudon nor Stevick employed reliable methodologies to arrive at their conclusion. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████[83]  Having conducted no independent investigation, Loudon relies only on the universe of documents selected for him by plaintiff's attorneys—precisely the type of "expert" opinion that is unreliable and should be excluded under *Daubert*. *See R.F.M.A.S.*, 748 F. Supp. 2d at 268 (excluding evidence where "[experts] made logical deductions based on the set of assumptions that plaintiff directed them to employ and the circumscribed universe of data available to them").

Stevick similarly used *no* methodologies and conducted *no* testing to arrive at his conclusion that New GM vehicles should provide ten additional seconds of power to the vehicle's SDM once the key is turned off (*i.e.*, SDM prolongation).[84] Stevick also did no analysis of whether a ten-second SDM prolongation was contemplated by other manufacturers in the industry and even admits that the 150-millisecond energy reserve on the Cobalts and Ions was a

---

[80]  *See* Ex. 17, Caruso 10/2/15 Dep. at 452 ("Q. Is any small car that has an SDM system that disables the airbags when the ignition switch rotates to off or accessory defective? A. Probably most would be.").

[81]  *See* Ex. 32, Loudon 7/29/15 Expert Rpt. at 38 ("the solution to eliminate the problems posed by the ignition switch defect is a software fix.  Software existed that GM considered installing and could have used which would have allowed the SDM and airbags to deploy even if the ignition switch transitioned from RUN to ACC or OFF."); *see also id.* at 39 ("I believe that at least [9.11 seconds] should have and could have been provided [to power the SDM after primary power loss], but was not."); Ex. 15, Stevick 7/29/15 Expert Rpt. at 88.

[82]  Ex. 44, Loudon 11/24/15 Dep. at 1 ████████████████████████████████████████

[83]  Ex. 45, Loudon 9/15/15 Dep. at 419–420; *see also* Ex. 44, Loudon 11/24/15 Dep. at 16–17.

[84]  Ex. 41, Stevick 9/28/15 Dep. at 297 ("Q. . . . [I]t's your opinion that the vehicle needs to have an extended SDM energy reserve of ten seconds; is that correct? A. *I think* that's an appropriate number.") (emphasis added).

standard followed by all automotive manufacturers.[85]   At no point did he attempt to evaluate whether non-GM manufacturers used airbag control systems similar to the Cobalt or Ion.[86] Nor did he do any testing to determine whether a ten second prolongation would adversely impact other systems in the vehicle.[87] Indeed, Stevick conducted no testing or independent analysis to show that his proposed prolongation "fix" was even feasible.[88]

Because plaintiff's experts failed to conduct *any* testing or independent analysis, this Court should exclude their prolongation testimony.  *See Zaremba v. Gen. Motors Corp.,* 360 F.3d 355, 358–60 (2d Cir. 2004) (excluding expert testimony regarding safer alternative design where none of the "four factors identified in *Daubert*" were met: "(1) Phillips has not tested his design; (2) he has not subjected it to peer review or publication; (3) his design does not have a "known rate of error," since it has not been tested; and (4) Phillips has not shown general acceptance either of his design or of his methodology."); *Sanders v. Fireline, Inc.*, 295 F. App'x 373, 375 (2d Cir. 2008) (excluding testimony when an expert failed "to validate through scientific methodology" why he had reached his defectiveness conclusions); *see also Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir. 2000) (affirming the exclusion of an expert who, among other "shortcomings," "never attempted to . . . test his theory"); *Bourelle v. Crown Equip. Corp.,* 220 F.3d 532, 536–38 (7th Cir. 2000) (affirming the exclusion of plaintiff's design

---

[85]   Ex. 56, Stevick 9/29/15 Dep. at 465–466 ("Q. And you're not aware of any other manufacturers extending the energy power reserve for an SDM beyond the represented 150 milliseconds, correct? . . . A. No, I can't name one now.").

[86]   *Id*. at 433–434.

[87]   *Id*. at 420 ("Q. Have you conducted any engineering validation analysis as far as the impact that [SDM prolongation] could have with respect to other components within the vehicle? A. No.").

[88]   In addition to conducting no testing to arrive at his SDM prolongation conclusions, Stevick did not review highly relevant deposition testimony from any of the airbag design engineers in this case.  For instance, he did not read the deposition of New GM's technical lead for the airbag controller, Vipul Modi.  *Id*. at 438.  In fact, Stevick had never even heard of Mr. Modi.  *Id*. ("Q. Now, are you familiar with a gentleman by the name of Vipul Modi? A. No.").  Further, when asked if he had conducted any interviews of Delphi or Continental SDM engineers, he said no.  *Id*. at 464.  This would have been highly a relevant investigation and analysis because Delphi and Continental design SDMs for most every automotive manufacturer on the market, including New GM.  *Id*. at 425.

expert where he "had not done any scientific testing to support his alternative design theory");
*Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991–92 (5th Cir. 1997) (affirming the exclusion of an expert who "did not even make any drawings or perform any calculations" to support his alternative design).[89] Of course, if Stevick and Loudon's "testimony regarding a safer alternative design is speculative and unreliable," then any "testimony—that the hypothetical design would have reduced the injuries in this accident—is even more so," and must be excluded. *See Zaremba,* 360 F.3d at 358.

*Second*, the opinions regarding a prolonged airbag deployment time-span are separately inadmissible under the relevancy requirements of Rule 702 and *Daubert*.  As detailed in Section I, above, there is no admissible evidence that there ever was a power loss before or during plaintiff's accident, nor is there any admissible expert testimony that airbags should have deployed in this case.  Accordingly, Loudon and Stevick's proffered "fix" should be excluded because it would not "help the trier of fact . . . to determine a fact in issue."  Fed. R. Evid. 702.

***

Loudon and Stevick's opinions regarding airbag prolongation should be excluded.

## IV.    STATE-OF-MIND OPINIONS SHOULD BE EXCLUDED.

### A.    Loudon's Opinions Regarding New GM's Knowledge And State-of-Mind.

Loudon opines that "GM had information that airbag non-deployment was resulting from the ignition switch defect and that people were being seriously injured or killed because of it. . . . Nonetheless, in my opinion based on my training and experience, GM did nothing about the safety problem for years and instead concealed information regarding this safety defect by

---

[89]    Stevick and Loudon's prolongation opinions are also inadmissible because they are not qualified to offer them.  Stevick has no experience designing airbag systems or components used in an airbag system.  Ex. 41, Stevick Dep. at 95–96.

keeping it secret."[90]  Loudon ultimately concludes, "[i]t is my opinion that GM *did* understand the advanced airbag technology in its vehicles. . . .  GM simply *chose* to do nothing to correct this serious safety defect."[91]  The Court should exclude these opinions (and other opinions regarding New GM's knowledge of state of mind) because they impermissibly invade the sole authority of the trier of fact.  Such testimony will not assist the trier of fact to comprehend the evidence through the application of the witness's expertise.  Instead, it will force upon the jury speculative conclusions in the guise of "expert opinion."

In fact, another federal district court excluded Loudon's similar opinions in the *Toyota* MDL, finding that his opinion about Toyota's "knowledge" and "understanding" was "not a proper subject for expert testimony."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, and Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1087 (C.D. Cal. 2013) ("In his capacity as an expert, Loudon may not offer testimony regarding what Toyota did or did not know or understand. . . .  Toyota's knowledge (or lack thereof) is not a proper subject for expert testimony, and it must be established (if at all) by other evidence."  This Court should likewise exclude Loudon's improper opinion testimony here.  *See Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005) (reversing district court's allowance of expert's opinion regarding credibility of police officers because the testimony did not assist the trier of fact and credibility of officers was exclusively for determination by a jury); *R.F.M.A.S.*, 748 F. Supp. 2d at 269 (holding expert testimony inadmissible when "[a]ny juror could have employed common sense to perform the same analysis.").

---

[90]   Ex. 32, Loudon 7/29/2015 Expert Rpt. at 25.

[91]   *Id.* at 44 (emphasis in original).

**B.      Markushewski's Opinions Regarding The "Ordinary Consumer."**

Markushewski opines that "the danger of the ignition switch moving from RUN-to-ACC was unknowable and unacceptable to the ordinary consumer."[92]   But Loudon has no expertise in terms of the characteristics of the "ordinary consumer."   Like Loudon's opinions above, Markushewski's opinions about what an "ordinary consumer's" knowledge is not the proper subject of expert testimony and should be excluded.   This opinion is also inadmissible because Markushewski has admittedly has not performed ***any*** analysis of the knowledge available to the ordinary consumer:

> Q.      All right.   You haven't done any analysis at this point to determine what was knowable or not to the ordinary consumer; correct?
>
> A.      Correct.[93]

***

As shown above, Loudon's opinions regarding New GM's knowledge or state-of mind and Markushewski's opinions regarding the "ordinary consumer" do not meet the requirements of *Daubert* or Rule 702.   They should be excluded.

# V.      REHABILITATION AND VOCATIONAL OPINIONS SHOULD BE EXCLUDED.

**A.      The Court Should Exclude Cox's Vocational Opinions.**

**1.      Cox Fails to Use A Reliable, Generally Accepted Methodology.**

It is clear Cox knows there are generally-accepted methodologies that vocational counselors use to evaluate the earnings capacity of workers. While Cox does not describe or identify the methodologies he used in the *Scheuer* case, he does cite to two texts that he says

---

[92]     Ex. 36, Markushewski Expert Rpt. at 11.

[93]     Ex. 19, Markushewski Dep. at 474.

describe "the bases for [his] methodologies."[94]   Notably, those texts indicate that vocational evaluations require, at a minimum, a client interview and tests of the subject's aptitude and vocational interests.[95]   Cox admitted that, in his private practice, an interview and testing are among his "core methodologies."[96]   Likewise, Dr. Michael Shahnasarian, GM's vocational expert, describes an interview and testing as key elements of the "methodologies generally used in the vocational rehabilitation field."[97]   In addition, it is generally agreed that earning capacity evaluations also require an analysis of transferable skills—in other words, a worker's acquired skills that can be used in other jobs.[98]   According to Cox, he typically performs such analyses in his private practice to help mitigate a client's potential loss of earnings.[99]

Although Cox may know how to use generally-accepted methodologies in his private practice, he certainly did not use them in this in this case. Put simply, Cox failed to perform *any* of these well-established procedures when evaluating Mr. Scheuer's earning capacity.   Cox has never interviewed or spoken to Mr. Scheuer; he did not administer any tests on Mr. Scheuer; he did not perform a transferable skills analysis or consider any earnings mitigation, and, as discussed below, he did not consult with any doctor about Mr. Scheuer's physical condition.[100]

---

[94]   Ex. 47, Rubin, Stanford E. and Roessler, Richard T., *Foundations of the Vocational Rehabilitation Process*, 6th Ed.; Ex. 48, Deutsch, Paul M. and Sawyer, Horace Witt, *A Guide to Rehabilitation*, 1998.

[95]   Ex. 47, Rubin & Roessler at 294–95, 305–313 (cited by Cox) (stating "[t]he evaluation phase begins with the initial or intake interview;" and describing the types of vocational testing used by rehabilitation counselors); Ex. 48, Deutsch & Sawyer at §§ 2.02, 2.06 (cited by Cox) (stating "the initial interview with the client is an integral part of the counseling process," and noting that vocational tests are "widely used" to evaluate clients)

[96]   Ex. 29, Cox Dep. at 74–75.

[97]   Ex. 49, Shahnasarian Rpt. at 14.

[98]   Ex. 50, Van de Bittner *et al.*, "Comparison of a Consensus Methodology for Evaluating Employability and Earning Capacity by the CA-IARP DFEC Work Group with Published, Peer-Reviewed Methodologies," The Rehabilitation Professional, Vol. 20, No. 2, 2012, at 81 (examining 22 peer-reviewed methodologies for evaluating earning capacity, and finding that 17 require an interview and testing, and 20 of 22 require a transferable skills analysis); Ex. 49, Shahnasarian Expert Rpt. at 14 ("standard vocational rehabilitation methodology requires" consideration of "potential mitigating positions.").

[99]   Ex. 29, Cox Dep. at 37–39.

[100]   *Id.* at 64:21–65, 132, 190, 244; Ex. 51, Cox Supp. Dep. at 353–355.

Expert witnesses must exercise "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  Cox has failed to do so here. Instead of following a generally-accepted methodology, or any discernible methodology, Cox provides only a bottom-line opinion. But "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) ("If Dr. Fletcher failed to follow his own stated methods, the [district] court could reasonably conclude that he had failed to follow any reliable method.").

### 2. Cox's Opinions Are Based on Medical Assumptions He is Not Qualified to Make.

Cox concludes that Mr. Scheuer is "not able to work overtime" now or in the future, that working overtime would be "detrimental to his health," and that Mr. Scheuer "might be . . . hurting himself medically" by working overtime.[101]  Cox admitted that he is not qualified to offer any medical opinion; instead, he must rely on medical professionals such doctors or physical therapists to provide diagnoses and determine a client's physical ability.[102] ███████

████████████████████████████████████████████████████████

████████████████████[03]

███████████████████████████████████████

████████████████████████[104]  Instead of relying on a medical professional, Cox based his opinion solely upon his own misinterpretation of plaintiff's

---

[101]   Ex. 31, Cox Expert Rpt. at 5; Ex. 55, Cox Supp. Rpt. at 2; Ex. 29, Cox Dep. at 221–222.

[102]   Ex. 29, Cox Dep. at 26–27; *see also id.* at 34–35 (testifying that rehabilitation counselors are "not in the habit" of imposing restrictions on clients unless vocational testing makes clear that those limitations are warranted). The literature Cox cites agrees that vocational counselors should rely on medical professionals to diagnose any physical impairments or deficits. *See, e.g.,* Ex. 47, Rubin & Roessler at 295–99.

[103]   Ex. 51, Cox Supp. Dep. at 400, 409–410.

[104]   Ex. 29, Cox Dep. at 190; Ex. 51, Cox Supp. Dep. at 354.

deposition testimony.[105]   Importantly, Cox's speculation about plaintiff's limitations are contradicted by plaintiff himself.   When New GM's expert asked about physician-imposed restrictions, plaintiff did not report any medical restriction on his overtime, and his payroll records indicate that he has worked significant overtime since his accident.[106,107]   And plaintiff does not offer any medical expert to support the conclusion that plaintiff is incapable of working overtime.

### 3.   Cox Admittedly Speculates that Plaintiff Might Have to Retire Early.

In his initial report, Cox stated that plaintiff "may" have to take an early medical retirement as a result of his injuries.[108] At his deposition, however, Cox admitted that (1) there is no medical foundation for this conclusion and (2) he has not reached an opinion to a reasonable degree of certainty that plaintiff will have to retire early.[109] When asked how he determined that plaintiff *might* have to retire five years early, Cox responded: "Experience.   Seeing -- seeing people who have undergone a lot of back surgeries and a lot of trauma and pain and they -- it just seems to me to be a time period that he in my opinion was likely to wear out."[110]   This is not an informed opinion; it is pure speculation. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is speculative or conjectural"). Stated differently, "[a] witness who invokes 'my expertise' rather than analytic strategies widely used

---

[105]   Cox apparently believed that Mr. Scheuer testified that he was advised to work no more than 40 hours per week, but that "testimony" comes from Mr. Scheuer's supplemental plaintiff fact sheet, in which Mr. Scheuer stated only that as of March 2015 he was not working overtime. *Id.* at 407–409.

[106]   Ex. 49, Shahnasarian Rpt. at 12, App'x III at 6; Ex. 52, Scarbrough Rpt. at 16–17.

[107]   Ex. 51, Cox Supp. Dep. at 403–404)

[108]   Ex. 31, Cox 7/29/15 Expert Rpt. at 5.

[109]   Ex. 29, Cox 9/14/15 Dep. at 198, 211.

[110]   *Id.* at 211.

by specialists is not an expert as Rule 702 defines that term." *Zenith Electronics*, 395 F.3d at

419

> **B.    The Court Should Exclude Macpherson's Opinions On Future Wage Losses Because They Rely On Cox's Unsupported And Inadmissible Opinions.**

It is well established that when one expert's opinions are precluded as unreliable under

the *Daubert* standard, any opinions that rely on that report are also inadmissible.  *Luitpold*

*Pharma., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *11

(S.D.N.Y. Sept. 16, 2015).  Macpherson purports to calculate plaintiff's damages from future lost

earning capacity.  However, because these specific opinions incorporate and extensively rely

upon Cox's inadmissible opinions, the Court should also exclude them.[111]

---

[111]   Dr. Macpherson does not dispute his reliance on Mr. Cox.  *See* Ex. 53, Macpherson 9/10/15 Dep. at 240, 267, 273; Ex. 54, Macpherson 11/19/15 Dep. at 33.

**CONCLUSION**

For the foregoing reasons, New GM respectfully requests the Court grant New GM's

Omnibus Motion To Exclude Expert Opinions Under *Daubert* and Federal Rule of Evidence

702.

Dated: December 4, 2015                          Respectfully submitted,

                                                 */s/ Richard C. Godfrey, P.C.*

                                                 Richard C. Godfrey, P.C.
                                                 Andrew B. Bloomer, P.C.
                                                 KIRKLAND & ELLIS LLP
                                                 300 N. LaSalle
                                                 Chicago, IL 60654-3406
                                                 Phone: 312-862-2000
                                                 Fax: 312-862-2200
                                                 richard.godfrey@kirkland.com
                                                 andrew.bloomer@kirkland.com

                                                 *Attorneys for Defendant General Motors LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 4, 2015, I electronically filed the foregoing Brief using the CM/ECF system which will serve notification of such filing to the email of all counsel of record in this action.


/s/ Andrew B. Bloomer       

Andrew B. Bloomer, P.C.