USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/29/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To:*
*Fleck, et al. v. General Motors LLC, 14-CV-8176*
------------------------------------------------------------------------------x

14-MD-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

The first bellwether trial in this multidistrict litigation ("MDL"), brought by Plaintiff Robert S. Scheuer and familiarity with which is presumed, is scheduled to begin on January 11, 2016. (*See* Docket No. 1694). Both parties have filed motions to exclude expert opinions and testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence. More specifically, New GM moves to exclude some or all of the testimony of seven experts proffered by Plaintiff (Docket No. 1815); Plaintiff moves to exclude some or all of the testimony of three experts proffered by New GM (Docket No. 1801). As discussed below, the vast majority of each party's objections to the other's experts go to the weight, not the admissibility, of such evidence. Accordingly, and for the reasons stated below, both motions are — with limited (and largely uncontested) exceptions — denied in their entirety.

## BACKGROUND

On May 28, 2014, Plaintiff Robert Scheuer was driving his 2003 Saturn Ion 3 — a car manufactured by Old GM — on Highway 48 in Bristow, Oklahoma. (Third Am. Compl. (Docket No. 1696) ("TAC") ¶¶ 1, 24). According to the Complaint, another car tried to pass him, but instead swerved into Plaintiff's lane, causing Plaintiff to veer off the road. (*Id.* ¶ 24). Plaintiff's car went over a small dirt bank, went airborne, and — after a rough landing — hit a tree before coming to a stop. (*See id.*). The airbags in Plaintiff's vehicle did not deploy upon

impact, and Plaintiff suffered injuries as a result of the crash. (*Id.* ¶¶ 25, 27). The theory of Plaintiff's case against New GM is that the airbags should have deployed but failed to do so because the ignition switch in Plaintiff's car had moved out of the "run" position at some point after Plaintiff veered off the road but before the car landed on the ground. (*See id.*). On that basis, Plaintiff argues that the ignition switch defect that New GM concedes was present in some GM cars — including the 2003 Saturn Ion — caused or exacerbated his injuries. (*Id.*).

## LEGAL STANDARDS

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his opinion if:

> (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the United States Supreme Court defined the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Rule 702 inquiry is a "flexible" one that "depends upon the particular circumstances of the particular case at issue." *Floyd v. City of N.Y.*, 861 F. Supp. 2d 274, 286 (S.D.N.Y. 2012) (internal quotation marks omitted). Although a district court should "admit expert testimony only where it is offered by a qualified expert and is relevant and reliable," *Cohalan v. Genie Indus., Inc.*, No. 10-CV-2415 (JMF), 2013 WL 829150, at *3 (S.D.N.Y. Mar. 1, 2013), exclusion

remains "the exception rather than the rule," *Floyd*, 861 F. Supp. 2d at 287 (internal quotation marks omitted). "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Cohalan*, 2013 WL 829150, at *5 (quoting *Bacardi & Co. v. N.Y. Lighter Co.*, No. 97-CV-7140 (JS) (VVP), 2000 WL 298915, at *2 (E.D.N.Y. Mar. 15, 2000)). As the *Daubert* Court itself stressed, "the traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

## DISCUSSION

Now pending are Plaintiff's *Daubert* Motion *in Limine* (Docket No. 1801) and New GM's Omnibus Motion to Exclude Expert Opinions Under *Daubert* and Rule 702 (Docket No. 1815). As noted, New GM challenges the opinions of seven of Plaintiff's experts: Christopher Caruso, Robert Cox, Steven Loudon, David Macpherson, Michael Markushewski, Michael McCort, and Glen Stevick. Plaintiff challenges the testimony of three of New GM's experts: Thomas Livernois, Jeya Padmanaban, and Harry Smith. Neither party seriously questions the other's experts' qualifications in their respective fields. Instead, all of their challenges are, at bottom, about the relevance and/or reliability of the various experts' testimony. The Court will address New GM's arguments first, and then turn to Plaintiff's.

### A. New GM's *Daubert* Motion

Following New GM's lead, the Court organizes its discussion of Plaintiff's expert testimony by substantive category. Although New GM moves to exclude the testimony of seven

expert witnesses, the challenged testimony falls within five substantive categories: (1) ignition-switch-rotation opinions; (2) medical-causation opinions; (3) airbag-prolongation opinions; (4) state-of-mind opinions; and (5) rehabilitation and vocational opinions.  The Court addresses each category in turn.

1. **Causation Opinions**

   a. **McCort**

New GM first challenges the causation testimony of McCort, Plaintiff's accident reconstruction expert.  McCort plans to testify, based on his reconstruction of the accident and his review of other documents and expert reports, that "it is likely that a key off movement occurred between [Plaintiff's] road departure and prior to the major ground strike event, causing the safety systems to be disabled and preventing [airbag] deployment."  (Affirmation of R. Allan Pixton  (Docket No. 1821) ("Pixton Decl."), Ex. 37, at 7).  New GM's principal criticism of McCort's proffered testimony is that the conclusion that the airbags should have deployed is an "unsupported assumption."  (Mem. Supp. General Motors LLC's Omnibus Mot. To Exclude Expert Ops. (Docket No. 1820) ("New GM's Mem.") 15).  That is not the case.  McCort's testing indicated that the car's impact with the ground after going airborne generated a change in velocity — known as the "delta-v," a metric used by accident reconstructionists to quantify the severity of a crash (*see* New GM's Mem. 24 n.63) — of at least twenty-two miles per hour, well above the must-fire threshold for the car's airbag system.  (Decl. Steve W. Berman Supp. Pl.'s Mem. Law Opp'n General Motors LLC's Omnibus Mot. To Exclude Expert Ops. (Docket No. 1876) ("Berman Decl. Opp'n"), Ex. 4, at 7).  New GM complains that McCort was hesitant to make definitive statements regarding the must-fire threshold for Plaintiff's car.  But Caruso, not McCort, is Plaintiff's expert on airbag deployment.  Caruso's expert report contends that the

must-fire threshold for airbag deployment in Plaintiff's car was sixteen miles per hour (Berman Decl. Opp'n, Ex 9, at 10; *id.*, Ex. 10, at 415-16), and McCort was entitled to consider that opinion in preparing his own report.  Based on that, not to mention his ample experience as an accident reconstructionist, McCort is qualified to testify both that the front air bag should have deployed in this specific case and that a delta-v of this magnitude is generally "above the threshold observed in most reconstructed crashes to cause a front airbag deployment."  (Berman Decl. Opp'n, Ex. 4, at 7).[1]

New GM's other arguments with respect to McCort fare no better.  New GM cites the fact that McCort cannot say precisely how or when the ignition switch moved out of the run position (*see* New GM's Mem. 18-20), but it is hard to understand why those specifics matter in the event that the jury finds that the key did, in fact, rotate prior to the crash.  And while New GM challenges McCort's testimony on that point, asserting that there is no reliable evidence that the key could have rotated if Plaintiff removed everything from his key ring (as he has testified he did in response to New GM's recall notice), that is not the case — Plaintiff's position on that issue, perhaps the central factual dispute in this case, is supported by, among other things, documentation from New GM itself and, ultimately, the opinions of Stevick.  (*See* Pixton Decl.,

---

[1]     In its reply brief, New GM also takes McCort to task for not ruling out "prior damage to sensing modules or wiring" as another potential explanation for the airbag non-deployment. (General Motors LLC's Reply Br. Supp. Omnibus Mot. To Exclude Expert Opinions Under *Daubert* & Fed. R. Evidence 702 (Docket No. 1937) ("New GM's Reply") 6).  Even assuming that is a plausible explanation for the airbag non-deployment, McCort is not required to rule out every possible alternative cause for his opinion to be admissible.  *See, e.g., U.S. Info. Sys., Inc. v. Int'l Bd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 238 (S.D.N.Y. 2004) ("An expert is not required, however, to categorically exclude each and every possible alternative cause.").  An expert need only "address *obvious alternative causes*," which McCort did here when he considered whether the delta-v was sufficient to trigger the airbags during Plaintiff's crash.  *Bee v. Novartis Pharms. Corp.*, 18 F. Supp. 3d 268, 306 (E.D.N.Y. 2014) (emphasis added) (internal quotation marks omitted).

Ex. 15, at 70-72). New GM's arguments may ultimately persuade the jury that Plaintiff's key did not rotate, and that the jury should therefore reject McCort's explanation for the airbag non-deployment, but those arguments — like many of its arguments with respect to Plaintiff's other experts — "go to the weight, not the admissibility" of McCort's testimony, and thus should be raised, if at all, during cross examination. *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038. 1044 (2d Cir. 1995); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### b. Stevick

New GM's principal argument with respect to Stevick — an engineer with a Ph.D. in Mechanical Engineering who specializes in failure analysis and the design of mechanical-electrical equipment and systems (*see* Berman Decl. Opp'n, Ex. 6, at 20) — fails for the same reason. New GM contends that Stevick's testimony about the possibility of a "knee-to-key event" (namely, that Plaintiff's knee struck the key, causing it to rotate from the Run position) is both irrelevant and unreliable given, among other things, Plaintiff's own testimony that he does not recall "any part of [his] body striking anything inside the car." (New GM's Mem. 20). But, as noted, whether a single key could rotate in an accident such as Plaintiff's is perhaps the core factual dispute in this case, and there is evidence from which a jury could take Stevick's — and thus Plaintiff's — side in that dispute. The fact that there is some evidence to impeach Stevick's opinion — including Plaintiff's (presumably imperfect) recollection of the traumatic seconds before his crash — goes, again, to its weight, not its admissibility. And the fact that Stevick relied primarily on observations of the car model at issue and New GM's testing and documentation, rather than conducting his own independent tests to evaluate the possibility of a

knee-to-key event, is no basis to exclude his testimony either.  There is no *per se* requirement that an expert conduct his or her own testing.  *See Daubert*, 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").  Deductive reasoning and critical review of existing test data can be a reasonable and reliable method of analysis, especially where (as here) extensive data on the precise question Stevick was asked to consider had already been collected.  (*See* Berman Decl. Opp'n, Ex. 6, at 52-72).  In other words, Stevick's opinions are based on data of a type reasonably relied upon by experts.  Any weaknesses New GM perceives in his testimony can, of course, be explored on cross-examination; they do not justify exclusion of Stevick's testimony.[2]

### 2. Medical Causation Opinions

The Court turns next to New GM's arguments with respect to Plaintiff's medical causation evidence.  As an initial matter, New GM raises two general objections to such evidence.  First, noting Plaintiff's concession that the accident itself was not caused by the defective ignition switch, New GM objects to Plaintiff's experts on the ground that they fail "to distinguish between the issues or injuries caused by the accident versus those caused by airbag non-deployment."  (New GM's Mem. 23).  But while some of Plaintiff's injuries may well have occurred even if the airbag had deployed, that does not mean injuries caused by the accident

---

[2] In both its briefing with respect to Stevick's proposed testimony and elsewhere (including, for example, in its briefing with respect to the admissibility of "other similar incidents" evidence, *see* New GM's Mem. Law Regarding Pl.'s Purported Other Similar Incidents Evidence (Docket No. 1910) 7 n.10), New GM cites a statement by the United States Secretary of Transportation seeming to endorse New GM's "position that the subject vehicles are safe to operate provided that the key that is placed in the ignition cylinder is not attached to a key ring containing other items."  (New GM's Mem. 14-15).  The Court is hard pressed to see how that out-of-court statement would be admissible at trial.  If New GM intends to offer the statement (as its briefing suggests), it shall advise the Court at or before the final pretrial conference on January 6, 2016, and the parties should be prepared to address its admissibility.

alone are irrelevant. New GM gives no indication of how one could determine what injuries were caused by the airbag non-deployment without considering what injuries were caused by the crash itself. New GM is free at trial to challenge Plaintiff's medical causation evidence on the ground that his injuries were (or could have been) caused by the accident itself, but that is not a ground for exclusion. New GM's other general objection — that Plaintiff's medical causation experts fail to account for Plaintiff's prior medical problems (New GM's Mem. 31) — is also without merit. As Plaintiff explains, his treating physician, Dr. Marouk, was well aware of Plaintiff's prior injuries and took them into account in preparing his expert report; Plaintiff's other experts are not going to testify about the causes of Plaintiff's injuries specifically, so there was no need for them to consider his prior history. (*See* Pl.'s Mem. Law Opp'n General Motors LLC's Omnibus Mot. To Exclude Expert Ops. (Docket No. 1874) ("Pl.'s Opp'n") 25-26).[3]

### a. Markushewski

Those general objections aside, New GM contends that Markushewski's testimony is inadmissible because he goes beyond his expertise in occupant kinematics (that is, how occupants move relative to a vehicle during a collision) and offers opinions about specific injury causation and biomechanics (that is, the injurious effects that the forces involved in a collision may have on the occupant). (New GM's Mem. 26-27). In response, Plaintiff represents that Markushewski's testimony will be limited to occupant kinematics — namely, how a body is generally expected to react to sudden deceleration in the absence of airbag and pretensioner

---

[3] On December 21, 2015, New GM filed a motion to strike Dr. Marouk's affidavit (*see* Docket No. 1934), a motion that is not yet fully submitted. New GM challenges allegedly new specific-causation opinions offered by Dr. Marouk; it does not appear to take issue with Dr. Marouk's statement that he was aware of (and considered) Plaintiff's preexisting medical conditions in reaching his original expert report. (*See* Berman Decl. Opp'n, Ex. 44, at 1). The Court will address the motion to strike separately and in due course.

deployment — a subject that, in conjunction with other evidence in the case, would plainly aid the jury in evaluating whether Plaintiff's injuries were caused by the ignition switch defect. (Pl.'s Opp'n 24-25). To the extent that Markushewski strays beyond that realm, and touches on specific causation or biomechanics, "the Court can address those defects at trial by ruling on objections to particular questions and testimony." *Vasquez v. City of N.Y.*, 10-CV-6277 (JMF), 2014 WL 4388497, at *13 (S.D.N.Y. Sept. 5, 2014).

New GM also challenges the reliability of Markushewski's opinions, but those challenges fall short of justifying exclusion. New GM faults him for failing to independently calculate Plaintiff's car's delta-v, but as New GM itself points out, delta-v is usually (and was here) calculated by an accident reconstructionist expert, not a crashworthiness expert. (*See* New GM's Mem. 24 n.63). And while Markushewski "admitted that neither he nor anybody else" could determine whether firing of the pretensioner alone would have prevented Plaintiff from contacting the interior of the vehicle (New GM's Mem. 25), that hypothetical is several degrees removed from reality and irrelevant. According to Markushewski's expert report, the pretensioner and airbags operated in tandem, such that one would never fire without the other. (Pixton Decl., Ex. 36, at 6-7). Thus, Markushewski's refusal to engage in New GM's hypothetical does not disqualify his testimony. Finally, New GM's complaint that "Markushewski cannot identify any evidence to support his opinion that plaintiff's body impacted the interior structure of the vehicle" (New GM's Mem. 25) is similarly off-base. Markushewski's analysis of the forces to which Plaintiff's body was subjected during the crash, coupled with Markushewski's expertise in the purpose and function of safety restraints, adequately support his opinions regarding how Plaintiff's body likely behaved during the crash — including whether or how Plaintiff's body would be expected to have impacted the car.

### b. Caruso

New GM also challenges the testimony of Caruso, Plaintiff's airbag sensor expert, on the ground that he is not competent to opine about specific injury causation. (New GM's Mem. 29-31). In response, Plaintiff represents that Caruso will not testify on that subject. (Pl.'s Opp'n 23 n.11). Instead, he will testify that "[a] properly deployed frontal impact airbag and seatbelt pretensioner would have provided a barrier between Mr. Scheuer and the vehicle interior structures, reducing or mitigating the harmful interior impact and G-forces he was subjected to" and that "[t]he injuries suffered by Mr. Scheuer would not have been expected to be life threatening, had [the airbags and seatbelt pretensioners] activated appropriately." (Pixton Decl., Ex. 21, at 5, 16). Those opinions are not about specific injury causation, but rather fall within Caruso's competence to "opine in general terms about what the airbag is supposed to do and the general types of injuries it's supposed to prevent." (Pixton Decl., Ex. 16, at 115-116). Again, to the extent New GM believes that Caruso's testimony at trial strays into the realm of specific causation, it can raise objections to specific questions and testimony on that basis. *See Vasquez*, 2014 WL 4388497, at *13.

### 3. Airbag Prolongation Opinions

Next, New GM seeks to exclude the airbag prolongation opinions of Loudon and Stevick, contending that neither opinion is sufficiently reliable to satisfy *Daubert*'s gatekeeper standard. New GM's primary argument on this point is that neither Loudon nor Stevick conducted independent testing. For starters, Stevick claimed during his deposition that he did create and test a simple circuit that would achieve airbag prolongation. (Berman Decl. Opp'n, Ex. 3, at 13-

19, 29, 115).[4]  In any event, as noted above in reference to Stevick's causation testimony, an expert is not required to conduct independent testing in all cases.  *See, e.g.*, *Cohalan*, 2013 WL 829150, at *4-5.  Both Loudon and Stevick have studied the relationship between the ignition switch and safety systems in Plaintiff's vehicle, are experts in the field of safety system design and function, and have reviewed documented testing and evaluations completed by GM itself.  (*See* Pixton Decl., Ex. 32, at 5, 8; *id.* Ex. 15, at 16-21).  That their opinions may not rest on statistical studies or independent testing does not alter the fact that they are, nevertheless, based on data "of a type reasonably relied upon by experts in various disciplines."  *Vasquez*, 2014 WL 4388497, at *12 (quoting *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 357 (S.D.N.Y. 2001) (Lynch, J.)).  New GM may try to convince the jury to discount Loudon's and Stevick's respective opinions during cross-examination, but New GM does not meet the high showing required to exclude those opinions from trial altogether.  *See Cohalan*, 2013 WL 829150, at *5 ("Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, . . . other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." (internal quotation marks omitted)).[5]

---

[4]   In a footnote in its reply memorandum of law, New GM alleges that Stevick failed to disclose his design and testing of a prolongation circuit in his expert reports and, thus, that they "should not be considered by this Court (or any jury) and should be excluded from any trial of this matter." (*See* New GM's Reply 14 n.19).  The Court is not prepared to take that step based on an argument made, without any supporting legal authority, in a footnote in a reply brief.  In any event, the Court need not address New GM's objection here because, even if the Court were to disregard Stevick's alleged design and testing, his testimony would still be admissible.

[5]   Although New GM does not raise any cumulativeness objection to the airbag prolongation testimony of Loudon and Stevick, Plaintiff should be prepared to address why the Court should allow him to elicit testimony on that subject from two experts rather than one.

### 4. State-of-Mind Opinions

New GM also challenges portions of both Loudon's and Markushewski's testimony on the ground that they offer impermissible state-of-mind opinions. (New GM's Mem. 34-36). Plaintiff concedes that Markushewski's opinion testimony regarding the expectations or knowledge of an "ordinary consumer" should be excluded. (*See* Pl.'s Opp'n 25 n.12). Additionally, the Court agrees with New GM that Loudon may not offer opinions regarding New GM's knowledge or beliefs, both because he is not qualified to give such opinions and because such testimony would impermissibly tread on the role of the jury. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1087 (C.D. Cal. 2013) ("In his capacity as an expert, Loudon may not offer testimony regarding what Toyota did or did not know or understand . . . . Toyota's knowledge (or lack thereof) is not a proper subject for expert testimony, and it must be established (if at all) by other evidence."). In fact, Plaintiff himself concedes that "expert witnesses generally are not permitted to testify regarding intent, motive, or state of mind, or evidence by which such state of mind may be inferred." (Pl.'s Opp'n 35 (internal quotation marks omitted)). But the Court need not do more than offer those cautionary words at this time. "A few stray sentences in his report perhaps aside," *Vasqeuz*, 2014 WL 4388497, at *13, Markushewski does not really opine on New GM's knowledge or state of mind in his report. (*See generally* Pixton Decl., Ex. 36). Further, to the extent that he does improperly touch on such subjects, "the Court can address those defects at trial by ruling on objections to particular questions and testimony." *Vasqeuz*, 2014 WL 4388497, at *13.

### 5. Vocational and Rehabilitation Opinions

New GM's final challenge is to Plaintiff's vocational expert, Cox (and, by extension, to the testimony of Macpherson, which relies on Cox's opinions and calculations). New GM's primary argument against Cox's testimony is that Cox failed to use reliable, generally accepted methodologies because he neither interviewed Plaintiff nor conducted vocational testing and transferable skills analysis. (New GM's Mem. 36-38). But while in-person interviews coupled with vocational testing may well be *a* generally accepted methodology of developing vocation opinions, that does not mean that alternative methodologies are necessarily inadequate for *Daubert* purposes. *See Daubert*, 509 U.S. at 588-89 (rejecting the "austere" *Frye* standard as "incompatible with" the "liberal thrust" of the Federal Rules of Evidence); *id.* at 592 ("[A]n expert is permitted wide latitude to offer opinions."). Cox has testified at thousands of Social Security hearings, and in none of those hearings did he meet with the client before offering his opinion. (*See* Berman Decl. Opp'n, Ex. 37, at 12, 15-16, 44). The Court finds that to be a compelling indication that the methodologies Cox applied here are "generally accepted" enough to satisfy *Daubert*. New GM's remaining challenges to Cox's opinions are equally unavailing. New GM complains that Cox's opinions are unduly speculative because he provided no basis for his overtime calculations and because he can only speculate as to whether and when Plaintiff will have to take an early medical retirement. (New GM's Mem. 39-40). But "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). The Court concludes that Cox's opinions as to both overtime and retirement are not based on "unrealistic assumptions" — or, more to the point, on assumptions that are so unrealistic as to warrant exclusion. Instead, the concerns that

New GM raises with Cox's opinions — like many of its concerns with respect to the opinions of Plaintiff's other experts, discussed above — "go to the weight, not the admissibility, of the testimony." *Id.* (internal quotation marks omitted). Accordingly, New GM's motion to exclude his testimony (and the testimony of Macpherson, who relies on Cox) is denied.

**B. Plaintiff's *Daubert* Motion**

As noted, Plaintiff challenges the testimony of three of New GM's experts: Jeya Padmanaban, Thomas Livernois, and Harry Smith. The Court addresses each in turn.

**1. Padmanaban**

Plaintiff first seeks to exclude the testimony of New GM's statistical expert, Padmanaban. Plaintiff's primary complaint is that Padmanaban's opinions are irrelevant and unreliable because she drew on databases including thousands of crashes completely unrelated to the circumstances surrounding Plaintiff's case. (*See* Mem of Law Supp. Pls.' *Daubert* Mot. *In Limine* (Docket No. 1802) ("Pl.'s Mem.") 5-15; Reply Mem. Law Supp. Pl.'s *Daubert* Mot. *In Limine* (Docket No. 1930) ("Pl.'s Reply") 1-6). But Plaintiff's challenge is founded on a misunderstanding of the purpose for which Padmanaban's testimony is being offered: Her testimony has no bearing on the specific cause of Plaintiff's accident or injury. Instead, her statistical opinions relate to Plaintiff's allegation — offered in support of his request for punitive damages — "that New GM has allowed a class of vehicles on the road that are unreasonably prone to be involved in accidents involving serious bodily harm or death." (*See* Mem. Opp'n Pls.' *Daubert* Mot. *In Limine* (Docket No. 1879) ("New GM's Opp'n") 14-15; TAC ¶ 121). Padmanaban's statistical analyses are plainly relevant to that issue.[6] *Cf. Tran v. Toyota Motor*

---

[6] Of course, whether Plaintiff may seek punitive damages is an issue currently under advisement in connection with New GM's pending motion for summary judgment and Amended

*Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005) ("The substantial similarity doctrine does not apply to situations . . . where the evidence is . . . not offered to reenact the accident." (internal quotation marks omitted)). Plaintiff's reliability arguments are unavailing for the same reasons. Plaintiff complains that Padmanaban's opinions are unreliable because they are derived from a review of "thousands and thousands of crashes that are completely unrelated to the accidents at issue here." (*See* Pl.'s Mem. 18). But the fact that Padmanaban reviewed a cache of crash data reflecting vast and varied circumstances does not undermine the point her testimony is offered to support — that even with the ignition switch defect New GM's cars were not, as a general matter, meaningfully more dangerous than other cars on the road.[7]

Plaintiff separately argues that Padmanaban's opinions should be excluded because they are inconsistent with New GM's admissions that the ignition switch defect existed and increased the risk and seriousness of certain crashes involving GM cars. (Pl.'s Mem. 16-17). In particular, Plaintiff contends that Padmanaban's opinions violate the terms of the Deferred Prosecution Agreement ("DPA") that New GM entered into with the United States Department of Justice.

---

Seventh Motion *in Limine*. (*See* Mem. Supp. New GM's Mot. Summ. J. (Docket No. 1811); Am. Mot. *in Limine* No. 7 (Docket No. 1799)). Needless to say, the Court's ruling here is subject to modification — or even reconsideration — as appropriate in light of the Court's decisions on those motions.

[7] This case is easily distinguished from cases in which Padmanaban's testimony has been excluded. In *Roberts v. General Motors, LLC*, for example, Padmanaban testified that the "serious and severe injury rates for belted drivers in rollover accidents in GMC Savana vans are low" and that those rates were "comparable to the serious and severe injury rate for other vans." 4:13-CV-541 (CAS), 2015 WL 6955362, at *11 (E.D. Mo. Nov. 10, 2015). The Court ultimately excluded Padmanaban's opinion because she purported to compare a very specific sort of rollover crash for GMC Savana vans with a generalized pool of dissimilar accidents involving other vans. *Id.* at *12-13; *see also Bavlsik v. General Motors LLC*, 4:13-CV-509 (DDN), 2015 WL 4920300, at *6 (E.D. Mo. Aug. 18, 2015) (rejecting Padmanaban's statistical opinions for similar reasons). Here, there is no such apples-to-oranges problem, as Padmanaban only purports to compare the general safety of GM cars to the general safety of peer vehicles. As discussed above, that opinion is relevant to Plaintiff's punitive damages claim.

15

(*Id.* at 16 n.9; *see* Decl. Steve W. Berman Supp. Pl.'s *Daubert* Mot. (Docket No. 1803) ("Berman Decl. Supp."), Ex. 3).  To the extent that New GM takes a position in this litigation that is contrary to the DPA, it may have to answer to DOJ under the terms of the DPA.  Such a conflict is not, however, a basis to exclude otherwise admissible evidence.  Further, and in any event, New GM's representations about the specific risks and dangers related to the ignition switch defect are analytically distinct from the risks and dangers associated with GM cars in general.  Padmanaban may therefore opine that GM vehicles are not unreasonably prone to be involved in accidents involving serious bodily harm or death when compared to peer vehicles *despite* the existence of the ignition defect.  (*See* Berman Decl. Supp., Ex. 1, at 42-43).

Finally, separate and apart from his attacks on the main subject of Padmanaban's testimony, Plaintiff argues that her rebuttal opinions regarding Stevick's failure mode and effects analysis ("FMEA") must be excluded as unreliable.  In particular, Plaintiff contends that Padmanaban is not qualified to serve as an FMEA expert and that her critiques of Stevick's FMEA are misguided.  (Pl.'s Mem. 23-25).  Beginning with the latter objection, Plaintiff's substantive criticisms of Padmanaban's FMEA opinions go to the weight of her testimony, not its admissibility, and are best aired before the jury.  As for the former, although Padmanaban is admittedly not an expert in the engineering aspect of FMEA (*see* New GM's Opp'n 27), she is an expert in statistics and is qualified to critically evaluate Stevick's FMEA from a statistical standpoint.  Assuming Padmanaban's testimony goes beyond her realm of expertise (or would constitute improper impeachment), "the Court can address those defects at trial by ruling on objections to particular questions and testimony."  *Vasquez*, 2014 WL 4388497, at *13.

16

## 2. Livernois

New GM offers the expert testimony of Livernois primarily to rebut the opinions offered by Plaintiff's experts Loudon and Stevick regarding airbag prolongation. Plaintiff's principal argument against Livernois's testimony is that his opinions regarding industry standards and customs are irrelevant to Plaintiff's product liability claims under Oklahoma law. (*See* Pl.'s Mem. 26-30). But Plaintiff concedes that — regardless of whether industry standards are relevant to products liability claims under Oklahoma law — industry standards are relevant "in determining a manufacturer's duty of care under a negligence theory." (Pl.'s Mem. 28). That alone is enough to defeat Plaintiff's contention that Livernois' opinions regarding industry standards should be excluded altogether as irrelevant. (Plaintiff halfheartedly raises a Rule 403 objection to Livernois's testimony as it relates to the negligence claim (Pl.'s Reply 16-17), but that objection borders on frivolous.) Moreover, while "compliance with industry standards is not a defense to an action predicated upon [a] manufacturer's products liability" under Oklahoma law, *Smith v. FMC Corp.*, 754 F.2d 873, 877 (10th Cir. 1985) (internal quotation marks omitted), such evidence can nevertheless be relevant and admissible in a products liability case, *see, e.g.*, *Smith v. Minster Mach. Co.*, 669 F.2d 628, 634 (10th Cir. 1982) (holding such evidence is relevant to show feasibility of alternative designs). Of particular relevance, when a plaintiff "open[s] the door" by introducing expert testimony founded in part on industry standards, he "cannot complain" when the defendant offers similar testimony in response. *Robinson v. Audi Nsu Auto Union Aktiengesellschaft*, 739 F.2d 1481, 1485 (10th Cir. 1984). That admonition is applicable here: Loudon's report makes repeated reference to the practices followed by "the rest of the industry" (*see, e.g.*, Pixton Decl., Ex. 32, at 20, 21, 40), thereby bringing the industry's standard of care into issue. Accordingly, and because Plaintiff's remaining objections to

Livernois's testimony — concerning the reliability of his opinions — go to weight, not admissibility, Plaintiff's motion to exclude Livernois is denied.[8]

### 3. Dr. Smith

Plaintiff does not take issue with the bulk of the expert report filed by New GM's biomechanics and injury causation expert, Dr. Smith. But Plaintiff argues that Smith's opinion that "the available physical evidence favors a decreased environmental awareness resulting in a gradual drifting off road as opposed to a rapid emergency-like maneuver" (Berman Decl. Supp., Ex. 23, at 15) must be excluded. (Pl.'s Mem. 35-37). New GM concedes that — given the Court's ruling on Plaintiff's Third Motion *in Limine*, *see In re General Motors LLC Ignition Switch Litigation*, 14-MD-2543 (JMF), 2015 WL 8578945, at *7 (S.D.N.Y. Dec. 9, 2015) — it may not (and will not) ask Smith to provide opinions related to Plaintiff's drug use on the day of the accident. (New GM's Opp'n 29-30). Given that Plaintiff himself does not allege that the accident was caused by the ignition switch defect, and given that New GM proffers no evidentiary basis for Dr. Smith's opinion that the accident may have been caused by "decreased environmental awareness," Plaintiff's motion is granted with respect to Dr. Smith.

## CONCLUSION

For the reasons stated above, the vast majority of each party's objections to the other's experts go to the weight, not the admissibility, of such evidence. Accordingly, and for the reasons stated above, both motions are — with the limited (and largely uncontested) exceptions noted — denied in their entirety.

---

[8] The Court agrees with Plaintiff that a limiting instruction should be given to the jury explaining that compliance with industry standards is not a defense to a products liability claim under Oklahoma law. (*See* Pl.'s Reply 18). The parties shall meet and confer in an effort to propose agreed upon language for such an instruction.

The Clerk of Court is directed to terminate Docket Nos. 1801 and 1815.

SO ORDERED.

Dated: December 29, 2015  
New York, New York

                                                 JESSE M. FURMAN  
                                            United States District Judge