USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/30/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To:*
*Fleck, et al. v. General Motors LLC, 14-CV-8176*
-----------------------------------------------------------------------------x

14-MD-2543 (JMF)
14-MC-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

The first bellwether trial in this multi-district litigation ("MDL"), familiarity with which is presumed, involves claims brought by Plaintiff Robert Scheuer ("Plaintiff" or "Scheuer") against General Motors LLC ("Defendant" or "New GM") stemming from a May 28, 2014 car accident involving Scheuer's 2003 Saturn Ion. That car was manufactured by General Motors Corporation ("Old GM") — which filed for bankruptcy in 2009, a bankruptcy from which New GM emerged. New GM now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all of Scheuer's claims, contending, first, that he cannot show that an alleged ignition switch defect in the car caused or enhanced his injuries and, second, that all of his claims based solely on New GM's conduct — the only claims that could expose New GM to punitive damages — fail as a matter of law. (Docket No. 1810). For the following reasons, New GM's motion is almost entirely DENIED.

### FACTUAL BACKGROUND

The following undisputed facts are taken from admissible evidence in the record and the parties' statements pursuant to Local Rule 56.1. Plaintiff, a resident of Oklahoma, purchased a 2003 Saturn Ion manufactured by Old GM in Nevada in the summer of 2003. (*See* Pl.'s Local Rule 56.1 Resp. Opp'n New GM's Statement Undisputed Material Facts & Statement Additional Material Disputed Facts (Docket No. 1880) ("Pl.'s 56.1 Statement") ¶¶ 1-2; Third Am. Compl.

(Docket No. 1696) ("TAC") ¶ 9).  On February 25, 2014, New GM notified the National Highway Safety Administration ("NHTSA") of a potentially deadly defect in the ignition switches installed in many GM-brand vehicles, including the 2003 Saturn Ion, and New GM's determination to conduct a safety recall of the affected vehicles.  (*See* Pl.'s 56.1 Statement ¶ 5; Affirmation R. Allan Pixton (Docket No. 1821) ("Pixton Decl."), Ex. 3).  The NHTSA letter stated that "[t]he ignition switch torque performance [in these vehicles] may not meet General Motors' specification.  If the torque performance is not to specification, the ignition switch may unintentionally move from the 'run' position to the 'accessory' or 'off' position with a corresponding reduction or loss of power."  (Pixton Decl., Ex. 3, at 1).

In April and May 2014, Plaintiff received two recall notices from New GM.  (*See* Pl.'s 56.1 Statement ¶¶ 12-15; Pixton Decl., Exs. 4-5).  The notices advised Plaintiff that replacement parts were being made available and that, in the meantime, he should "remove all items from your key ring, leaving only the vehicle key.  The key fob (if applicable) should also be removed from the key ring."  (Pixton Decl., Ex. 4).  Following receipt of the May notice, Plaintiff called his local car dealership and was informed that replacement parts were not then available.  (*See* Pl.'s 56.1 Statement ¶¶ 16-18).  The dealership also reminded Plaintiff to take everything but his ignition switch key off his key ring, which Plaintiff did.  (*See id.* ¶¶ 18-19).  Plaintiff continued to drive the Saturn Ion.  (*See id.* ¶¶ 19-20).

On May 28, 2014, Plaintiff was driving on a highway in Oklahoma when he was forced off the road by another car.  (*See id.* ¶¶ 20-22).  The precise sequence of what followed is heavily disputed, but Plaintiff's car ended up crashing head-on into two trees.  (*See id.*  ¶¶ 21-22).  Plaintiff's frontal airbags, however, did not deploy.  (*See* Decl. Robert C. Hilliard Supp. Pl.'s Mem. Law Opp'n New GM's Mot. Summ. J. (Docket No. 1882) ("Hilliard Decl."), Ex. 14

("Scheuer Dep."), at 126).  Shortly after the accident, Plaintiff's insurer, State Farm, "determined that the vehicle was a total loss," and paid him a sum representing "the value of the vehicle." (Mem. Law Supp. Pl.'s Mot. *In Limine* No. 4 (Docket No. 1712) ("Pl.'s Fourth MIL Mem.") 4; *see id.*, Ex. 1).  Thereafter, State Farm transferred title for the car to a salvage yard, and on September 22, 2014, the salvage yard destroyed the car.  (*See* Pl.'s Fourth MIL Mem. 4; *id.*, Ex. 3; New GM's Combined Opp'n Pl.'s Mot. *In Limine* No. 4 (Docket No. 1816) 5).  On October 10, 2014, Plaintiff filed this action against New GM, alleging that he suffered various injuries as a result of the airbag non-deployment in his crash and that the airbag non-deployment was a result of the widely publicized ignition switch defect.  (Complaint, *Fleck, et al. v. General Motors, LLC*, No. 14-CV-8176 (JMF) (S.D.N.Y. Oct. 10, 2014), Docket No. 1; *see also* TAC ¶¶ 7-8).  Plaintiff's case was consolidated with the MDL and eventually selected to be tried as the first of several "bellwether" cases.  (*See* MDL Consolidated Order, *Fleck*, 14-CV-8176 (S.D.N.Y. Oct. 20, 2014), Docket No. 4; Order No. 25, 14-MD-2543, Docket No. 422; 14-MD-2543, Docket No. 590; 14-MD-2543, Docket No. 1217).

## BANKRUPTCY PROCEEDINGS

Before turning to New GM's arguments for summary judgment, it is necessary to briefly summarize certain proceedings before the Honorable Robert E. Gerber, United States Bankruptcy Judge for the Southern District of New York, who presided over the bankruptcy of Old GM in 2009.  After New GM's disclosure of the ignition switch defect in early 2014, many claims were filed against New GM — some alleging economic losses and some alleging personal injuries and wrongful deaths.  In April and August 2014, New GM filed motions before the Bankruptcy Court alleging that many of those claims were barred by the 2009 Sale Order through which New GM assumed many of Old GM's assets and some of its liabilities.  In April

3

2015, Judge Gerber ruled that many of the claims brought against New GM were in fact barred by the 2009 Sale Order.  *See In re Motors Liquidation Co.*, 529 B.R. 510 (Bankr. S.D.N.Y. 2015).  In particular, he determined that New GM could be held liable for certain assumed liabilities of Old GM (namely, products liability claims that were included in the Sale Agreement), but distinguished between liability based on Old GM's conduct and liability for "claims based solely on any wrongful conduct its own part." *Id.* at 583.  A later Order implementing that opinion defined claims "based solely on New GM's own, independent, post-Closing acts or conduct" as "Independent Claims." *See In re Motors Liquidation Co.*, 09-50026 (REG), Docket No. 13177 ¶ 4 (Bankr. S.D.N.Y. June 1, 2015).

The definition of "Independent Claims" reemerged as significant in Judge Gerber's recent opinion on punitive damages and "imputation." *See In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) ("*November Decision*").  There, Judge Gerber made two findings that bear on this bellwether trial.  First, he determined that, as a matter of bankruptcy law, knowledge of Old GM personnel or knowledge of information contained in Old GM files could be imputed to New GM only to the extent that it could be shown, as a matter of non-bankruptcy law, that New GM actually had that knowledge (for example, through an Old GM employee who later became an employee of New GM). *See November Decision* at 108.  Second, Judge Gerber ruled that claims for punitive damages could only be "based on New GM knowledge and conduct alone" because New GM did not assume liability for punitive damages under the Sale Agreement. *See id.*  In light of Judge Gerber's decisions, there are three types of damages available to Plaintiff: (1) compensatory damages for products liability claims based on Old GM conduct, which were assumed by New GM in the 2009 Sale Agreement; (2) compensatory damages for "Independent Claims" — that is, claims based solely on New GM

conduct (including any knowledge of Old GM properly imputed to New GM); and (3) punitive damages for "Independent Claims" (again, including any knowledge of Old GM properly imputed to New GM).  In his Third Amended Complaint, Plaintiff pursues all three.  (*See* TAC ¶¶ 418-29).

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a judgment for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To

defeat a motion for summary judgment, the non-moving party must advance more than a

"scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the

allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits

supporting the motion are not credible."  *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir.

1996) (citation omitted).

## CAUSATION

New GM argues first that summary judgment is warranted with respect to *all* of

Plaintiff's claims because there is no admissible evidence that the ignition switch defect (a defect

that New GM has admitted existed in 2003 Saturn Ions and other GM cars) caused or contributed

to his accident or injuries.  (*See* Mem. Supp. New GM's Mot. Summ. J. (Docket No. 1811)

("New GM's Mem.") 5-11).  The Court disagrees.  Under Oklahoma law — which the parties

agree applies in this diversity action — "[t]he determination of causation may be removed from

the province of the fact-finder only when there is a complete lack of evidence and no reasonable

inference tending to link the defendant's negligence to the plaintiff's harm."  *Smith v. Hines*, 261

P.3d 1129, 1135 (Okla. 2011).  Thus, summary judgment is inappropriate when a reasonable jury

could infer a causal link between the plaintiff's injury and facts relating to a defendant's conduct;

the plaintiff need not exclude all other possible causes of his injury.  *See Jones v. Mercy Health

Ctr., Inc.*, 155 P.3d 9, 12 (Okla. 2006); *Dutsch v. Sea Ray Boats, Inc.*, 845 P.2d 187, 191 (Okla.

1992); *see also Chickasha Cotton Oil Co. v. Hancock*, 306 P.2d 330, 333-34 (Okla. 1957)

(holding that "direct proof" that pellets manufactured by defendants contained harmful chemical

was not necessary where "[t]he same facts were susceptible of proof by circumstantial evidence, making it appear more probable that [the injury] came from this source than from any other").

Here, in light of the Court's recent Opinion and Order largely denying New GM's motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude Plaintiff's experts (*see* Op. & Order (Docket No. 1970) ("*Daubert* Op.")), the question of causation is plainly one for the jury.  Put simply, taken together, Plaintiff's experts on accident reconstruction, airbag design, and the ignition switch provide sufficient evidence for a reasonable jury to find that the airbags in Plaintiff's car failed to deploy as a result of the ignition switch defect.  (*See, e.g.*, Pixton Decl., Ex. 14 ("McCort Dep.") 55 ("[T]he airbag didn't deploy and we had a high Delta-v, and so either something else was going on or the ignition switch failed."); *id.*, Ex. 32 ("Loudon Report") 12 ("When the ignition switch moves from [run] to [accessory] or [off] mode, the airbags do not deploy and the seat pretensioners do not work."); *see also Daubert* Op. at 5 ("McCort is qualified to testify both that the front airbag should have deployed in this specific case and that a delta-v of this magnitude is generally above the threshold observed in most reconstructed crashes to cause a front airbag deployment." (internal quotation marks omitted))).  And similarly, taken together, Plaintiff's experts on occupant kinematics, crashworthiness, and airbag sensors provide sufficient evidence for a reasonable jury to find, in turn, that the airbag non-deployment caused, or exacerbated, Plaintiff's injuries.  (*See, e.g.*, Pixton Decl., Ex 16 ("Caruso Dep.") 108 ("I will say based on my 21 years of design experience and development experience that . . . these are the types of injuries that airbags will typically protect against."); *id.* 116 ("I believe I can opine in general terms about what the airbag is supposed to do and the general types of injuries it's supposed to prevent"); Pixton Decl., Ex. 18 ("Markushewski Dep.") 93 (discussing the tests he has done to evaluate injury thresholds); *see*

*also* McCort Dep. 62 ("[I]n terms of biomechanics, I certainly can tell the jury what happens when you're in a frontal crash and which direction the body in general will go.")).

Contrary to New GM's contentions, Plaintiff need not introduce expert evidence on specific injury causation, as this is a case "where the cause of the injury is apparent without the aid of science and the injury is objective rather than subjective in nature." *Orthopedic Clinic v. Hanson*, 415 P.2d 991, 995-96 (Okla. 1966); *see also Smith*, 261 P.3d at 1135-36; *Jones*, 155 P.3d at 12.[1]  The cases New GM cites in its reply brief for the proposition that expert testimony on injury "enhancement" is required are not to the contrary; in each of those cases, there was no expert evidence of *either* specific or general enhancement of injury due to airbag non-deployment.  (*See* Reply Mem. Supp. New GM's Mot. Summ. J. (Docket No. 1941) ("New GM's Reply Mem.") 3 n.3).  In *Battistella v. Daimler Chrysler Motors, Co.*, for example, there was *no* expert testimony as to whether or not airbag non-deployment typically caused or exacerbated car crash injuries, as the Court had stricken the proffered expert's testimony.  No. Civ. A 03-2286, 2004 WL 1336444, at *1-2 (E.D. La. June 14, 2004).  Similarly, in *Caboni v. General Motors Corp.*, the Court, relying on *Battistella*, found no evidence to support causation because the plaintiff had not adduced any expert testimony that "the injuries [he] suffered would have been different or less significant had the air bag deployed."  398 F.3d 357, 362 (5th Cir. 2005).  The experts there appear to have testified only that the plaintiff sustained certain injuries as a result of the crash and that airbag deployment would have prevented him from hitting his head on the steering wheel; there was no evidence with respect to airbag non-deployment's

---

[1]      On December 21, 2015, New GM filed a motion to strike the testimony of Dr. John Marouk, Plaintiff's treating physician — a motion that will become fully briefed on December 31, 2015.  (Docket Nos. 1931, 1947).  The Court need not, and does not, rely on the testimony of Dr. Marouk in deciding this motion.

tendency to enhance crash injuries.  *See id.*; *see also Stewart v. Gen. Motors Corp.*, 222 F. Supp.

2d 845, 848-49 (W.D. Ky. 2002) (same).  Here, by contrast, there is expert evidence from which

a juror could conclude that airbag non-deployment enhances injuries of the type suffered by

Plaintiff and, in turn, from which a juror could infer that the airbag non-deployment in Plaintiff's

case enhanced his injuries.  It follows that New GM's motion for summary judgment on all

claims based on causation must be and is denied.

## PRODUCTS LIABILITY

Plaintiff's first claim is for "Oklahoma Manufacturer's Product Liability," which is the

common law standard for strict liability in tort.  (*See* TAC ¶¶ 342-79).  He asserts two theories of

products liability: design defect and post-sale failure to warn.  (*See* Pl.'s Mem. Law Opp'n New

GM's Mot. Summ. J. (Docket No. 1878) ("Pl.'s Mem.") 11).  Pursuant to the 2009 Sale

Agreement, New GM assumed liability on the first theory from Old GM, the actual manufacturer

of the car — but as noted, only for compensatory damages, not for punitive damages.  (*See* New

GM's Mem. 12-13).  By contrast, the latter theory is premised on New GM's own conduct —

that is, on its failure to warn Plaintiff about the ignition switch defect despite its own conceded

knowledge of the defect.  Thus, if valid, Plaintiff's failure-to-warn products liability claim would

constitute an "Independent Claim" within the meaning of the Bankruptcy Court's rulings for

which Plaintiff could conceivably recover punitive damages.  New GM argues that the claim is

not valid under Oklahoma law.  (*See* New GM's Mem. 12-13, 19).[2]

In Oklahoma, the elements of a failure-to-warn claim are: (1) the product caused an

injury to the plaintiff; (2) the defect existed in the product when the product left the

---

[2]     New GM moves for summary judgment on the design defect product liability claim (for
which it assumed liability from Old GM pursuant to the 2009 Sale Agreement) solely on
causation grounds, which the Court addressed above.

manufacturer's possession and control; and (3) the defect made the product unreasonably

dangerous. *See Kirkland v. Gen. Motors Corp.*, 521 P.2d 1353, 1363 (Okla. 1974). The defect

can be caused either by a defective design or by an inadequate warning about the product's

dangers. *See Braswell v. Cincinnati, Inc.*, 731 F.3d 1081, 1085 (10th Cir. 2013) (applying

Oklahoma law); *Tansy v. Dacomed Corp.*, 890 P.2d 881, 886 (Okla. 1994). New GM argues that

"Oklahoma does not recognize a *post-sale* duty to warn or retrofit a product" (New GM's Mem.

19 n.54 (emphasis added) (quoting *Wicker ex rel. Estate of Wicker v. Ford Motor Co.*, 393 F.

Supp. 2d 1229, 1236 (W.D. Okla. 2005)), but the weight of authority suggests that the duty to

provide adequate warnings is a continuing duty that exists even after the sale of the product. *See,

e.g.*, *Smith v. FMC Corp.*, 754 F.2d 873, 877 (10th Cir. 1985) ("[A] manufacturer has a

responsibility to warn of a defective product at any time after it is manufactured and sold if the

manufacturer becomes aware of the defect."); *Thiry v. Armstrong World Indus.*, 661 P.2d 515,

517 (Okla. 1983) ("It should not be profitable for a manufacturer to knowingly continue to

market a defective product."); *McKee v. Moore*, 648 P.2d 21, 24 (Okla. 1982) ("The

manufacturer has a continuing duty to warn of all potential danger, which it knew, or should

have known, in the exercise of reasonable care to exist."); 8 Vicki Lawrence MacDougall,

Oklahoma Product Liability Law § 7:2 (2015) ("The warning obligation of the manufacturer is a

continuing duty.").

Admittedly, New GM's argument to the contrary finds some linguistic support in a

handful of federal cases. *See, e.g.*, *Smith v. Cent. Mine Equip. Co.*, 559 F. App'x 679, 685 (10th

Cir. 2014) (unpublished); *Smith v. Sears Roebuck & Co.*, No. 04-CV-1271 (HE), 2006 WL

687151, at *6 (W.D. Okla. Mar. 17, 2006); *Wicker*, 393 F. Supp. 2d at 1236; *see also Brown v.

Crown Equip. Corp.*, 460 F. Supp. 2d 188, 193-94 (D. Me. 2006). But none of them cites

Oklahoma decisions on point.[3]  And in each case, the court cited the fact that the product at issue was not alleged to be defective at the time of sale.  *See Smith*, 559 F. App'x at 680-81 (noting that the drill rig at issue had been retrofitted and, at the time of the accident, no longer had "operational safety equipment, making it more dangerous than it would be otherwise"); *Oja v. Howmedica, Inc.*, 111 F.3d 782, 791 (10th Cir. 1997) (applying Colorado law) (noting that under a failure-to-warn theory, "the product must have been defective at the time of sale"); *Sears Roebuck*, 2006 WL 687151, at *6 (stating that "Oklahoma does not recognize a post-sale duty to warn" because, instead, "the determination of whether a product is unreasonably dangerous due to a defective design is measured by consumer expectations *at the time the product leaves the manufacturer's control*"); *Wicker*, 393 F. Supp. 2d at 1234-36 (finding that there was no evidence that the tractor was defectively designed when sold decades earlier); *Brown*, 460 F. Supp. 2d at 193-94 (listing cases from around the country where courts declined to impose a post-sale duty to warn because the product was not shown to be negligently designed as originally sold).  New GM relies heavily in its reply brief on *Stokes v. Lake Raider, Inc.*, No. 13-CV-507 (KEW), 2014 WL 7375576 (E.D. Okla. Dec. 29, 2014), but in that third-party

---

[3]    The district courts in *Sears Roebuck* and *Wicker* cited two Oklahoma Supreme Court cases as authority for their conclusion that Oklahoma does not recognize a post-sale duty to warn: *Lee v. Volkswagen of Am., Inc.*, 688 P.2d 1283 (Okla. 1984) and *Kirkland*, 521 P.2d 1353.  *See Smith*, 2006 WL 687151, at *6; *Wicker*, 393 F. Supp. 2d at 1236-37.  (The Tenth Circuit in *Smith* in turn cited to *Wicker* and *Kirkland*.  *See Smith*, 559 F. App'x at 685.)  Neither case, however, addresses a failure-to-warn theory.  In *Kirkland*, the Court merely noted that its ruling did not "declare manufacturers and suppliers of defective products absolute insurers of all users and consumers whom they serve," because plaintiffs are required to prove causation and defendants may assert the defenses of unintended use and voluntary assumption of risk.  521 P.2d at 1366.  Similarly, the *Lee* Court noted that a plaintiff "must prove that the product was the cause of the injury, that the defect existed in the product at the time it left the control of the defendant and that the defect made the product unreasonably dangerous as defined by ordinary consumer expectations."  688 P.2d at 1285.  At most, those decisions suggest only that a post-sale duty to warn does not extend to products that were not defective at the time of sale.

indemnification case there was no allegation that the boat design at issue was defective until a retrofit was developed after the boat left the manufacturer; furthermore, the plaintiff had not alleged any product liability or negligence claim against the boat seller. *Id.* at 2.  In this case, of course, Plaintiff alleges a defect in the ignition switch of his car that, if it was present at all (a point that New GM does not concede), was present when the car was manufactured and sold. Under those circumstances, the Court concludes, Oklahoma law does recognize a post-sale duty to warn.

Somewhat more substantially, New GM argues that, to the extent a post-sale duty to warn exists under Oklahoma law at all, it would not apply to New GM as a successor corporation that did not manufacture Plaintiff's car.  (*See* New GM's Mem. 12-13; New GM's Reply 6-7).  After all, the very name of the cause of action is "Oklahoma *Manufacturer's* Products Liability."  *See, e.g.*, *Kirkland*, 521 P.2d at 1361.  (*See* New GM's Mem. 12).  And, as New GM emphasizes, Plaintiff does not cite any case applying Oklahoma law recognizing a successor corporation's post-sale duty to warn a purchaser of the predecessor corporation's product.  (*See* New GM's Reply 7-10).  With respect to the first point, however, Oklahoma courts have — despite the name — extended liability beyond manufacturers to entities that "have some relationship with the product alleged to have caused a plaintiff's injuries, either through manufacturing, selling, or distributing the product."  *Shrock v. Wyeth, Inc.*, 727 F.3d 1273, 1282 (10th Cir. 2013).  And with respect to the second point, the lack of precedent is not dispositive, as there appears to be no Oklahoma precedent either accepting *or rejecting* a successor corporation's post-sale duty to warn; that is, the question appears to be one of first impression under Oklahoma law. Accordingly, it is the task of the Court, sitting in diversity, to predict what the Oklahoma Supreme Court would decide if presented with the question.  *See Travelers Ins. Co. v. 633 Third*

*Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).  Based on existing Oklahoma precedent, influential

treatises, and persuasive authority from other jurisdictions, the Court concludes that the

Oklahoma Supreme Court would hold that a successor corporation, such as New GM, has an

independent post-sale duty to warn so long as certain conditions are met.[4]

First and foremost, that is the position taken by the influential *Restatement (Third) of*

*Torts: Products Liability*.  Section 13 of the *Restatement* provides that a successor corporation

> is subject to liability for harm to persons or property caused by the successor's
> failure to warn of a risk created by a product sold or distributed by the
> predecessor if: (1) the successor undertakes or agrees to provide services for
> maintenance or repair of the product or enters into a similar relationship with
> purchasers of the predecessor's products giving rise to actual or potential
> economic advantage to the successor, and (2) a reasonable person in the position
> of the successor would provide a warning.

Restatement (Third) of Torts: Products Liability § 13 (1998).  Second, many other states and

many federal courts have adopted that position.  *See, e.g.*, *Herrod v. Metal Powder Prods.*, 413

F. App'x 7, 13 (10th Cir. 2010) (per curiam) (applying Utah law); *Patton v. TIC United Corp.*,

77 F.3d 1235, 1240-41 (10th Cir. 1996) (applying Kansas law); *Florom v. Elliott Mfg.*, 867 F.2d

570, 577 (10th Cir. 1989) (applying Colorado law) ("Succession alone does not impose a duty to

warn the predecessor's customers of recently-discovered defects.  Where such a duty arises, it

stems from the existence of the relationship between the successor and the customers of the

predecessor.") (citation omitted); *Tabor v. Metal Ware Corp.*, 168 P.3d 814, 818 (Utah 2007)

("We conclude that Utah does impose an independent post-sale duty on successor corporations to

---

[4]      The Court, however, agrees with New GM's argument that a post-sale duty to warn
cannot be imposed solely on the basis of the 2009 Sale Agreement pursuant to which New GM
acquired Old GM's assets and a limited number of liabilities.  (*See* New GM's Mem. 12-13).
*See, e.g.*, *Doyle v. New Werner Holding Co.*, 307 P.3d 405, 409 (Okla. Civ. App. 2013) (holding
that a successor in bankruptcy was not liable for a product liability claim regarding a product
manufactured by the bankrupt company).

warn customers of defects in products manufactured and sold by the predecessor corporation as outlined in section 13 of the Restatement (Third) of Torts."); *Schumacher v. Richards Shear Co.*, 59 N.Y. 2d 239, 247 (1983); *see also* Restatement (Third) of Torts: Products Liability § 13, Reporters' Note to Comment a (1998) (collecting cases).

Although Oklahoma courts have not (to the Court's knowledge) had occasion to consider the *Restatement*'s position, an Oklahoma products liability treatise suggests that that position is consistent with Oklahoma law.  *See* 8 Vicki Lawrence MacDougall, Oklahoma Product Liability Law § 9:2 (2015) ("Courts may impose a duty to warn on successors based on a reasonableness standard.").  Additionally, the *Restatement* has been highly influential in Oklahoma products liability law.  *See, e.g.*, *Allenberg v. Bentley Hedges Travel Serv., Inc.*, 22 P.3d 223, 227 (Okla. 2001) (noting that Oklahoma strict products liability is based on Section 402A of the *Restatement (Second) of Torts*); *Tansy*, 890 P.2d at 884-88 (adopting Comment K to Section 402A of the *Restatement (Second) of Torts*); *Kirkland*, 521 P.2d 1353 (relying on Section 402A in endorsing strict products liability in Oklahoma law).  Finally, recognizing a duty to warn on the part of some successor corporations would be consistent with the theory of products liability endorsed by the Oklahoma Supreme Court, which places the duty to protect the public from a dangerous defect on the entity that "is best situated to protect the public against products that are a menace to safety."  *Okla. Gas & Elec. Co. v. McGraw-Edison Co.*, 834 P.2d 980, 984-85 (Okla. 1992); *see Kirkland*, 521 P.2d at 1362.  In the Court's view, therefore, it is likely that the Oklahoma Supreme Court would adopt the *Restatement*'s position on whether and when a successor corporation is subject to liability based on a failure to warn with respect to a product sold or distributed by its predecessor.  *Cf., e.g.*, *Hartford Fire Ins. Co. v. Dent-X Int'l, Inc.*, No. 05-CV-1019 (TPS), 2007 WL 911841, at *5 n.2 (D. Conn. Mar. 23, 2007) (predicting that the

Connecticut Supreme Court would adopt a standard set forth in the *Restatement (Second) of Torts* because the *Restatement* had been influential in Connecticut products liability law).

The pertinent question, therefore, is whether New GM has a sufficient "relationship with the customers of [Old GM]" to trigger an independent post-sale duty. *Florom*, 867 F.2d at 577. The primary factor courts have looked to in this context is whether the successor corporation assumed service and repair duties to predecessor products. *See, e.g.*, *id.*; *In re Old Carco LLC*, 492 B.R. 392, 405 (Bankr. S.D.N.Y. 2013); *Doyle*, 307 P.3d at 409; *see also* Restatement (Third) of Torts: Products Liability § 13, cmt. b (1998) (noting that a court should consider whether the successor sells or offers to sell "spare parts to the predecessor's customers for machinery sold by the predecessor . . . in deciding whether sufficient actual or potential economic advantage has accrued to the successor to warrant the imposition of a duty to warn").  Here, Section 2.3 of the 2009 Sale Agreement provides that New GM assumed all liabilities under express warranties, even for Old GM cars sold before the bankruptcy; that creates obligations with respect to Old GM vehicles still under warranty, and presumably also means that New GM continued to provide spare parts and services for Old GM vehicles even after warranties expired.  (*See* Pixton Decl., Ex. 22 ("Sale Agreement") 29).  The notification and recall obligations under the Safety Act that New GM inherited provide another kind of service and repair duty.  Among other things, those obligations put New GM into a position of ongoing communication with Old GM purchasers.  *See Florom*, 867 F.2d at 577.  *Holland v. FCA US LLC*, No. 15-CV-121, 2015 WL 7196197 (N.D. Ohio Nov. 16, 2015), cited by New GM, actually supports these conclusions. (*See* New GM's Reply Mem. 9 & n.17).  The *Holland* Court found that the plaintiffs (who were alleging economic harm) had failed to establish a sufficient relationship between New Chrysler and purchasers of the plaintiffs' Old Chrysler vehicles.  *Id.* at *4.  The only evidence in that case

was that New Chrysler had issued notices of an extended warranty for a limited class of vehicles, but that class did not include any of the plaintiffs' cars. *Id.* at *1-2. And as the Court noted, New Chrysler issued the notices pursuant to a voluntary duty and had no obligation to pay for repairs not covered by the notification. *Id.* at *4. By contrast, the 2009 Sale Agreement imposed a contractual warranty duty on the part of New GM to Old GM vehicles and New GM had a continuing duty to monitor and notify Old GM purchasers of defects. This is the kind of "relationship . . . that g[i]ve[s] rise to a duty to warn." *Id.*

In short, although New GM's arguments are not insubstantial and the question is a close one, the Court concludes that, under the circumstances here, New GM had a post-sale duty to warn Plaintiff of the known ignition switch defect. It follows that New GM's motion for summary judgment on Count I, Plaintiff's product liability claim, must be and is denied.

## FRAUD

Plaintiff's fraud claim (Count II) is exclusively an Independent Claim — and, thus, is (and can be) based solely on the conduct and knowledge of New GM. (*See* New GM's Mem. 11 n.39). New GM contends that summary judgment is warranted on three grounds: (1) because fraudulent concealment is not a cause of action under Oklahoma law; (2) because the TAC fails to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure; and (3) because Plaintiff cannot establish reasonable reliance. (*See* New GM's Mem. 13-16).

New GM's first two arguments can be quickly rejected. First, although Plaintiff styles his claim as one for "Deceit (Fraudulent Concealment)," it is plain that he asserts a claim for deceit or fraud, which is indisputably a cause of action under Oklahoma law. *See, e.g.*, *Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1259 (W.D. Okla. 2012); *Bowman v. Presley*, 212 P.3d 1210, 1217-18 (Okla. 2009). Plaintiff does not actually assert a *claim* of

fraudulent concealment — which, as New GM correctly points out, is only a *means of tolling* a statute of limitations, not a separate cause of action.  (*See* New GM's Mem. 14 (citing *McAlister v. Ford Motor Co.*, No. Civ-14-1351-D, 2015 WL 4775382, at *3 (W.D. Okla. Aug. 13, 2015))).  Second, New GM's reliance on Rule 9(b) — which establishes a heightened *pleading* standard for fraud — is misplaced at the summary judgment stage and on the eve of trial.  At this point, "no purpose would be served by asking Plaintiff[] to replead" even if the TAC failed to satisfy Rule 9(b).  *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 333 (S.D.N.Y. 2003).  Instead, it is appropriate to decide New GM's motion "under the summary judgment standard based on the evidence" in the record.  *Id.*; *accord Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001); *Perry v. Robinson*, No. 96-6027, 1996 WL 606380, at *4 (10th Cir. Oct. 23, 1996) (unpublished); *Kirk v. Liberty Mut. Ins. Co.*, 28 F. Supp. 2d 696, 700 (D. Conn.), *aff'd* 164 F.3d 618 (2d Cir. 1998).  Unfortunately, because the parties largely focus on Rule 9(b) and the allegations in the TAC (*see* New GM's Mem. 14-16; Pl.'s Mem. 13-14), they do not adequately brief the question of whether the evidence in the record is sufficient to survive the summary judgment standard.[5]  It is New GM that suffers the consequences for that failure, as it bears the

---

[5]      The parties' briefs fall short not only in discussing the evidence in the record, but also in discussing the law.  For example, it is unclear whether Oklahoma recognizes a claim for *actual* fraud based on the concealment of a material fact, as opposed to a *constructive* fraud claim, which requires a particular duty to disclose.  Some authorities suggest that fraud based on concealment is included within the umbrella of actual fraud.  *See, e.g.*, *Manakoune v. State Farm Mut. Auto. Ins. Co.*, 145 P.3d 1081, 1086 (Okla. 2006) ("[A]ctual fraud is the intentional misrepresentation or concealment of a material fact which substantially affects another person." (internal quotation marks omitted)); Okla. Unif. Jury Instructions – Civil ("OUJI-CIV") 18.1, Vernon's Okla. Form 2d (2d ed.) (instruction for false representation).  Other authorities imply that concealment is fraudulent only when the defendant had a duty to disclose the material facts (based on a contractual or fiduciary duty), or that actual fraud does not encompass fraudulent concealment.  *See, e.g.*, *Myklatun v. Flotek Indus., Inc.*, 734 F.3d 1230, 1234 (10th Cir. 2013) ("Plaintiffs do not contend they presented any evidence of an affirmative misrepresentation. Rather, they argue their fraud claim is based on Defendants' omissions or failures to speak, *i.e.* constructive fraud." (internal quotation marks omitted)); *Optima Oil & Gas Co. v. Mewbourne*

initial burden of showing the absence of a genuine issue of material fact.  *See, e.g.*, *Celotex Corp.*, 477 U.S. at 325.

New GM's third argument — that Plaintiff cannot establish reasonable reliance on a misrepresentation or omission of New GM in light of the recall notices that he received before the accident warning him of the ignition switch defect — is much stronger and may ultimately prevail, but does not warrant entry of summary judgment either.  For one thing, whether a plaintiff relied on a misrepresentation or omission of the defendant and, even more, whether such reliance was reasonable are questions normally "reserved for the trier of fact."  *Bowman*, 212 P.3d at 1222; *see also Evers v. FSF Overlake Assocs.*, 77 P.3d 581, 586-87 (Okla. 2003).  For another, a reasonable jury could find for Plaintiff on these questions, as he alleges that he purchased and drove his car based on a belief in its safety — a belief that, to put it mildly, would have been hard to maintain had New GM not concealed the ignition switch defect.  (*See* Scheuer Dep. 89 (Plaintiff bought the car originally because of its reputation for safety); *id.* at 120 (Plaintiff had followed instructions in a prior recall notice)).  Plaintiff also alleges that the recall notices were not sufficient to overcome that belief — and arguably fraudulent in themselves. (*See* Pl.'s Mem. 15; TAC ¶¶ 388-391).  With respect to the latter point, for instance, Plaintiff contends that the recall notices were inadequate because they did not warn about the possibility of single-key rotation (*see* Pl.'s Mem. 15), and New GM itself admits that there is evidence of "single-key rotation events" that were reported prior to the recall notice.  (*See* New GM's Reply

---

*Oil Co.*, No. 09-CV-145-C, 2009 WL 1773198, at *6 (W.D. Okla. June 22, 2009) ("In Oklahoma, the elements of actionable fraud are (1) the defendant made a material representation that was false, (2) he knew when he made the representation that it was false, (3) he made it with the intention that it should be acted upon by plaintiff, and (4) plaintiff acted in reliance upon it and thereby suffered detriment." (internal quotation marks omitted)); OUIJI-CIV 18.2 (2d ed.) (Oklahoma's jury instruction for fraud liability on the basis of nondisclosure or concealment requires showing that defendant had a duty to disclose).

Mem. 20; *see also Daubert* Op. at 6-7; Opinion & Order (Docket No. 1968) at 5-6).[6]

Accordingly, New GM's motion for summary judgment on Count II — Plaintiff's claim for

fraud or deceit — must be and is DENIED.

## NEGLIGENCE

Next, Plaintiff brings negligence claims against New GM.  (*See* TAC ¶¶ 392-405).[7]  To

show negligence, plaintiffs "must prove that (1) defendants owed them a *duty to protect* them

from injury, (2) defendants *breached that duty*, and (3) defendants' *breach was a proximate*

*cause* of plaintiffs' injuries."  *Iglehart v. Bd. of City Comm'rs of Rogers Cnty.*, 60 P.3d 497, 502

(Okla. 2002); *see Martinez v. Angel Expl., LLC*, 798 F.3d 968, 974 (10th Cir. 2015).  Here,

Plaintiff alleges that New GM is liable for negligence on two independent bases: first, because

the company assumed liability under the 2009 Sale Agreement for *Old GM's* negligence (that is,

to the extent an Old GM car caused personal injury or property damage); and second, based on

its *own* negligence in failing to warn of the defect and in failing "to adequately recall and fix the

defect."  (TAC ¶¶ 400-401).  New GM does not appear to take issue with the former basis for

liability — that is, to dispute that Plaintiff can bring claims based on Old GM's negligence

---

[6]     In its reply brief, New GM argues that there is no evidence in the record that it knowingly
or intentionally made misrepresentations or omissions in the recall notices.  (New GM's Reply
Mem. 10-12).  If true, that would be fatal to any fraud claim based on the notices themselves.
*See, e.g.*, *Optima Oil & Gas*, 2009 WL 1773198, at *6 (listing knowledge and intent as two
elements of actionable fraud under Oklahoma law).  But Plaintiff has not had an opportunity to
respond to that argument.  Moreover, the argument would not necessarily defeat a fraud claim
based on pre-recall misrepresentations or omissions by New GM, as a jury could presumably
find that Plaintiff's reliance on those misrepresentations or omissions was reasonable
notwithstanding the notices because the notices were somehow inadequate, whether New GM
intended them to be or not.

[7]     Under Oklahoma law, a plaintiff need not "elect between a negligence or strict products
liability in tort cause of action."  8 Vicki Lawrence MacDougall, Oklahoma Product Liability
Law § 3:8 (2015); *accord Kirkland*, 521 P.2d at 1365.

(except to the extent that it argues lack of causation, an argument rejected above).  But the company does seek summary judgment with respect to Plaintiff's negligence claims based on its own conduct (which would qualify as "Independent Claims" and thus could support an award of punitive damages).  (*See* New GM's Mem. 17-24; New GM's Reply 12-15).

More specifically, New GM seeks summary judgment with respect to any "Independent Claim" of negligence on four grounds: (1) that there is no such thing as a "negligent recall claim" under Oklahoma law; (2) that, to the extent there is such a claim under Oklahoma law, it would be preempted by federal law; (3) that any negligence *per se* claim would fail as a matter of law because the TAC provides inadequate notice of what statute New GM allegedly violated; and (4) that, under Oklahoma law, there is no post-sale duty to warn, particularly for a successor corporation.  (*See* New GM's Mem. 17-24).  The Court addressed the last of these arguments above, in connection with Plaintiff's product liability claim, and that discussion applies here with equal force.  (If anything, it applies with greater force given Oklahoma's "traditional common-law [negligence] rule that whenever one person is by circumstances placed in such a position with regard to another, that, if he (she) did not use ordinary care and skill in his (her) own conduct, he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."  *Iglehart*, 60 P.3d at 502.)  Accordingly, the Court focuses here only on New GM's first three arguments.

## A.  Negligent Recall

New GM's first argument is that there is no such thing as a "negligent recall claim" under Oklahoma law.  (*See* New GM's Mem. 19).  The thrust of New GM's theory is that, just as Oklahoma law does not impose a post-sale duty to warn, neither does it impose a duty to recall defective products, let alone a duty to do so adequately.  (*See id.*).  Plaintiff's claim does not

depend, however, on a specific "duty to recall"; instead, it is grounded in the duty of ordinary care that the common law demands from all actors.  (*See* Pl.'s Mem. 16-19).  Oklahoma clearly imposes such a duty, both by statute and common law precedent.  *See, e.g.*, 76 Okla. Stat. Ann. § 1 ("Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."); *Beugler v. Burlington N. & Santa Fe Ry. Co.*, 490 F.3d 1224, 1228 (10th Cir. 2007) (noting that for a duty analysis under Oklahoma law, "the most important consideration is foreseeability") (internal quotation marks omitted)); *Morales v. City of Okla. City ex rel. Okla. City Police Dep't*, 230 P.3d 869, 878 (Okla. 2010) ("A defendant is generally said to owe a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks that make the conduct unreasonably dangerous.") (internal quotation marks omitted)).  Plaintiff was foreseeably endangered by New GM's alleged misconduct — that is, New GM's delay in recalling admittedly defective vehicles — because New GM knew that Plaintiff was driving a defective car by at least 2012.  (*See* Pl.'s Mem. 17-18).  *See Frey v. AT&T Mobility, LLC*, No. 07-CV-468-TCK-FHM, 2008 WL 4415328, at *8 (N.D. Okla. Sept. 23, 2008) (finding that a cellular phone services provider owed a duty of care to the plaintiff because there was evidence in the record suggesting that the defendant's employees "were at least arguably in a position . . . such that 'ordinary prudent people' would have recognized that if they did not act with ordinary care and skill in regard to the circumstances, *i.e.*, by timely providing the information in their possession, they may cause injury").  And delay of the recall was arguably unreasonably dangerous conduct, as it involved a hidden defect that caused a risk of serious injury or death "'beyond that which would be contemplated by the ordinary consumer who purchases it.'"  *Kirkland*, 521 P.2d at 1362 (quoting *Restatement (Second) of Torts* § 402A cmt. g (1965)).

In any event, New GM also assumed a duty when it instituted the recall.  Oklahoma law recognizes that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or thing, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."  *Lay v. Dworman*, 732 P.2d 455, 459 (Okla. 1986) (quoting *Restatement (Second) of Torts* § 323 (1965)); *see Underwood v. Jensen Farms*, No. 6:11-CV-348-JHP, 2013 WL 6903751, at *6 (E.D. Okla. Dec. 31, 2013).  Courts have found that this duty applies "where the plaintiff and defendant have a relationship that inherently implicates safety and protection."  *Frey v. AT&T Mobility, LLC*, 379 F. App'x 727, 729-30 (10th Cir. 2010).  Here, New GM had (and still has) a relationship with drivers like Plaintiff "that inherently implicates safety and protection."  Thus, when the company undertook the ignition switch recall — which was "necessary for the protection of [an]other's person or thing" — it exposed itself to liability if the recall was carried out negligently and caused injury.  *See Lay*, 732 P.2d at 459.  In short, whether or not Oklahoma courts have specifically recognized a "negligent recall claim," Plaintiff's negligence claim with respect to the recall is firmly grounded in Oklahoma law.[8]

## B.  Preemption

Next, New GM argues that any negligent recall claim would be preempted by the Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. § 30101 *et seq.* and applicable regulations.

---

[8]       As discussed, New GM's duty is grounded in the common law of torts, not the 2009 Sale Order, and thus does not rest on any third-party beneficiary status under the Sale Order (which, New GM rightly points out, would be inconsistent with Judge Gerber's rulings).  (*See* New GM's Mem. 18-19).

(New GM's Mem. 17-22).  Wisely, New GM does not contend that Plaintiff's claims are expressly or field preempted by the Safety Act.  *See, e.g.*, *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 867-68 (2000) (holding that Congress did not intend to preempt common law tort actions when it enacted the Safety Act); *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2000) ("Congress in the Safety Act plainly did not intend to occupy the field of motor vehicle safety.").  Instead, it relies on the doctrine of conflict preemption, which applies when "compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective[s] of Congress." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) (internal quotation marks omitted).  It is well established that the "ultimate touchstone" of any preemption analysis — including conflict preemption analysis — is congressional intent.  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96 (1992).  Further, and significantly, there is a presumption that Congress did not intend to preempt state law in areas traditionally regulated by the states.  *See California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989).  That presumption applies here, as "[m]otor vehicle safety is an area of law traditionally regulated by the states."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1196 (C.D. Cal. 2010); *accord Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 958-59 (N.D. Cal. 2004).

New GM fails to overcome the presumption against preemption.  First and foremost, the Safety Act itself plainly contemplates that it will operate in conjunction with traditional common law tort remedies.  *See* 49 U.S.C. § 30103(d) ("A remedy under [the provisions of the Safety Act] is in addition to other rights and remedies under other laws of the United States or a State."); *id.* § 30103(e) ("Compliance with a motor vehicle safety standard prescribed under this

chapter does not exempt a person from liability at common law.").  Second, the flexibility and discretion built into the Secretary of Transportation's oversight of vehicle recalls make plain that Congress contemplated some diversity, if not inconsistency, in recall mechanisms.  *See* 49 U.S.C. §§ 30118, 30119.  (*See* New GM's Mem. 21-22).  And third, consistent with the statutory language and structure, New GM fails to show that a claim or finding that it acted negligently with regard to the ignition switch recall would conflict with the Safety Act's recall requirements. That is, New GM provides no evidence demonstrating that application of the traditional common law negligence duty would put it in a position where it could not comply with both state and federal duties.  *Cf. Chamberlan*, 314 F. Supp. 2d at 963.

*Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000), and *In re Bridgestone/Firestone Inc., Tires Products Liability Litigation*, 153 F. Supp. 2d 935 (S.D. Ill. 2001), upon which New GM principally relies, do not call for a different conclusion.  In *Geier*, the Supreme Court held that a state court lawsuit alleging that failure to include a driver's side airbag was negligent or a design defect was preempted because the Safety Act gave car manufacturers a choice as to whether or not such airbags were included.  *See* 529 U.S. at 866. The state claim was "preempted on the basis of an actual conflict with specific, explicitly enunciated safety standards . . . [that were] the result of a considered policy choice." *Chamberlan*, 314 F. Supp. 2d at 963.  That is, the *Geier* Court found that Congress had intended to leave choices available to car manufacturers with regard to airbag installation, and the state mandate negated those choices.  *See* 529 U.S. at 874-75.  Here, by contrast, any allegation that the recall was conducted negligently would impose a separate, but not conflicting, duty on top of the federal requirement that recalls be "adequate."  (*See* New GM's Mem. 20-21).  *Cf. Chamberlan*, 314 F. Supp. 2d at 963.  In *Bridgestone/Firestone Inc.*, on the other hand, plaintiffs

24

sought a court-ordered recall of allegedly defective tires.  *See* 153 F. Supp. 2d at 937.  The Court found, first, that the presumption against preemption did not apply (contrary to the weight of other authority) because states had not traditionally occupied the field of vehicle recalls; and second, that such judicially imposed injunctive relief would frustrate the Safety Act regulations that provide when a defect merits a recall.  *See id.* at 942, 945-46.  Here, by contrast, the presumption against preemption applies; and Plaintiff primarily seeks damages, in no small part on the basis of an *admitted* Safety Act violation and completed recall.  *Cf. Great W. Cas. Co. v. Volvo Trucks N. Am., Inc.*, No. 08-CV-2872, 2010 WL 4222924, at *5 (N.D. Ill. Oct. 20, 2010).

## C.  Negligence *Per Se*

Finally, New GM contends that Plaintiff's negligence *per se* claim fails as a matter of law.  (*See* New GM's Mem. 22-23; New GM's Reply 13-14).  "When courts adopt statutory standards for causes of action for negligence, the statute's violation constitutes negligence per se.  To establish negligence per se, the plaintiff must demonstrate the claimed injury was caused by the violation, and was of the type intended to be prevented by the statute.  Finally, the injured party must be one of the class intended to be protected by the statute."  *Howard v. Zimmer*, 299 P.3d 463, 467 (Okla. 2013) (footnote omitted).  Here, although the TAC cites many statutes in support of negligence *per se*, Plaintiff appears to have abandoned all but one: the Safety Act.  That one suffices.  The recall provisions of the Safety Act were plainly intended to prevent injuries caused by defective cars, and Plaintiff equally plainly falls within the class of drivers intended to be protected by the statute.  *See, e.g.*, *Lowe v. Gen. Motors Corp.*, 624 F.2d 1373, 1380 (5th Cir. 1980) (holding that the violation of a similar motor vehicle safety act was evidence of negligence *per se* under Alabama law).  Significantly, New GM does not really argue otherwise, but instead takes issue with the number of other statutes cited by Plaintiff in the

TAC, contending that it lacked "fair notice" of the basis of Plaintiff's claim.  (*See* New GM's Mem. 22-23).  Putting aside whether that would be a valid basis for summary judgment (as opposed to allowing Plaintiff to replead), it is disingenuous at best, as the Safety Act is referenced repeatedly in the TAC and has been central throughout this litigation.  Moreover, New GM has *admitted* to violating the Act.  (*See, e.g.*, Hilliard Decl., Ex. 4 (NHTSA Consent Order)).[9]

*          *          *          *          *

In sum, New GM's arguments with respect to Plaintiff's negligence claims are unpersuasive, so summary judgment on that count is DENIED.

## BREACH OF IMPLIED WARRANTY

Next, New GM moves for summary judgment on Plaintiff's claim for breach of implied warranty (Count IV), arguing that it is — among other things — time barred.  (New GM's Mem. 24-25).  Plaintiff does not respond to the argument and appears to have abandoned the claim. (*See* Proposed Joint Pretrial Order (Docket No. 1925) 3 n.1 (acknowledging that "Plaintiff did not dispute New GM's motion for summary judgment with respect to Plaintiff's implied warranty claim")).  Accordingly, New GM's motion for summary judgment is GRANTED with respect to the claim.

---

[9]     Although New GM does not make the argument, Plaintiff may have a hard time at trial showing that New GM's violation of the Safety Act caused his injuries in light of the recall notices that he received before the accident.  *See Howard*, 299 P.3d at 467-68.  Nevertheless, summary judgment on that ground is not warranted, both because New GM does not make the argument and for the reasons discussed above with respect to the reliance element of fraud.

## OKLAHOMA CONSUMER PROTECTION ACT

Finally, New GM's sole argument for dismissal of Plaintiff's claim under the Oklahoma Consumer Protection Act (Count V) is that the Act does not apply because Plaintiff purchased his car outside of Oklahoma.  (*See* New GM's Mem. 25).  But the Act extends to any "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead" a consumer, and expressly provides that the challenged "practice may occur before, during or after a consumer transaction is entered into."  Okla. Stat. Ann. Tit. 15 § 752(13).  Consistent with that language, the Oklahoma Supreme Court has applied the statute to conduct directed toward a plaintiff in Oklahoma following an out-of-state purchase.  *See Lumber 2, Inc. v. Ill. Tool Works, Inc.*, 261 P.3d 1143, 1145 (Okla. 2011).  In this case, Plaintiff's claim is not (and, in light of Judge Gerber's rulings, presumably could not be) based on his purchase of the car in Nevada; instead, it is based on New GM's alleged misrepresentations, omissions, and other practices directed toward him in Oklahoma, where he resided.  Accordingly, New GM's motion for summary judgment with respect to Count V must be and is DENIED.[10]

---

[10]    New GM contends — albeit only in a footnote — that, even if the Oklahoma Consumer Protection Act applies, punitive damages are not available under the statute.  (*See* New GM's Mem. 25 n.67).  Although the Court is inclined to agree in light of Oklahoma precedent, *see, e.g.*, *Robinson v. Sunshine Homes, Inc.*, 291 P.3d 628, 637 (Okla. Civ. App. 2010) ("The measure of damages in an action under the Act is the plaintiff's actual damages."); *Wilson v. Johnson*, No. 05-CV-0921-F, 2006 WL 1555809, at *3 (W.D. Okla. June 5, 2006) ("Private claims for damages under the Consumer Protection Act . . . are remedial claims, not punitive claims."), it reserves final judgment on the issue because Plaintiff did not respond to the argument.  If Plaintiff believes that he is entitled to seek punitive damages under the Act, he shall raise the issue — and cite appropriate authority — sufficiently in advance of the charge conference to allow New GM to respond.

**CONCLUSION**

For the reasons stated above, New GM's motion for summary judgment is GRANTED (as uncontested) with respect to Plaintiff's breach-of-implied-warranty claim, but is otherwise DENIED.  Moreover, because there is sufficient evidence to support several Independent Claims with respect to which Plaintiff seeks punitive damages, New GM's Amended Seventh Motion *in Limine* (which asks the Court to exclude all evidence and argument related to punitive damages) must also be DENIED.  (*See* Docket No. 1800).  The Clerk of Court is directed to terminate 14-MD-2543, Docket Nos. 1799 and 1810; and 14-CV-8176, Docket No. 223.


SO ORDERED.

Date:  December 30, 2015
       New York, New York

_____
JESSE M. FURMAN
United States District Judge