UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

IN RE:

GENERAL MOTORS LLC IGNITION SWITCH LITIGATION

*This Document Relates To:*
*Fleck, et al. v. General Motors LLC, 14-CV-8176*
------------------------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __08/01/2016____

14-MD-2543 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

**[Regarding the Parties' *Daubert* Motions and Plaintiff's Motion *in Limine* No. 4]**

The next bellwether trial in this multidistrict litigation ("MDL"), brought by Plaintiff

Stephanie Cockram and familiarity with which is presumed, is scheduled to begin on September

12, 2016. (*See* Order No. 100, Docket No. 2836). Both parties move to exclude expert opinions

and testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Rule

702 of the Federal Rules of Evidence. (Docket Nos. 2852, 2857). Each party seeks to limit, if

not preclude, the testimony of experts offered by the other side, but the parties' principal dispute

concerns the admissibility of expert opinions regarding alcohol and drug tests of Plaintiff shortly

after her crash. In a related motion *in limine* — Plaintiff's Motion *in Limine* No. 4 — Plaintiff

moves to preclude evidence of those tests altogether. (Docket No. 2967). For the reasons

discussed below, the Court holds that evidence and argument concerning the drug test is

inadmissible but that the alcohol test and most (but not all) of the proffered expert testimony

relating to it are fair game. In addition, the Court concludes that most (but not all) of the parties'

other objections to expert testimony go to weight rather than admissibility. Accordingly,

Plaintiff's fourth motion *in limine*, Plaintiff's *Daubert* motion, and New GM's *Daubert* motion

are all GRANTED in part and DENIED in part.

## BACKGROUND

On December 31, 2005, Cockram, a resident of Virginia, purchased a new 2006 Chevrolet Cobalt.  (Def. New GM's Statement Undisputed Material Facts Pursuant to Local Civil Rule 56.1 (Docket No. 2939) ("Def.'s SOF") ¶ 2).  Roughly five-and-a-half years later, in the late afternoon of June 28, 2011, Plaintiff crashed her Cobalt into a drainage ditch culvert. (*Id.* ¶¶ 4-6; Pl.'s Local Rule 56.1 Resp. in Opp'n New GM's Statement Undisputed Material Facts & Statement of Additional Facts (Docket No. 3016) ("Pl.'s SOF") ¶ 44).  Despite the frontal impact, the frontal airbags did not deploy, and Plaintiff was severely injured in the crash. (*Id.* ¶¶ 45, 49).  In this action, Plaintiff seeks compensatory and punitive damages for her injuries resulting from the airbag nondeployment, claiming that it was caused by a defect in the ignition switch that allowed the switch to move from the "run" to the "accessory" or "off" positions.  (*See id.* ¶¶ 44-50; Third Am. Compl. (14-CV-8176, Docket No. 393) ¶¶ 23, 421-432).  Notably, she does not claim that inadvertent ignition switch rotation caused her car to veer off the road and crash — only that it caused the airbags to fail, enhancing or exacerbating her injuries.

## LEGAL STANDARDS

District courts have discretion to determine evidentiary issues presented in motions *in limine* in advance of trial.  *See, e.g.*, *United States v. Dupree*, 706 F.3d 131, 135 (2d Cir. 2013); *Henry v. Wyeth Pharm.*, 616 F.3d 134, 149 (2d Cir. 2010).  Under Rule 402 of the Federal Rules of Evidence, "relevant" evidence is admissible unless prohibited by rule, statute, or constitutional provision.  *See* Fed. R. Evid. 402.  Pursuant to Rule 401, evidence is relevant if it "has any tendency to make a [consequential] fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Finally, to the extent relevant here, Rule 403 prevents the admission of otherwise relevant evidence whose "probative value is substantially outweighed by

a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  A district court's balancing under Rule 403 will not be overturned "unless there is a clear showing of abuse of discretion or that the decision was arbitrary or irrational." *United States v. Bermudez*, 529 F.3d 158, 161-62 (2d Cir. 2008) (internal quotation marks omitted).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert*, the United States Supreme Court defined the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  "The Rule 702 inquiry is a flexible one that "depends upon the particular circumstances of the particular case at issue."  *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9480448, at *2 (S.D.N.Y. Dec. 29, 2015) (the "*Scheuer Daubert Op.*") (internal quotation marks omitted).  "Although a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule."  *Id.* (internal quotation marks omitted).  And "[a]lthough expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so

unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (internal quotation marks omitted).  As the *Daubert* Court itself stressed, "the traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

## DISCUSSION

As noted, the parties' principal dispute concerns the admissibility of evidence that Plaintiff tested positive for alcohol and clonazepam shortly after her accident and expert testimony from each party concerning those tests.  The Court will address those issues first, then turn to each party's other *Daubert* objections.

**A.  Opinions and Evidence Regarding Alcohol and Drug Use**

At the hospital following her accident, Plaintiff's blood was drawn for routine testing that revealed she had, less than an hour after the accident, a blood-alcohol concentration ("BAC") level of .059.  (*See* Mem. Supp. Gen. Motors LLC's Mot. To Exclude Certain Expert Ops. (Docket No. 2853) ("New GM's Daubert Mem.") 4 & n.3 (noting that, per Plaintiff's toxicology expert, .067 grams per deciliter is the equivalent to a .059 percent BAC)).  In addition, Plaintiff was subjected to a urine analysis, which tested positive for benzodiazepine — a class of drugs that includes clonazepam (also known by its brand name, klonopin), an anxiety-treating medication for which Plaintiff had a prescription.  (*Id.* at 4.)  Notably, unlike the blood-alcohol test, the urine test simply comes back negative or positive, providing, in the words of New GM's toxicology expert, no indication of "how much Clonazepam she had in her blood at the time of the incident, *if she had any*."  (Pl.'s Mem Law Supp. Mot. *Limine* No. 4 (Docket No. 2858)

("Pl.'s Fourth Mem."), Ex. H, at 138 (emphasis added)).  In her fourth motion *in limine*, Plaintiff

argues that, under Virginia law, evidence of the tests should be excluded in its entirety.[1]

Relatedly, each party seeks to exclude the other's expert testimony regarding the tests' import.

(*See* New GM's Daubert Mem. 6-16; Pl.'s Mem. Law Supp. Omnibus Mot. To Exclude Certain

Expert Ops. (Docket No. 2858) ("Pl.'s Daubert Mem.") 4-14).  For obvious reasons, the Court

will begin with the question of whether the tests are admissible at all.

### 1. The Admissibility of the Tests

Plaintiff's broadest argument for exclusion of the tests is that they are irrelevant.  (Pl.'s

Fourth Mem. 6-7 & n.3).  The argument is premised on the fact that Plaintiff has abandoned any

contention that the ignition switch defect caused her to veer off the road and contends only that

airbag nondeployment enhanced her injuries.  *See, e.g.*, *Slone v. Gen. Motors Corp.*, 249 Va.

520, 526 (1995) (holding that the plaintiff had a valid negligence claim against a vehicle

manufacturer because the alleged product defect enhanced his injuries, even though it did not

cause his accident); *see also* Paul A. LeBel, *A Doctrine By Any Other Name: The Putative

Rejection of "Crashworthiness" in Virginia Products Liability Law*, Popular Media, Paper 133

(1995) (observing that, in *Slone*, the Virginia Supreme Court approved of a "crashworthiness"

cause of action even though it declined to label it as such), *available at* http://scholarship.law.

wm.edu/popular_media/113.  Even under that circumscribed theory of injury, however, New GM

---

[1]      Plaintiff also moves to preclude evidence of other occasions on which she drove after
drinking some alcohol.  (Pl.'s Fourth Mem. 7).  In its opposition, New GM states that it "does
not intend to introduce evidence of instances during which plaintiff drove after consuming
alcohol at any time prior to the day of the accident, unless plaintiff opens the door to other
alcohol use, for example by testifying or suggesting that she has never driven after consuming
alcohol."  (New GM's Mem. Law Opp'n Pl.'s Mot. *In Limine* No. 4 ("New GM's Fourth
Opp'n") Docket No. 3045) 1 n.3).  Accordingly, that portion of Plaintiff's motion is granted as
unopposed.

is entitled to assert as a defense that Plaintiff's own negligence was a cause of the accident.  *See*

*Hodges v. Fed.-Mogul Corp.*, No. 7:12-CV-00362, 2015 WL 9460567, at *4 (W.D. Va. Dec. 23,

2015) (noting that in a case "involving a defective automobile airbag," the "negligent operation

of the automobile may prevent the driver from recovering on contributory negligence grounds");

*Shifflett v. Gen. Elec. Co.*, No. 5:06-CV-00127, 2007 WL 3243796, at *4 (W.D. Va. Nov. 1,

2007) (holding that the plaintiff, who characterized his claim as one for "enhanced injury," had a

viable negligence claim under *Slone*, but "that contributory negligence and unforeseeable misuse

are viable defenses"); *see also* Restatement (Third) of Torts: Prod. Liab. § 16 & cmt. f (1998)

("A majority of courts . . . allows the introduction of plaintiff's conduct as comparative fault in a

crashworthiness context.").  Given that, tests tending to show that Plaintiff was impaired at the

time of her accident are plainly relevant within the meaning of Rule 401.[2]

Less broadly, Plaintiff argues that evidence of the drug and alcohol tests is inadmissible

absent additional evidence of impairment.  (Pl.'s Fourth Mem. 7-9, 11-12; Pl.'s Reply 2-3).  That

argument is not without some force, as the Virginia Supreme Court has "set forth . . . requisites

that must be satisfied before evidence of intoxication properly comes before a jury for its

consideration."  *Hemming v. Hutchinson*, 221 Va. 1143, 1145-46 (1981); *see Pitt Ohio Exp.,

LLC v. Pat Salmon & Sons, Inc.*, 532 F. App'x 439, 442-43 (4th Cir. 2013); *accord Watts v.

Hollock*, No. 3:10-CV-92, 2011 WL 6026998, at *2 (M.D. Pa. Dec. 5, 2011) (applying similar

Pennsylvania law).  To be admissible, for example, evidence of intoxication must involve more

than the "mere odor" of alcohol on a person's breath, *see Burks v. Webb*, 199 Va. 296, 304-05

---

[2]     Plaintiff argues that evidence of her BAC is not admissible to prove that her conduct was
"willful and wanton" (because, among other things, Virginia law requires a BAC of 0.15 or
higher for such a finding), an issue that could be relevant if Plaintiff were to prove that New GM
acted willfully and wantonly.  (Pl.'s Fourth Mem. 9 & nn.6-7).  Plaintiff may well be right on
that score, but the Court need not and does not reach the issue at this time.

(1957), or the fact that alcohol was consumed, *see Hoffner v. Kreh*, 227 Va. 48, 51 (1984)

(affirming the trial court's exclusion of alcohol-related evidence where the driver had "two

drinks of Scotch and water" at a bar in the three hours before the accident, but "[t]here was no

evidence that he was not fully alert when" questioned by a police officer after the accident or

"that there was any odor of alcohol . . . or that there was any irregularity in his speech,

appearance, or actions").  At the same time, the Virginia Supreme Court has made clear that the

"mere odor rule" is inapplicable "where the quantity of alcohol consumed and the relative time

of its consumption are sufficient to raise an inference of intoxication." *Baker v. Taylor*, 229 Va.

66, 69-70 (1985); *see also, e.g.*, *Harrell v. Woodson*, 353 S.E.2d 770, 773-74 (Va. 1987)

(reversing the trial court's exclusion of alcohol-related evidence where the driver had quickly

drunk four beers "three and one-half hours before the accident," even though the defendant

argued (without any opposing argument noted) "that there was no [other] evidence that he was

intoxicated").  Additionally, the rule remains inapplicable even if "the quantity of alcohol

consumed may not be sufficient to cause a person's intoxication in a strict penal sense." *Baker*,

229 Va. at 70.  Evidence of intoxication is admissible if the intoxicants "impair [the driver's]

capacity to perceive the dangers with the clarity, make the decisions with the prudence, and

operate the vehicle with the skill and caution required by law." *Simon v. Commonwealth*, 220

Va. 412, 419-20 (1979).

Applying those standards here, the Court concludes that evidence of Plaintiff's BAC test

result is admissible, but that evidence of her clonazepam test result is not.  With respect to the

former, measuring one's BAC following an accident is, to put it bluntly, simply a more scientific

and accurate way of measuring "the quantity of alcohol consumed and the relative time of its

consumption." *Baker*, 229 Va. at 69-70.  And there is admissible evidence — namely, the

7

testimony of New GM's expert, discussed below — tending to show that a person with Plaintiff's alleged BAC would have been, in some respects, impaired.  (*See* Docket No. 2859, Ex. 6 ("McCutcheon Report") 6; *id.*, Ex. 7 ("Raphael Report") 12-15).  It follows that evidence of the tests is "sufficient to raise an inference of intoxication" and thus admissible to show contributory negligence — and that is true even though Plaintiff's alleged BAC did not exceed the "legal limit" under Virginia law.  *Baker*, 229 Va. at 69-70; *see also, e.g.*, *Simon*, 220 Va. at 419-20 (allowing the prosecution to show criminal negligence by "introducing evidence that [the] defendant consumed alcohol shortly before the accident," even though the defendant had already been found "not guilty of driving under the influence of intoxicants" with respect to the same accident in a separate proceeding).[3]  In sharp contrast, the fact that Plaintiff's urine tested positive for clonazepam indicates nothing more than the fact that she had traces of the drug in her urine.  As New GM's own expert conceded, it provides no indication of "how much Clonazepam she had in her blood at the time of the incident, *if she had any*."  (Pl.'s Fourth Mem., Ex. H, at 137-38 (emphasis added)).  A blood test would have been required "to establish or be able to interpret degree of impairment."  (*Id.* at 138).  It follows that Plaintiff's urine test does not "raise an inference of intoxication" or impairment.  *Baker*, 229 Va. at 69-70.  Under

---

[3]      Citing Virginia Code, Section 18.2-266, Plaintiff states that her BAC was "below the legal limit" (Pl.'s Fourth Mem. 4 & n.1), and even contends that "the blood alcohol results legally demonstrate that Plaintiff was not intoxicated" (*id.* at 1).  As New GM points out, however, Virginia Code, Section 18.2-266, makes it "illegal to drive *either* with a blood alcohol concentration above 0.08 percent *or* 'while [the driver] is under the influence of alcohol.'"  (New GM's Fourth Opp'n 10 (quoting Va. Code § 18.2-266)).  Thus, the BAC "limit" to which Plaintiff refers (*i.e.*, a BAC of .08) is not necessarily "the level under which operating a vehicle is legal or safe," but rather "simply the [BAC] at which there arises an irrebuttable presumption of intoxication for a *criminal* defendant."  (*Id.* (emphasis added)).  The parties should meet and confer with respect to whether the Court should permit testimony concerning the "legal limit" at trial and to propose an instruction that the Court can give to the jury explaining the law in the event that it allows testimony on the issue.  The parties shall submit any proposed jury instruction no later than one week before the beginning of trial.

such circumstances, and in light of the Virginia case law discussed above, the clonazepam test results have limited or no probative value, and any probative value they do have is substantially outweighed by the danger of unfair prejudice and juror confusion.  *See* Fed. R. Evid. 403. Accordingly, New GM may admit Plaintiff's BAC test (and related expert testimony, consistent with the discussion below), but it may not offer any evidence or argument suggesting that Plaintiff was impaired by clonazepam at the time of her crash.[4]

### 2.  The Admissibility of Alcohol-Related Expert Testimony

Turning to the admissibility of the alcohol-related expert testimony, the Court begins with Plaintiff's challenges to New GM's toxicology expert, J. Rod McCutcheon, and New GM's biomechanics expert, Elizabeth Raphael.[5]  Both experts opine that Plaintiff was impaired by alcohol at the time of her crash.  McCutcheon reaches that conclusion by estimating Plaintiff's BAC at the time of the accident from her BAC forty-five minutes after the accident. McCutcheon, like Raphael, also relies on scientific literature discussing the degree of impairment at different BAC levels (as well as his own experience).  Objecting to these opinions, Plaintiff points to the lack of any witness testimony suggesting Plaintiff was drinking or impaired.  (Pl.'s Daubert Mem. 4-6, 13-14).  But expert opinions based on blood test results need not be separately corroborated by witness testimony in order to be admissible.  Tellingly, Plaintiff does

---

[4]      In a footnote, Plaintiff asks the Court, if it allows evidence of her BAC, to preclude New GM "from arguing or suggesting that Plaintiff went to a bar before the crash" on the ground that there is "no evidence that Plaintiff went to a bar nor is there any evidence that there is a bar in the town the crash occurred."  (Pl.'s Fourth Mem. 9 n.5).  The Court defers judgment on that issue to trial.

[5]      Following Plaintiff's objections, New GM withdrew its experts' opinions that drivers generally underestimate their own alcohol consumption, that the hospitals treating Cockram suspected alcohol use, and about the effects of "chronic" alcohol abuse.  (*See* New GM Daubert Opp'n 3 n.3).  Accordingly, the Court need not and does not address them here.

not question McCutcheon's estimation of Cockram's time-of-accident BAC or the scientific

literature discussing BAC's impairing effects.  Thus, any weaknesses in McCutcheon's and

Raphael's conclusions that Plaintiff was impaired — based on, among other things, the lack of

witness testimony to that effect or the experts' ignorance of her tolerance for alcohol — go to the

weight, not the admissibility, of their opinions.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence.").

Plaintiffs' other objections to Raphael and McCutcheon are without merit or unripe.

First, Plaintiff objects to Raphael's testimony on the basis of her qualifications.  (*See* Pl.'s

Daubert Mem. 11-12; Pl.'s Reply Mem. Law. Supp. Omnibus Mot. To Exclude Certain Expert

Ops. (Docket No. 2925) ("Pl.'s Daubert Reply") 9-10).  New GM responds that as "an

experienced emergency room physician," Raphael may offer opinions on "the physiological

effects of alcohol."  (Gen. Motors LLC's Mem. Law Opp'n Pl.'s Omnibus Mot. To Exclude

Certain Expert Ops. (Docket No. 2899) ("New GM's Daubert Opp'n") 7).  The Court agrees.

The opinions Raphael offers (*see* Raphael Report 12-15) do not require her to be a toxicologist,

especially because she is entitled to rely on McCutcheon's opinions.  Second, Plaintiff contends

that Raphael's testimony would be cumulative.  (*See* Pl.'s Daubert Mem. 12-13).  That may be

right, but the Court reserves judgment until trial, when it will be in a better position to evaluate

the issue.  Lastly, Plaintiff objects to McCutcheon's opinions regarding alcohol odor —

specifically, his opinions that "(1) the first responders were not able to detect the smell of alcohol

because Ms. Cockram's breath did not smell like alcohol; and (2) the inability to detect the smell

of alcohol is not proof that Ms. Cockram had not consumed alcohol."  (Pl.'s Daubert Reply 8).

In response, New GM makes clear that McCutcheon's opinion is limited to the latter.  (New

GM's Daubert Opp'n 6).  And, as before, Plaintiff does not question the reliability or relevance of the studies supporting that opinion.  To the extent those studies also support conclusions about varying detectability of different alcohol's odors, McCutcheon may discuss them.  Accordingly, Plaintiff's objections to New GM's alcohol-related expert testimony are largely denied, but, consistent with the foregoing, Plaintiff may raise or renew specific objections during trial.

That leaves New GM's objections to Plaintiff's toxicology expert, Dwain Fuller.  (*See* New GM's Daubert Mem. 6-16; Gen. Motors LLC's Reply Supp. Mot. Exclude Certain Expert Ops. (Docket No. 2924) ("New GM's Daubert Reply") 2-14).  Fuller offers several opinions to which New GM objects: (1) that the enzymatic test used to measure Plaintiff's BAC is less accurate than the gas chromatography method used in forensic laboratories and can result in false positives (*see* Pl.'s Mem. Law. Opp'n Gen. Motors LLC's Mot. Exclude Certain Expert Ops. (Docket No. 2895) ("Pl.'s Daubert Opp'n") 4-9); (2) that there are several possible explanations for such false positives, including elevated levels of lactic acid dehydrogenase ("LDH"), other (unidentified) interferences in a subject's blood, and — most relevant and disputed here — contamination from an alcohol swab (*see id.* at 10-11); and (3) that "it is more likely than not that [Plaintiff's] blood alcohol reading was the result of a false positive" (*id.* at 13).  Whether Fuller should be allowed to offer the first opinion (and thus testify at all) is a close question.  As New GM makes clear, the literature on the issue of false positives in enzymatic tests is not particularly robust.  (*See* New GM's Daubert Reply 10).  But Fuller does cite, and rely upon, two case reports, a study, and an article that provide some support for his opinions.  (*See* Docket No. 2896, Ex. 1 ("Fuller Report"); *id.*, Ex. 10 ("Fuller Decl.")).[6]  And New GM itself cites only one

---

[6]  New GM objects to Fuller's reliance on the study because it was offered in connection with an affidavit produced and filed with Plaintiff's opposition papers.  (New GM's Daubert Reply 2-4).  Although there is some merit to New GM's complaint that Fuller's supplemental

study — a study that Fuller and others have criticized (*see* Fuller Decl. ¶¶ 16-22) — that appears

to cut the other way.  (New GM's Daubert Mem. 10-11).  When push comes to shove, the fact

that there are reported instances of false positives, as Fuller makes clear there are, plainly

supports an inference that the enzymatic test is not infallible, and Plaintiff is entitled to share that

with the jury.  New GM's arguments to the contrary go to weight, not admissibility.  *See, e.g.*,

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to . . . lack of

textual authority for [an expert's] opinion[] go to the weight, not the admissibility, of his

testimony.").

   Whether Fuller can testify about the potential reasons for false positives is a more

complicated question.  There is plainly empirical support for the proposition that elevated LDH

can result in false positives (*see* Pl.'s Daubert Opp'n 5), but Fuller (and Plaintiff) concede that

that explanation does not apply to her.  (New GM's Daubert Mem. 7; *see* Pl.'s Daubert Opp'n).

There is also sufficient, if less, empirical support to support Fuller's opinion that false positives

can occur even without elevated LDH levels.  (Fuller Report 3-5; Fuller Decl. ¶¶ 4-15; *id.* at 14-

15 (attaching Nebile Daglioglu, *et al.*, *Determination of Blood Ethanol Levels: Comparison of

Enzymatic and Gas Chromatographic Methods*)).  Where Fuller goes too far, however, is in

---

affidavit and attachments are improper, the Court declines to strike them, as they merely amplify
and provide more support for the opinions that Fuller previously offered.  (*See also* Fuller Report
6 ("I reserve the right to amend, supplement or retract any and all of these opinions should I
receive further information.")).  In that regard, the situation here is a far cry from the main case
cited by New GM, in which an expert's affidavit, submitted in opposition to a Daubert motion,
was excluded in part because it contained wholly "new opinions, facts, and testing that were not
previously disclosed" and was "essentially a new expert report with new opinions."  *Palmer v.
Asarco Inc.*, No. 03-CV-0498 (CVE) (PJC), 2007 WL 2254343, at *3 (N.D. Okla. Aug. 3, 2007).
That said, the Court agrees that New GM should be allowed to re-depose Fuller with respect to
(that is, limited to) the supplemental affidavit and attachments and that McCutcheon should be
permitted to address and rebut any new opinions and materials.  The parties shall meet and
confer to schedule the deposition, which may not exceed one hour.

opining that false positives can result from alcohol-swab contamination, as he offers literally no

data to support that conclusion.  The sole authority he cites for his opinion is a single case report

describing a false positive test, in which the author cites "contamination of the specimen from

the use of ethanol as the antimicrobial/cleansing agent used prior to venipuncture" as a possible

source of "interference," but then *rules it out* as an explanation for the false positive.  Terry E.

Jones, *False-Positive Ethanol Blood Concentrations Leading to Clinical Confusion on Christmas

Day*, 44 Clinical Biochemistry 1355, 1357 (2011).  Thus, Fuller fails to cite a *single* reported

instance of a false positive linked to alcohol-swab contamination.  Moreover, the one study cited

by Fuller (by Daglioglu and others) actually tested for the "possible effects of antiseptic solution

on BAC and its relationship with false-positivity," and found that there were "no statistically

significant findings or differences" between alcoholic and non-alcoholic cleansing solutions.

(Fuller Decl. at 15).  *See also Jessup v. State*, No. 13-02-00024-CR, 2004 WL 2612958, at *3

(Tex. Ct. App. Nov. 10, 2004) (affirming a criminal conviction where the defendant's expert

admitted at trial that "[n]obody knows for sure what effect [an alcohol swab] has [on BAC]. . . .

*It's pure conjecture*." (emphasis added)).  In short, it cannot be said that Fuller's opinion

concerning alcohol-swab contamination "is based on sufficient facts or data."  Fed. R. Evid. 702.

Instead, it is pure speculation, and he is precluded from offering it at trial.[7]

---

[7]     Separate and apart from the absence of empirical support for Fuller's opinion, he lacks
any factual basis to proffer it in relation to Plaintiff's case, as he has no knowledge (either direct
or indirect) of what sterilization substance the hospital personnel used, if any; of whether and
how long the area was permitted to dry before the sample was drawn; or of how much blood was
drawn — all of which, he himself conceded, could affect the probability of alcohol-swab
contamination.  (New GM's Daubert Mem., Ex. 4, at 73-74, 107-108, 126).  *See Daubert*, 509
U.S. at 591 (noting that the consideration of whether expert testimony helps "the trier of fact to
understand the evidence or to determine a fact in issue . . . has been aptly described . . . as one of
fit") (internal citations and quotation marks omitted); *In re Fosamax Prods. Liab. Litig.*, 645
F.Supp.2d 164, 173 (S.D.N.Y. 2009) (noting that for expert testimony to be admissible, it must

Fuller goes even further across the inadmissibility line in proffering that "it is *more likely than not* that [Plaintiff's] blood alcohol reading was the result of a false positive." (Pl.'s Daubert Opp'n 13 (emphasis added)). There are two premises for that conclusion (which are, in truth, conclusions of one sort or another in themselves): first, that the enzymatic ethanol assay used to test Plaintiff's BAC "is forensically unreliable" and, second, that "no evidence other than the enzymatic ethanol assay suggests that Ms. Cockram ingested alcohol in the hours before her accident." (*Id.*). Whether or not the empirical evidence upon which Fuller relies fully supports the first premise, it is, as discussed above, the proper subject of expert testimony. But the second premise plainly is not, as it turns on an evaluation of the credibility of Plaintiff and other witnesses at trial, which is the province of the jury, not expert testimony. *See, e.g.*, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("We have . . . disapproved of the practice of expert witnesses basing their conclusions on the in-court testimony of fact witnesses, out of concern that such expert testimony may improperly bolster the account given by the fact witnesses."); *U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*, No. 06 CIV. 2860 (DLC), 2009 WL 1110577, at *2 (S.D.N.Y. Apr. 22, 2009) ("An expert may not intrude on the jury's role in assessing credibility. It is appropriate, therefore, to exclude expert testimony offered to bolster the credibility of fact witnesses." (citation omitted)).

In sum, the Court finds that the clonazepam-related evidence (expert and non-expert) is inadmissible altogether, but that Plaintiff's BAC test results and some, but not all, of the related expert testimony may be admitted at trial. More specifically, Plaintiff's objections to New GM's experts are rejected as meritless or unripe, and while Fuller may testify that the enzymatic

---

be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").

method for testing BAC is less reliable than the gas chromatography method and can result in false positives (even without elevated LDH levels), he may not — unless New GM somehow opens the door — testify that alcohol-swab contamination is a reason for false positives, and certainly may not opine that Plaintiff's BAC reading was likely the result of a false positive.

## B.  New GM's Other *Daubert* Arguments

The Court turns, then, to the parties' other *Daubert* arguments, beginning with New GM's.  Notably, many of New GM's arguments need not be discussed because they are not disputed.[8]  New GM seeks to exclude Stephen Irwin's and Chris Caruso's opinions regarding "loss of control" and Caruso's opinions regarding "specific injury causation," but Plaintiff makes clear in her response that she will not offer any of that testimony.  (*See* Pl.'s Daubert Opp'n 17-19; New GM's Daubert Reply 16-18).  The same is true of the opinions of Robert Cox and David Macpherson with respect to Plaintiff's lost earnings capacity.  (*See* Pl.'s Daubert Opp'n 23).  Lastly, New GM challenges the opinions of Caruso, Steven Loudon, and Glen Stevick that go to New GM's knowledge or state of mind and the knowledge and expectations of ordinary customers.  (New GM's Daubert Mem. 21-25).  Plaintiff concedes only the latter (Pl.'s Daubert Opp'n 22 n.8), but the Court has already made clear its agreement with New GM on the former.  *See Scheuer Daubert Op.*, 2015 WL 9480448, at *5; *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1087 (C.D. Cal. 2013).  That said, the issue affects only a few stray sentences in the experts'

---

[8]     This is not the first time that a party has briefed a *Daubert* argument unnecessarily in this litigation.  *See Scheuer Daubert Op.*, 2015 WL 9480448, at *4-5, *8).  Similarly, the parties have filed motions *in limine* that proved to be moot or unopposed.  (*See, e.g.*, Docket No. 3087).  Given the nature and scope of this litigation, it would be far better — for the parties and the Court — to limit briefing to matters that are actually in dispute.  Accordingly, for future trials, the Court expects that the parties will meet and confer before filing pretrial motions in an effort to narrow or eliminate the need for motion practice.

reports, so the Court will enforce its ruling through particular objections at trial, as it did in *Scheuer*. That is, "to the extent New GM believes that [these experts'] testimony at trial strays into" objectionable realms, "it can raise objections to specific questions and testimony." *Scheuer Daubert Op.*, 2015 WL 9480448, at *5.

That leaves New GM's objections to certain opinions of Caruso and Loudon. The Court will address each in turn.

### 1. Chris Caruso's Delta-V Opinion

New GM seeks to preclude Caruso from testifying that the airbag in Plaintiff's vehicle should have deployed because, it contends, he based that opinion "solely on his review of post-accident vehicle pictures." (New GM's Daubert Mem. 17).[9] To the extent that Caruso's opinion is based on "eyeballing" photographs of Plaintiff's car, New GM's argument is not without force. *See, e.g.*, *Reali v. Mazda Motor of Am., Inc.*, 106 F. Supp. 2d 75, 77-78 (D. Me. 2000) (finding an estimated delta-v unreliable where the expert "derived the 12 m.p.h. figure in large part from eyeballing accident photographs"); *see also, e.g.*, *Niemeyer v. Ford Motor Co.*, No. 2:09-CV-2091 (JCM) (PAL), 2012 WL 3277273, at *4 (D. Nev. Aug. 9, 2012) (excluding Caruso's testimony that an 11 or 12 mph impact could trigger airbag deployment despite its threshold of 14.7 mph where he relied "solely on his experience in supporting his estimate" but allowing Caruso nonetheless to testify "to his experience regarding airbag sensors and explain the general princip[le]s regarding direct collisions and offset pole impact collisions"). But the practical import of New GM's argument is limited, as Caruso is not Plaintiff's accident

---

[9] New GM does not object to Caruso's testimony concerning the "must fire" threshold for the airbag in Plaintiff's car, and for good reason. As Plaintiff notes, "Caruso is intimately familiar with the subject Cobalt's [Sensing Diagnostic Module ("SDM")] and airbag functionality after working with GM for 27 years and after designing the crash sensing algorithm for the SDM module." (Pl.'s Daubert Opp'n 14).

reconstruction expert on delta-v issues, a point New GM itself tacitly acknowledges.  (New GM's Daubert Mem. 17 n.12).  Stephen Irwin is, and he has concluded (and will presumably testify) that the delta-v in Plaintiff's accident was 16-18 miles per hour.  (*Id.*, Ex. 9, at 263). Thus, while Caruso may not offer his own opinion that the delta-v was 20-25 mph, he may rely on Irwin's estimate — unchallenged by New GM here — when offering an opinion as to whether the airbags should have deployed.  (Docket No. 2896, Ex. 13, at 121 (Caruso answering "correct" to New GM's question about whether he "always defer[s] the final opinion on the principal direction of force, time duration and delta-V to the accident reconstructionist"); New GM's Daubert Mem., Ex. 5 19 (reserving "the right to . . . modify observations and opinions based upon the review of the opinions of other experts")).  *Cf. Scheuer Daubert Op.*, 2015 WL 9480448, at *2 (rejecting New GM's challenge to Scheuer's accident reconstruction expert based on his lack of expertise over airbag issues, noting that "Caruso, not McCort, is Plaintiff's expert on airbag deployment . . . . and McCort was entitled to consider [Caruso's] opinion").

### 2. Steven Loudon's Opinions Regarding ESC and ABS

Finally, New GM challenges the opinions of Loudon regarding electronic stability control ("ESC") and anti-lock braking ("ABS").  (New GM's Daubert Mem. 20-22).  New GM contends that Loudon opines these are separate defects (*id.*), but Plaintiff rightly responds that Loudon merely states that "ESC and ABS are critical safety systems that are rendered inoperable by the inadvertent turning of the ignition switch" as part of his conclusion that the ignition switch is "arguably the most important safety feature."  (Plaintiff's Daubert Opp'n 20).  Whether or not Plaintiff's particular car had ABS, the importance of the ignition switch to the safety of the vehicles GM was engineering is surely relevant to this case.  As Plaintiff notes, "the safety-critical nature of each system that was disabled by the ignition switch is . . . relevant to New

GM's" negligence and knowledge "at the time of Ms. Cockram's crash" — a crash that occurred
before the spring of 2012, the earliest New GM has admitted to being on notice of the ignition
switch defect.  (Pl.'s Daubert Opp'n 22).  New GM is free to clarify (by eliciting testimony or by
proposing appropriate limiting instructions) that Plaintiff's car did not even have ABS and that
Plaintiff is not alleging that the absence of ESC or the absence of ABS are separate defects
independent of the ignition switch defect.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-
examination, presentation of contrary evidence, and careful instruction on the burden of proof
are the traditional and appropriate means of attacking shaky but admissible evidence.").  But
there is no reason to categorically exclude Loudon from providing some (albeit limited)
testimony concerning the connections between the ignition switch and both ESC and ABS.

## C.  Plaintiff's Other *Daubert* Arguments

Plaintiff's remaining *Daubert* arguments concern a videotape offered in connection with
the testimony of Donald Tandy and the testimony of Robert Rucoba.  The Court will address
each in turn.

### 1. Donald Tandy

Tandy created videotapes of drivers on a test track to illustrate certain principles
allegedly applicable in this case; these videos were admitted without objection in the *Barthelemy*
trial, and Plaintiff does not seek to exclude them here.  (Pl.'s Daubert Mem. 15-16).  One video,
however, is specific to Cockram's crash: It shows a driver successfully steering around a curve
with the same radius as the curve that Cockram's car followed into its crash.  (*See* New GM's
Daubert Opp'n, Ex. 16).  Plaintiff seeks to exclude that one video on the ground that it is
effectively a recreation and not substantially similar enough to her crash.  Courts have long
"recognized the unique problems presented by the introduction of videotapes purporting to

recreate events at the focus of a trial." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 425 (4th Cir.

1996); *see also Altman v. Bobcat Co.*, 349 F. App'x 758, 763 (3d Cir. 2009) ("[D]epictions that

appear to 'recreate' an accident are significantly more likely to confuse the jury than depictions

which merely illustrate principles forming an expert's opinion.") (internal quotation marks

omitted).  In response, "courts have created a doctrine, predating and now loosely appended to

Rule 403, that requires a foundational showing of substantial similarity" before a party may

introduce an apparent recreation.  *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993);

*see also* 1 McCormick On Evid. § 202 (7th ed. 2016) ("The burden of showing substantial

similarity is on the proponent.").  In considering the threshold question — whether a video is a

so-called recreation or merely an illustration of generic scientific principles — the critical issue

is "not one of labels" but rather "whether the demonstration is sufficiently close in appearance to

the original accident to create the risk of misunderstanding by the jury."  *Fusco*, 11 F.3d at 264;

*accord McKnight By & Through Ludwig v. Johnson Controls, Inc.*, 36 F.3d 1396, 1402 (8th Cir.

1994).

Applying those principles here, the Court concludes that Tandy's video falls on the

recreation side of the line and should not be presented to the jury.  In the video, there are several

introductory stills (similar to PowerPoint slides), the second of which reads: "Steering

Demonstration on an 890ft Radius Turn (Steve Irwin's Crash Path)" — that is, Cockram's "crash

path," as reconstructed by Steve Irwin, Plaintiff's accident reconstruction expert.  (New GM's

Daubert Opp'n, Ex. 16).  The next slide makes clear that the demonstration vehicle is a 2006

Chevrolet Cobalt, the same as Plaintiff's.  (*Id.*).  The slide after that is titled "Irwin's Accident

Scene Diagram" and, on a bird's eye view of a map of the accident site, superimposes the curve

Plaintiff's car traveled that led to the crash.  (*Id.*).  The final introductory slide states "Driving

890ft Radius Turn at 35mph" — and the screen then cuts to a few videos of the test track where a professional driver safely guides the Cobalt around the relatively moderate turn, once with the engine on and once with the engine off.  (*Id.*).  In short, the video effectively presents itself as a recreation of Cockram's accident, and there is plainly a risk that it would be so received by the jury.  *See Fusco*, 11 F.3d at 264.  Although New GM points to Tandy's deposition testimony that his test was "'not recreating any specific event'" (New GM's Daubert Opp'n 12-13), his *ipse dixit* is not controlling and, more importantly, belied by the video's contents.  *See, e.g.*, *Fusco*, 11 F.3d at 264 ("[T]he critical point is not one of labels.").  New GM attempts to argue that the accident and the video are substantially similar enough for the latter to be introduced even if it does qualify as a recreation.  (*See* New GM's Daubert Opp'n 15 n.11).  But that argument — which is relegated to a footnote — is meritless given, among other things, that "the test occurred in controlled conditions, on a test track with a driver expecting the occurrence."  *Fusco*, 11 F.3d at 264; *see Swaijian v. Gen. Motors Corp.*, 916 F.2d 31, 36 (1st Cir. 1990) ("[T]he videotapes depicted an experienced test driver performing all the driving, and the driver knew what to expect.  Moreover, the videotaped tests took place at controlled facilities, and the tests involved axles that had been rigged to fracture."); *Green v. Ford Motor Co.*, No. CIV 3:00CV00049, 2001 WL 1593232 at *5 (W.D. Va. Dec. 10, 2001) (excluding a testing video that replicated only certain conditions similar to the accident rather than recreating the entire accident sequence).  Accordingly, Plaintiff's motion is granted with respect to the Tandy video.

### 2. Robert Rucoba

Lastly, Plaintiff objects to the opinions of Rucoba on the ground that they relate exclusively to the *Yingling* case, which, prior to its settlement, was to be the third bellwether trial.  (Pl.'s Daubert Mem. 16-18; Pl.'s Daubert Reply 14).  Notably, at the *Scheuer* trial, New

GM objected to a portion of the testimony of Mark Hood, an expert called by the plaintiff, insofar as it related exclusively to the *Yingling* case.  (*See* January 15, 2016 Trial Tr. 641-43).  In light of the fact that the plaintiff had not noticed the Yingling crash as an "other similar incident" ("OSI") he would prove at trial, the Court precluded Hood from testifying about the *Yingling* case.  (*Id.* at 643).  New GM cannot have it both ways.  Just as Hood was precluded from testifying about the *Yingling* case in *Scheuer*, Rucoba may not testify about the *Yingling* case in *Cockram*.  New GM contends that the Court's ruling in *Scheuer* was based on the fact that the plaintiff had not noticed *Yingling* as OSI evidence.  That is true, but besides the point, as *Yingling* is not on Plaintiff's OSI notice in this case either.  (*See* Docket No. 2855, Ex. 1).  Thus, testimony about *Yingling* is as irrelevant here as it was in *Scheuer*.  New GM also asserts that Rucoba's report is "non-case-specific" (New GM's Daubert Opp'n 16), but that assertion is belied by his report.  Rucoba's report is titled "Re: Yingling v. General Motors Co." and relates almost exclusively to matters particular to that case.  (Docket No. 2859, Ex. 14).  Rucoba's summary of the facts relates exclusively to the Yingling crash; the list of materials that he "Received/Reviewed" is limited exclusively to the Yingling crash (and expert reports and depositions); and his "opinions and conclusions" are specific to the *Yingling* case.  (*Id.* at 1, 51, 53-54).  In its opposition, New GM points to a few pages of the report that discuss the test track simulations performed by Rucoba and Tandy (one of which was discussed above).  (New GM's Daubert Opp'n 15).  But those tests related to a 2006 Saturn Ion, the car that Yingling was driving — and not to a 2006 Chevy Cobalt, the car that Cockram was driving.  Thus, they were

plainly relevant to *Yingling*, but they are not plainly relevant here.  Accordingly, Plaintiff's

motion is granted with respect to Rucoba.

## CONCLUSION

For the reasons given above, the parties' *Daubert* motions and Plaintiff's fourth motion *in limine* are all granted in part and denied in part.  Specifically:

- New GM may not offer any evidence or argument suggesting that Plaintiff was impaired by clonazepam at the time of her crash;

- New GM may admit Plaintiff's BAC test and its experts' related testimony, subject to Plaintiff's specific objections during trial;

- Plaintiff may call Fuller as a toxicology expert to opine on the reliability of enzymatic assay testing and the possibilities of false positives, but Fuller may not testify that false positives can result from alcohol-swab contamination or that it is more likely than not that Plaintiff's blood alcohol reading was the result of a false positive;

- New GM may raise specific objections at trial to any testimony from Plaintiff's experts (namely, Caruso, Loudon, or Stevick) regarding New GM's knowledge or state of mind and the knowledge and expectations of ordinary customers;

- Caruso may rely on Irwin's delta-v estimate and opine as to whether, given that estimate, Plaintiff's airbags should have deployed;

- Loudon may testify, within reasonable limits, concerning the connections between the ignition switch and both ESC and ABS;

- Tandy's video recreation is inadmissible; and

- Rucoba, New GM's *Yingling* expert, may not testify in this case.

The Clerk of Court is directed to terminate 14-MD-2543, Docket Nos. 2967, 2857, 2852, and 14-CV-8176, Docket Nos. 386, 430.


SO ORDERED.

Date:  August 1, 2016
       New York, New York

_____
JESSE M. FURMAN
United States District Judge